## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

**MOTION OF THE DEBTOR FOR ENTRY OF (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (C) AUTHORIZING
THE DEBTOR TO ENTER INTO THE STALKING HORSE AGREEMENT,
(D) AUTHORIZING PAYMENT OF THE STALKING HORSE PAYMENT AS AN
ADMINISTRATIVE EXPENSE, (E) SCHEDULING AN AUCTION AND SALE
HEARING, (F) APPROVING PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, AND (E) GRANTING RELATED RELIEF; AND
(II) AN ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN
THE DEBTOR AND THE SUCCESSFUL BIDDER, (B) AUTHORIZING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (D) GRANTING
RELATED RELIEF**

The debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>") hereby

moves (the "<u>Motion</u>"), pursuant to sections 105(a), 363, 364, 365, and 503 of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), and Rules 2002, 6004, 6006, 9006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of (i) an order

approving the bid procedures, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bid</u>

<u>Procedures Order</u>"), including (a) approving the proposed auction and bid procedures, attached as

Exhibit 1 thereto (the "<u>Bid Procedures</u>") for the proposed sale of substantially all the Debtor's

assets (the "<u>Sale</u>"), (b) authorizing the Debtor to enter into the Stalking Horse Agreement (as

defined below), (c) authorizing payment of the Stalking Horse Payment as an administrative

---

[1]  The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431

expense, (d) scheduling an auction ("Auction") if the Debtor receives two or more Qualified Bids (as defined below), (e) scheduling a hearing to consider approval of the Sale (the "Sale Hearing"), (f) approving the form and manner of notice thereof, and (g) establishing procedures (the "Assumption Procedures") for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts"), including notice of proposed cure amounts; and, (ii) entry of an order approving the sale of substantially all of the Debtor's assets (the "Sale Order"), including (w) approving the transaction documents between the Debtor and the Successful Bidder (as defined below), (x) authorizing the Sale to the Successful Bidder (after the Auction, if necessary) free and clear of liens, claims, interests and encumbrances, (y) authorizing the assumption and assignment of the Contracts, and (z) granting related relief. In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Toby Shea, Chief Restructuring Officer, in Support of the Debtor's First Day Pleadings* filed with the Court concurrently herewith (the "First Day Declaration"). In further support of the Motion, the Debtor, by and through its undersigned counsel, respectfully states as follows:

## **Jurisdiction and Venue**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this case is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 364, 365, and 503, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, and Local Rule 6004-1.

## BACKGROUND

**A.     General Background**

3.     On August 30, 2021 (the "Petition Date"), the Debtor filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

4.     The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.     No trustee, examiner or committee has been appointed in this Chapter 11 Case.

6.     The factual background regarding the Debtor, including its business operations, its capital and debt structures, and the events leading to the filing of this Chapter 11 Case, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

**B.     The Debtor's Assets**

7.     The Debtor owns and operates a licensed continuing care retirement facility with 222 units, comprised of 141 independent living units, 43 assisted living units, 18 memory care units, and 20 licensed but not yet opened long term nursing care units (the "Facility") located on or about 95 Wyman Road, Keene, New Hampshire, comprising approximately 66 acres (the "Premises").

8.     The Debtor's primary assets include the Facility, the Premises, and the assets used in Debtor's operation of the Facility (the "Assets").

9.     The Debtor has, subject to this Court's approval, retained Grandbridge Real Estate Capital LLC ("Grandbridge") to conduct a marketing and sale process for substantially all of the Debtor's assets.

## **RELIEF REQUESTED**

10.     By this Motion, the Debtor seeks entry of the Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**:

      (a)     authorizing and approving the Bid Procedures, in substantially the form attached to the Bid Procedures Order as **Exhibit 1**, in connection with the Sale of substantially all of the Debtor's Assets;

      (b)     approving the form and manner of notice, in substantially the form attached to the Bid Procedures Order as **Exhibit 2** (the "Sale Notice"), of the Auction and Sale Hearing for the Sale;

      (c)     authorizing the Debtor to enter into that certain Asset Purchase Agreement with Covenant Living Communities (the "Stalking Horse"), a copy of which is attached hereto as **Exhibit B** (the "Stalking Horse Agreement"), pursuant to which the Stalking Horse seeks to purchase the Assets (as defined in the Stalking Horse Agreement) from the Debtor as set forth therein;

      (d)     authorizing payment of the Stalking Horse Payment as an administrative expense;

      (e)     scheduling the Auction and Sale Hearing;

      (f)     approving the Assumption Procedures for the Contracts in connection with the Sale; and

      (g)     granting related relief.

11.     Furthermore, the Debtor will seek entry of the Sale Order at the Sale Hearing:

      (a)     authorizing and approving the Sale of all or substantially all of the Assets to the Successful Bidder (as defined in the Bid Procedures) on the terms set forth in the Successful Bid;

      (b)     authorizing and approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests, all in accordance with the Successful Bid;

      (c)     authorizing the assumption and assignment of the Contracts identified by the Successful Bidder; and

      (d)     granting any related relief.

12.     The Debtor reserves the right to file and serve any supplemental pleading or declaration that the Debtor deems appropriate or necessary in its reasonable business judgment,

including any pleading summarizing the competitive bid and sale process and the results thereof, in support of its request for entry of the Sale Order before the Sale Hearing.

**Prepetition Marketing and Sale Process**

13.     Prior to the Petition Date, the Debtor engaged Grandbridge as its broker to conduct a prepetition marketing process for substantially all of the Debtor's assets. As a result of the prepetition marketing process, the Debtor has identified a number of potential purchasers for the Debtor's Assets. The Debtor executed NDAs with 63 potential purchasers, of which, approximately 92% accessed the offering materials via the electronic data room. Grandbridge's marketing efforts included regular follow-up with all potential purchasers, posting of new information to the data room, and utilizing an Excel cash flow model to gauge buyer interest. As a result of these marketing efforts, the Debtor received eight term sheets from potential purchasers during the first round of bidding. After reviewing the first round term sheets, the Debtor selected several first round bidders to participate in the second round process (one potential purchaser did not participate in the second round due to its terms being by far the lowest first round offer received).  One additional potential purchaser submitted a late bid and was invited to the second round.  Each of the second round bidders was invited to a formal property tour and was provided additional time and data to further evaluate the potential acquisition. Seven of the eight second round participants elected to tour the property.

14.     As a result of the second round process, the Debtor received updated term sheets from second round bidders. These term sheets were evaluated based upon purchase price, contingencies, financial capability, and other terms. After reviewing the updated term sheets, a few potential buyers were deemed to be the top bidders and were invited to a buyer interview call facilitated by Grandbridge. After the buyer interview calls were finalized, Covenant Living

Communities was selected as the Stalking Horse, subject to negotiation of an Asset Purchase Agreement and completion of Due Diligence.

15. On June 24, 2021, the Debtor entered into a Letter of Intent with the Stalking Horse. On August 17, 2021, the Debtor and the Stalking Horse executed the Stalking Horse Agreement. On August 23, 2021, the Diligence Period (as defined in the Stalking Horse Agreement) expired and the Deposit (as defined in the Stalking Horse Agreement) became non-refundable, except as provided for in the Stalking Horse Agreement.

16. To maximize the value of the Assets, the Debtor proposes to commence a postpetition sales process for the Assets. As part of the proposed postpetition sale process, the Debtor and its other professionals will continue to engage in the robust marketing effort for the Debtor's Assets, which started well before the Petition Date, by continuing to contact both financial and strategic investors regarding a potential sale, including all parties contacted prior to the commencement of the Chapter 11 Case. All interested parties have been or, upon entry of the Bid Procedures Order, will be given an additional opportunity to execute a confidentiality agreement (a "Confidentiality Agreement") and be given access to the data room maintained by Grandbridge. Those parties that execute a Confidentiality Agreement will be provided with substantial due diligence information concerning, and access to, the Debtor, including, without limitation, presentations by the Debtor and its advisors, and access to financial, operational, and other detailed information.

**Stalking Horse Agreement**

17.     The key terms of the proposed Stalking Horse transaction can be found in the Stalking Horse Agreement attached hereto as **Exhibit B**. The material terms of the Stalking Horse Agreement are as follows:

| MATERIAL TERMS OF STALKING HORSE AGREEMENT[2] | |
|---|---|
| **Purchase Price** | The Purchase Price payable under the Stalking Horse Agreement for the Assets is Thirty-Three Million and NO/00 Dollars ($33,000,000.00) (the "Purchase Price") as adjusted in accordance with this Section 2.5 of the Stalking Horse Agreement.<br><br>*See* Stalking Horse Agreement at § 2.5. |
| **Assets** | Upon the terms and subject to the conditions contained in the Stalking Horse Agreement, at the Closing (as defined in Section 2.6), the Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller pursuant to Bankruptcy Code sections 363 and 365, free and clear of all Liens except Permitted Liens, all of Seller's right, title and interest in and to all of the following to the extent owned by the Seller and used in the Business, but excluding the Excluded Assets (as defined in Section 2.2) (collectively, the "Purchased Assets"):<br><br>    i.   The Facility, the Premises, and the improvements thereon;<br><br>    ii.   the Books and Records, Resident medical records, and Transferred Employee records;<br><br>    iii.   the Assumed Contracts (including for Resident Agreements, any rights of Seller in the Entrance Fee and Option Deposits);<br><br>    iv.   the Equipment;<br><br>    v.   the Inventory; |

---

[2] All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement. To the extent there are any discrepancies between the Stalking Horse Agreement and this summary, the terms of the Stalking Horse Agreement shall prevail.

| | |
|---|---|
| | vi.  to the extent transferable under applicable law, the Permits; |
| | vii.  all intellectual property, including any trademarks, trade secrets, and the like; |
| | **viii.**  general intangibles, and community specific intellectual property, including domain name www.hillsidevillagekeene.org, as well as the names "The Prospect-Woodward Home" and "Hillside Village Keene" and related logos and marketing materials; and |
| | ix.  because the Buyer is a non-profit, such funds being transferable, and the restrictions on the use of any such funds (such funds and restrictions as described in Schedule 2.1(j)), all of Seller's rights in any endowment or donor-restricted funds held by Seller (collectively, the "<u>Endowment</u>"). |
| | *See* Stalking Horse Agreement at § 2.1. |
| **Assumed Liabilities** | Upon the terms and subject to the conditions contained in the Stalking Horse Agreement, at the Closing, Buyer shall assume or otherwise be responsible for, which amounts shall be in addition to the Purchase Price, for (collectively, the "<u>Assumed Liabilities</u>"): |
| | i.  all Entrance Fee Obligations and obligations under Residency Agreements and Option Agreements; |
| | ii.  all liabilities and obligations under the Purchased Assets accruing or arising after the Closing; |
| | iii.  all liabilities and obligations associated with the Assumed Contracts from and after Closing and all Cure Amounts associated with such Assumed Contracts; and |
| | iv.  all liabilities required to be paid by Buyer pursuant to the Stalking Horse Agreement (such as, without limitation, any recording fee, one-half of the real property transfer Taxes, and to the extent the Endowment is transferred to Buyer, any obligations with regard to the use after the Effective Time of the Endowment in accordance with law). |
| | Seller shall have no liability for any such liabilities or obligations. |
| | *See* Stalking Horse Agreement at § 2.3. |

| | |
|---|---|
| **Real Property Included** | 95 Wyman Road, Keene, New Hampshire |
| **Releases** | The Sale Order provides certain claims against the Debtor and/or the Purchaser are barred or otherwise waived. *See* Sale Order, ¶ 20, 22, 24, and 25. |
| **Closing and Other Deadlines** | The closing of the transactions contemplated by the Stalking Horse Agreement (the "Closing") shall take place at the offices of Hinckley Allen, 650 Elm Street, Manchester, New Hampshire, within seven (7) days after satisfaction or waiver of the conditions to Closing set out in Article 6 of the Stalking Horse Agreement (the "Closing Date"), and in no event later than March 31, 2022 (the "Outside Closing Date") (unless otherwise mutually agreed by the Parties, including with regard to a remote closing). The Closing shall be effective as of 11:59 p.m. Eastern Time on the Closing Date or such other date and time as the parties may agree in writing (the "Effective Time"). <br><br>*See* Stalking Horse Agreement at § 2.6. |
| **Good Faith Deposit** | One Million Dollars and NO/00 ($1,000,000.00) was paid as an earnest money deposit (the "Deposit") to Connecticut Attorneys Title Insurance Company ("Escrow Agent") at the time of execution of the Stalking Horse Agreement, which is being held by Escrow Agent in accordance with the terms and conditions of the Stalking Horse Agreement and the Escrow Agreement. The Deposit will be credited against the Purchase Price at Closing, and will otherwise be disbursed as provided in the Stalking Horse Agreement, the Escrow Agreement and the Sale Order. Any interest on the Deposit shall follow the Deposit. <br><br>*See* Stalking Horse Agreement at § 2.5(b). |
| **Record Retention** | Following the Closing of the Sale, the Debtor shall have, and the Purchaser shall provide, reasonable access to their books and records, to the extent they are included in the Assets transferred to the Purchaser as part of the Sale as set forth in the Agreement. <br><br>*See* Proposed Sale Order at ¶ 29. |
| **Sale of Avoidance Actions** | Avoidance Actions are not being sold, assigned transferred, or conveyed to Purchaser, *provided, however*, that during the Chapter 11 Case, Seller shall not commence, assign, convey or abandon any Avoidance Actions against any of Seller's ordinary course vendors, contract counterparties, contractors and other suppliers of services related to the Business who are doing business with Purchaser following the Closing, without the prior written consent of Buyer. |

| | |
|---|---|
| | *See* Stalking Horse Agreement §§ 2.2(d) and 5.9(j). |
| **Credit Bid** | The Bond Trustee shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit. The Bond Trustee may participate in the Auction and may credit bid up to the conclusion of the Auction, in its sole and absolute discretion, any portion and up to the entire amount of the Bond Trustee's claims at any time on all the Assets constituting its collateral; provided, however, the Bond Trustee must bid in cash at least the amount of the Stalking Horse Payment, which amount must be payable in cash at the Closing (the "Credit Bid"). Upon exercise of a Credit Bid, the Bond Trustee shall not be required to take title to or ownership of, or have any obligation in connection with, or be deemed to have taken title to or ownership of, or have any obligation in connection with, any Assets, and the Bond Trustee shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the Assets that are subject to the Credit Bid. The Bond Trustee will not be a Backup Bidder unless the Bond Trustee consents in writing otherwise. If the Bond Trustee elects to exercise its right to Credit Bid, such bid shall provide that the Stalking Horse Payment must be paid in cash.<br><br>Subject to the prior paragraph, the Stalking Horse shall have the right (including as part of any Overbid) to credit bid all or a portion of its Stalking Horse Payment (if any) pursuant to Bankruptcy Code section 363(k).<br><br>*See* Bid Procedures Order at ¶¶ 5, 6. |

18.     The Assets shall be sold free and clear of any liens, security interests, claims, charges, offsets and recoupments, or encumbrances pursuant to Bankruptcy Code section 363 and any such liens, security interests, claims, charges, offsets and recoupments, or encumbrances shall attach to the amounts payable to the Debtor's estate resulting from the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

19.     The Stalking Horse Agreement was negotiated in good faith and at arm's length, and the Debtor believes the terms of the proposed transaction are fair and reasonable under all the circumstances. In addition, the Debtor believes that the proposed postpetition marketing process

described herein will provide sufficient time and opportunity for any other interested party to submit a higher or otherwise better offer for the Assets.

**The Proposed Sale**

20.     The Debtor believes a prompt sale of the Assets represents the best option available for all stakeholders in the Chapter 11 Case. Moreover, it is critical for the Debtor to execute on any sale transaction as expeditiously as possible to maximize value for the Debtor's estate.

21.     By this Motion, the Debtor requests that the Court approve the following general timeline:

(a)     ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on October 15, 2021.

(b)     ***Sale Objection Deadline***: Objections to the Sale will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on October 29, 2021.

(c)     ***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than October 29, 2021 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**").

(d)     ***Auction***: The Auction, if necessary, will be held at November 3, 2021 at 10:00 a.m. (prevailing Eastern Time), at Hinckley, Allen & Snyder LLP, 28 State Street, Boston, Massachusetts 02109 or such other location as identified by the Debtor after notice to all Qualified Bidders.

(e)     ***Sale Hearing***: Subject to the Court's availability and schedule, the Sale Hearing will commence on or before November 8, 2021.

22.     The Debtor believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing its estate. Given the Debtor's extensive prepetition marketing efforts, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets. To further ensure that the Debtor's proposed Auction and Sale process maximizes value for the benefit of the Debtor's estate,

the Debtor and its professionals will use the time following entry of the Bid Procedures Order to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. The Debtor believes the relief requested by this Motion is in the best interests of its creditors, other stakeholders, and all other parties in interest, and should be approved.

**The Bid Procedures Order**

**I.      The Bid Procedures**

23.      To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order. The Bid Procedures were designed to permit an expedited sale process, to promote participation and active bidding, and to ensure that the Debtor receives the highest or otherwise best offer for the Assets. The Debtor believes that the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of its estate and all parties in interest.

24.      The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bid process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining Qualified Bids, and the criteria for selecting a Successful Bidder.

25.      The following summary describes the salient points of the Bid Procedures:[3]

(a)      **Qualification of Bidders.** To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtor to satisfy each of the following conditions:

      **(i)**      <u>Corporate Authority</u>. Written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the Sale; *provided, however*, that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Bidder must furnish written

---

[3] This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures.

evidence reasonably acceptable to the Debtor, in consultation with the Consultation Parties, of the approval of the Sale by the equity holder(s) of such Bidder.

**(ii)** <u>Proof of Financial Ability to Perform</u>. Written evidence that the Debtor reasonably concludes, in consultation with the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Sale and provide adequate assurance of future performance under all Assigned Contracts. Such information should include, *inter alia*, the following:

- contact names, email addresses and telephone numbers for verification of financing sources;

- evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction;

- the Bidder's current financial statements; and

- any such other form, financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the transaction; *provided, however*, that the Debtor shall determine, in its reasonable discretion, in consultation with the Debtor's advisors and the Consultation Parties, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(b) **Qualified Bids.** Each Bid must be determined by the Debtor, in consultation with the Consultation Parties, to satisfy each of the following conditions:

**(i)** <u>Good Faith Deposit</u>. Each Bid must be accompanied by a deposit in the amount of One Million Dollars and NO/00 ($1,000,000.00) to an interest bearing escrow account to be identified and established by the Debtor (the "<u>Good Faith Deposit</u>").

**(ii)** <u>Terms</u>. A Bid must have a Purchase Price of at least $34,010,000. A Bid must include an executed asset purchase agreement similar in form and substance to the Stalking Horse Agreement, as modified by the Bidder, pursuant to which the Bidder proposes to effectuate the contemplated transaction and a black-lined company of the asset purchase agreement marked to show all changes requested by the Bidder, including any changes to exhibits or schedules (the "<u>Transaction Documents</u>"). A Bid should propose a transaction involving substantially all, or a portion of, the Debtor's Assets or operations. The Debtor shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtor's estate as a whole. The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtor that the Bidder wishes to have

assumed and assigned to it pursuant to the Sale (collectively, the "Assigned Contracts"). The Debtor will consider proposals for less than substantially all of the Debtor's Assets or operations. A Bid to purchase only certain Assets of the Debtor shall propose a purchase price determined by such Bidder but shall be reviewed by the Debtor to determine if it is acceptable in consultation with the Consultation Parties. The Transaction Documents must contain a commitment to close no later than the Closing Date (as defined in the Stalking Horse Agreement). A Bid must allow for immediate payment of the Stalking Horse Payment to the Stalking Horse from the first proceeds of the cash portion of such bid.

(iii) Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties.

(iv) Irrevocable. A Bid must be irrevocable through the Auction; *provided, however*, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined in the Bid Procedures), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bid Procedures.

(v) Disclaimer of Fees. Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive any break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.

(vi) Bid Deadline. The Debtor must receive a Bid in writing, on or before October 29, 2021 at 4:00 p.m. or such later date as may be agreed to by the Debtor (the "Bid Deadline"). Bids must be sent to the following by the Bid Deadline to be considered: counsel for the Debtor, (i) Polsinelli PC, 600 Third Avenue, 42nd Floor, New York, New York 10016, Attn: Jeremy R. Johnson (jeremy.johnson@polsinelli.com) and Attn: Stephen J. Astringer (sastringer@polsinelli.com), and (ii) Hinckley, Allen & Snyder LLP, 650 Elm Street, Manchester, New Hampshire 03101, Attn: Daniel M. Deschenes (ddeschenes@hinckleyallen.com) and 28 State Street, Boston, Massachusetts 02109, Attn: Jennifer V. Doran (jdoran@hinckleyallen.com); broker for the Debtor, Grandbridge Real Estate Capital LLC, 1408 North Westshore Boulevard, Suite 910, Tampa, Florida 33607, Attn: l; and counsel to the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck (dsbleck@mintz.com).

(c) **Right to Credit Bid**. UMB Bank, N.A., as bond trustee with respect to the Series 2017 Bonds authorized and issued by the New Hampshire Health And Education Facilities Authority for the benefit of the Debtor (the "Bond Trustee"), shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit in submitting a Credit Bid (defined below). The Bond Trustee may participate in the Auction and, to extent set forth in the Cash Collateral Order, may

Credit Bid at any time up to the conclusion of the Auction, in its sole and absolute discretion, any portion and up to the entire amount of its individual claims (a "Credit Bid"). Upon exercise of a Credit Bid, the Bond Trustee shall not be required to take title to or ownership of, or have any obligation in connection with, or be deemed to have taken title to or ownership of, or have any obligation in connection with, the Assets, and the Bond Trustee shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the Assets that are subject to the Credit Bid. The Bond Trustee will not be a Backup Bidder unless it consents in writing otherwise.

Subject to the prior paragraph, the Stalking Horse Bidder shall have the right (including as part of any Overbid) to credit bid all or a portion of its Bid Protections (if any) pursuant to Bankruptcy Code section 363(k). For avoidance of doubt, the Stalking Horse Bid is a Qualified Bid and the Stalking Horse Bidder is a Qualified Bidder.

(d)    **Cancelation of the Auction.** If the Debtor does not receive one or more Qualified Bids (other than the Stalking Horse Bid) and the Bond Trustee has not indicated its intention to exercise its right to submit a Credit Bid) or otherwise determines, after consultation with the Consultation Parties, not to proceed with the Sale, the Debtor may elect not to conduct the Auction and may cancel the Auction.

(e)    **Stalking Horse Rights.** The Stalking Horse Payment shall be taken into account with each round of bidding and in each phase of the Auction by adding $910,000.00 (the amount of the Stalking Horse Payment) to the amount of each bid made by the Stalking Horse. Any credit bids submitted by a party other than the Stalking Horse shall include a cash component that is sufficient to pay the amount of the Stalking Horse Payment.

(f)    **Bidding Increments and Overbid.** At the Auction, the Debtor will announce the leading Qualified Bid (the "Auction Baseline Bid"). Bidding on the Assets beyond the Auction Baseline Bid will be done in increments that will be determined by the Debtors after consultation with the Consultation Parties. The initial minimum Overbid shall be $100,000. In advance of the Auction and after a review of the Qualified Bids received, the Debtor, in consultation with its advisors and the Consultation Parties, shall determine the increments of any subsequent Overbid after the Auction Baseline Bid but such amount shall not be less than $100,000 (the "Minimum Overbid Increment"); provided, that the Debtor shall retain the right to modify the bid increment requirements at the Auction in consultation with the Consultation Parties. Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include only cash, the assumption of debt, or a Credit Bid.

(g)    **Backup Bidder.** If an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction, as determined by the Debtor, in the exercise of its business judgment, shall be required to serve as a backup

bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its final Bid at Auction (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until sixty (60) days after entry of the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtor's estate. The closing date to consummate the transaction with the Backup Bidder shall be the later of (a) sixty (60) days after the date that the Debtor provides notice to the Backup Bidder that the Successful Bidder failed to consummate a Sale and that the Debtor desires to consummate the transaction with the Backup Bidder, or (b) March 31, 2022 (the "Outside Closing Date"). The deposit, if any, of the Backup Bidder shall be held by the Debtor until the earlier of two (2) business days after (a) the closing of the Sale with the Successful Bidder and (b) the Outside Backup Date; *provided, however*, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtor provides notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtor fails to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtor's estate.

(h) **Diligence Materials.** To participate in the Bidding Process and to receive access to any materials relating to the Assets (the "Diligence Materials"), a party must submit to the Debtor an executed Confidentiality Agreement, signed and transmitted by the person or entity wishing to have access to the Diligence Materials.

(i) **Reservation of Rights.** The Debtor reserves the right to modify the Bid Procedures in its reasonable business judgment in any manner, after consultation with the Consultation Parties, that will best promote the goals of the Bidding Process or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

26. Importantly, the Bid Procedures recognize the Debtor's fiduciary obligations to maximize sale value and, as such, do not impair the Debtor's ability to consider all Qualified Bid proposals. Additionally, as noted above, the Bid Procedures preserve the Debtor's right to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtor's estate.

II.     **Stalking Horse Protections.**

27.     If the Stalking Horse Agreement has not been terminated by the Debtor based on a material breach by the Stalking Horse and the Debtor sells all or any substantial portion of the Assets in a transaction or series of transactions with one or more persons other than the Stalking Horse pursuant to the terms of the Bid Procedures, upon consummation of such transaction or transactions, from the proceeds of such a sale or sales, the Debtor shall pay the Stalking Horse the sum of $910,000.00 (the "Stalking Horse Payment" or the "Stalking Horse Projections").

28.     Except for the Stalking Horse, no other party submitting an offer or Bid for all or any of the Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination, or similar fee or payment or any other protection against the Debtor designating another party as the Successful Bidder or Backup.

III.    **The Auction and Sale.**

29.     If one or more Qualified Bids are received by the Bid Deadline (other than the Stalking Horse Agreement), the Debtor will conduct an Auction to determine the highest and otherwise best Qualified Bid. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, after consultation with the Consultation Parties, including, without limitation, the following: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities and/or executory contracts or unexpired leases; (c) the ability of the Qualified Bidder to close the proposed transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing, including delays owing to regulatory uncertainty; (e) any purchase price adjustments; (f) the impact of the transaction on any actual or potential litigation; and (g) the net after-tax consideration to be received by the Debtor's estate (the "Bid Assessment Criteria"). If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline and

the Bond Trustee has not indicated its intention to exercise its right to submit a Credit Bid, the Debtor may determine not to conduct the Auction and deem the Stalking Horse Agreement to be the Successful Bid without conducting the Auction. The Debtor seeks authority from the Court to schedule the Auction on a date as described in the Bid Procedures.

**IV.     Form and Manner of Sale Notice**

30.     On or within five (5) business days after entry of the Bid Procedures Order, the Debtor will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for Region 1, James C. Cleveland Building, 53 Pleasant Street, Suite 2300, Concord, NH 03301 (the "U.S. Trustee"); (b) counsel to the Bond Trustee; (c) counterparties to the Contracts (the "Contract Counterparties"); (d) all parties who have expressed a written interest in the Assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (f) the Internal Revenue Service; (g) all other applicable state and local taxing authorities; (h) all the Debtor's other creditors; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

**V.     Summary of the Assumption Procedures.**

31.     The Debtor is also seeking approval of the Assumption Procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale. Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts, and the right, procedures, and deadlines for objecting, will be provided in separate notices, attached to the Bid Procedures Order as **Exhibit 3** (the "Cure and Possible Assumption and Assignment Notice") and **Exhibit 4** (the "Assumption Notice") to be sent to the Contract Counterparties. Because the Bid Procedures Order sets forth

the Assumption Procedures in detail, they are not restated here. Generally, however, the Assumption Procedures: (a) outline the process by which the Debtor will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

<u>**Basis for Relief**</u>

**I.     The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtor's Estate and Should Be Approved.**

**A.     *The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate.***

34.     The Debtor seeks to sell the Assets through an Auction and related sale process, subject to the Debtor's right to seek an alternative course of action to maximize the value of its estate. The Debtor and its advisors have conducted and will conduct an extensive marketing process. The Debtor has developed a list of "Contact Parties" who will receive a copy of the "Information Package" (both as defined in the Bid Procedures). The list of Contact Parties will encompass those parties whom the Debtor believes may potentially be interested in pursuing a Sale and whom the Debtor reasonably believes may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtor's estate for the benefit of its creditors and other stakeholders.

35.     Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtor respectfully submits that the Sale Notice is reasonably calculated to provide all interested parties with timely

and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one will be held); (b) the Bid Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

36.    The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, as provided for herein, constitutes good, adequate, and constitutionally sufficient notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtor further submits that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate as much as possible. Accordingly, the Debtor respectfully requests that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

**B.    *The Bid Procedures Are Appropriate and Will Maximize Value.***

37.    Bidding procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in

selling an estate's assets. *See In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'"); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (same); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

38.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."); *Edwards*, 228 B.R. at 561.

39.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the Debtors' assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

40.    The Debtor believes that the Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction. The Bid Procedures will increase the likelihood that the Debtor will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

41.    The Debtor believes that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bid Procedures will enable the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

42.    Specifically, the Bid Procedures contemplate an open auction process with reasonable barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid. At the same time, the Bid Procedures provide the Debtor with a robust opportunity to consider competing Bids and select the highest or otherwise best offer for the completion of the Sale. Additionally, the Debtor's entry into the Stalking Horse Agreement with the Stalking Horse will ensure that the Debtor obtains fair market value for the Assets by setting a minimum purchase price that will be tested in the marketplace. As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above the market value.

43.    In sum, the Debtor believes the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtor's sound business judgment.

C.     *Entering into the Stalking Horse Agreement with Stalking Horse Protections Has a Sound Business Purpose and Should be Approved.*

44.     Pursuant to this Motion, the Debtor is seeking approval of this Court of the Stalking Horse Agreement and approval of the Stalking Horse Protections. The Debtor believes that, in this case, such relief is warranted to ensure the Debtor's ability to take advantage of a potentially value-maximizing bid. The ability of the Debtors to offer the Stalking Horse Purchaser the Stalking Horse Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the Auction.

45.     As noted above, the Stalking Horse was induced to submit its stalking horse bid in reliance on the promise by the Debtor to seek the Stalking Horse Protections and in reasonable expectation that this Court would enter an order providing such relief. The Debtor submits that the Stalking Horse Protections are a normal, and oftentimes necessary, component of sales outside of the ordinary course of business under Bankruptcy Code section 363. In particular, such protections encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's… due diligence"); *In re Marrose Corp.*, Case No. 89 B 12171 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (stating that "agreements to provide

reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse[,]' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding process by providing some form of compensation for the risks it is undertaking") (citations omitted).

46.     In this case, the Stalking Horse Protections consist of a Stalking Horse Payment of $910,000. A proposed bidding incentive, such as the Stalking Horse Payment, should be approved when it is in the best interests of the estate. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

47.     In *O'Brien*, the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. *O'Brien*, 181 F.3d at 536. The court determined that Calpine Corp.'s right to breakup fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. *Id.* at 537. The Debtor believes that approval of the Stalking Horse Protections will create such a competitive bidding process.

48.     The Debtor believes that the proposed Stalking Horse Payment is fair and reasonably compensates the Stalking Horse for taking actions that will benefit the Debtor's estate. The payment compensates the Stalking Horse for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

49.     Moreover, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtor and the Stalking Horse. There is no evidence or reason to believe that the relationship between the Debtor and the Stalking Horse has been tainted by self-dealing or manipulation.

50.     The Debtor does not believe the Stalking Horse Protections will have a chilling effect on the sale process. Rather, the Stalking Horse has increased the likelihood that the best possible price for the Assets will be received by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse, and moreover, by allowing qualified bidders to use the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

51.     In sum, the Stalking Horse Protections are reasonable under the circumstances and will enable the Debtor to maximize the value for the Assets while limiting any chilling effect on the sale process. The Stalking Horse Protections are not only necessary given the risk the Debtor assumes in forgoing a known, willing, and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by its estate, after deducting the Stalking Horse Protections to be paid to the Stalking Horse in the event of a prevailing overbid.

52.     Courts in the First Circuit have repeatedly recognized the importance of bid protections for stalking horse bidders. *See, e.g.*, *In re Wintex, Inc.*, 158 B.R. 540, 543 (D. Mass. 1992) (stating that a "debtor may avoid the increased costs and complexity associated with

considering additional bids unless the additional bids are high enough to justify their pursuit" and a "10% increase requirement is one example of a reasonable litmus test"); *In re Lexington Jewelers Exchange, Inc., d/b/a Alpha Omega Jewelers*, Case No. 08-10042 (WCH) [Docket No. 42] (Bankr. D. Mass. Jan. 4, 2009) (approving breakup fee in order approving bid procedures); *In re Syratech Corporation*, Case No. 05-11062 (RS) (Bankr. D. Mass. 2005) (authorizing breakup fee and expense reimbursement in order approving bid procedures) [Docket No. 290]; *In re Dehon, Inc. (f/k/a In re Arthur D. Little, Inc.)*, Case No. 02-41045 (HJB) (Bankr. D. Mass. 2002) [Docket No. 86] (approving bid procedures which provide for a $1,000,000 reimbursement expense to the stalking horse bidder in the event another bidder was deemed the highest or best offer).

   **D.    *The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.***

   53.    As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Debtor believes it is necessary to establish a process by which: (a) the Debtor and the Contract Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code sections 105(a) and 365; and (b) such counterparties can object to the potential Assumption Procedures.

   54.    The Bid Procedures specify the process by which the Debtor will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

   55.    Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(b) by (a) payment of the undisputed cure amount (the "Cure Amount") and/or (b) reserving amounts

with respect to any disputed cure amounts. Should the Stalking Horse be the Successful Bidder, the Debtor shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(d), by (a) payment of the Cure Amount and/or (b) reserving the full disputed amount with respect to any disputed cure amounts.

56.    As set forth in the Bid Procedures Order, the Debtor also requests that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to Bankruptcy Code section 365 on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

57.    The Debtor believes that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of their Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof. Accordingly, the Debtor requests that the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**II.    Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estate.**

**A.    *The Asset Sale Should Be Authorized Pursuant to Bankruptcy Code Section 363 as a Sound Exercise of the Debtor's Business Judgment.***

58.    Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-

possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999). A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

59.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See Del.& Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

60.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995)

("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company."); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1). Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

61.    As set forth above, and in the First Day Declaration, the Debtor has a sound business justification for selling the Assets. First, the Debtor believes that the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis. Moreover, to the extent that the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtor's creditors.

62.    Second, the sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets. The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction and accepted by the Debtor in the exercise of its reasonable business judgment, will

constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for its estate than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

63.     Thus, absent a change in circumstances that causes the Debtor to abandon the sale process, the Debtor submits that the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through an Auction process and subsequently to enter into the purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtor's business judgment. The Debtor will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtor's business judgment and is rightly authorized.

**B.     *Adequate and Reasonable Notice of the Sale Will Be Provided.***

64.     As described above, the Sale Notice: (a) will be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court

pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

**C.   *The Sale and Purchase Price Will Reflect a Fair-Value Transaction.***

65.     Where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). The Debtor will continue to market the Assets and solicit offers consistent with the Bid Procedures, including, without limitation, by providing acceptable Bidders with access to Due Diligence and requested information. In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized. On the other hand, if the Debtor enters into a Stalking Horse Agreement and no auction is held because no auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

**D.   *The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Bankruptcy Code Section 363(f).***

66.     The Debtor further submits that it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and interests (collectively, the "Interests") pursuant to Bankruptcy Code section 363(f), with any such Interests attaching to the net sale proceeds of the Assets.

67.     Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

68.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtor's sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the Debtors have the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citcorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided that at least one of the subsections of section 363(f) has been satisfied).

69.     The Debtor submits that, excluding assumed agreements, the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of Bankruptcy Code section 363(f). Consistent with Bankruptcy Code section 363(f)(2), each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets. Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtor from the Sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtor and

its estate may possess. Accordingly, Bankruptcy Code section 363(f) authorizes the sale and transfer of the Assets free and clear of any such Interests.

E.  *The Assets and the Assigned Contracts Should Be Sold Free and Clear of Successor Liability.*

70.    The Sale Order will provide that the Successful Bidder shall not have any successor liability related to Seller or the Assets to the maximum extent permitted by law. Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

71.    Although Bankruptcy Code section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

72.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See In re Ormet*,

2014 WL 3542133 at *4 (Bankr. D. Del. July 17, 2014); *The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of Debtors' employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

73.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Successful Bidder. Under Bankruptcy Code section 363(f), the Successful Bidder is entitled to know that the Assets are not tainted by latent claims that could be asserted against the Successful Bidder after the proposed transaction is completed. Absent that ruling, the value of the Assets could be severely compromised.

74. Accordingly, there is substantial authority for any order approving the Sale of the Assets to include a finding that the Successful Bidder is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**F.** ***The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n).***

75. The Debtor requests that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the sale of the Assets. Bankruptcy Code section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

76. Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

77.     The Debtor submits that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction would be a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m), and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of Bankruptcy Code section 363(m).[4] First, as set forth in more detail above, the consideration to be received by the Debtor pursuant to the Sale will be subject to a market process by virtue of the Debtor's marketing efforts and the Auction will be substantial, fair, and reasonable. Second, the asset purchase agreement entered into by the Debtor and the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse) will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtor will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtor's competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis. Third, where—as the Debtor anticipates will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to Bankruptcy Code section 363(n). Moreover, with respect to potential Bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process. Finally, the Successful Bidder's offer will be evaluated and approved by the Debtor in consultation with its advisors and the Consultation Parties.

---

[4] The Debtor believes that a finding of good faith within the meaning of Bankruptcy Code section 363(m) will be appropriate for any Successful Bidder arising from the Auction, if any, and the Bid Procedures. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtor will not choose as the Successful Bidder or the Backup Bidder (as defined in the Bid Procedures) any entity whose good faith under Bankruptcy Code section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of Bankruptcy Code section 363(m) has been satisfied.

Accordingly, the Debtor believes that the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of Bankruptcy Code section 363(m).

78.     Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale will not constitute an avoidable transaction pursuant to Bankruptcy Code section 363(n), and, as a result, the Successful Bidder should receive the protections afforded good faith purchasers by Bankruptcy Code section 363(m). Accordingly, the Debtor requests that the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of Bankruptcy Code section 363(m). The Debtor will submit evidence at the Sale Hearing to support these conclusions.

   **G.     *Credit Bidding Should Be Authorized Pursuant to Bankruptcy Code Section 363(k).***

79.     The Bond Trustee's right to Credit Bid is appropriate. A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Bankruptcy Code section 363(k) provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with Bankruptcy Code section 506(a), Bankruptcy Code section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

80.     Absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't,*

*LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bid Procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Hldgs, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under section 363(k) to make a credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the Debtors' assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

**III.    The Assumption and Assignment of the Contracts Should Be Approved.**

**A.    *The Assumption and Assignment of the Contracts Reflects the Debtor's Reasonable Business Judgment.***

81.    To facilitate and effectuate the sale of the Assets, the Debtor is seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

82.    Bankruptcy Code section 365 authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

83.    The standard applied in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v.*

*Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

84.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a Debtors' decision whether to reject an executory contract."). A debtor's decision to assume or reject an executory contract or unexpired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

85.    The Court here should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtor's business judgment. First, the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to

inducing the best offer for the Assets. Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Contracts needed to manage the day-to-day operations were included in the transaction. Third, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in the Chapter 11 Case. Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtor's business judgment.

86.    A debtor-in-possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with Bankruptcy Code section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtors has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

87.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

88.     Contract Counterparties will have the opportunity to request additional adequate assurance information by responding to the Cure and Possible Assumption and Assignment Notice. Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

89.     To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtor also requests that the Sale Order approving the Sale of the Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

90.     Bankruptcy Code section 365(f)(1) permits a debtor to assign unexpired leases and executory contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

91.     Bankruptcy Code section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g.*, *Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998). Bankruptcy Code section 365(f)(3) goes beyond the scope of Bankruptcy Code section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr.

S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

92.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer., Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

## IV.     Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

93.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the

Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

94.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests that the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

95.     To maximize the value received from the Assets, and to ensure compliance with the requirements of the Cash Collateral Order, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtor requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## WAIVER OF MEMORANDUM OF LAW

96.     The Debtor requests that the Court waive and dispense with the requirement set forth in LBR 7102(b)(2) that any motion filed shall have an accompanying memorandum of law. The legal authorities upon which the Debtor relies are set forth in the Motion. Accordingly, the Debtor submits that a waiver of the requirements set forth in LBR 7102(b)(2) is appropriate under the circumstances.

## NOTICE

97.     Notice of the Motion has been provided to: (a) the Office of the United States Trustee for the District of New Hampshire; (b) counsel to the New Hampshire Insurance Department; (c) the Office of the Attorney General of New Hampshire; (d) the United States Attorney's Office for the District of New Hampshire; (e) the Office of the New Hampshire Secretary of State; (f) counsel to UMB Bank, as indenture trustee; (g) the Debtor's twenty (20) largest unsecured creditors; (h) any party filing a notice of appearance in this Chapter 11 Case; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) counsel to the Stalking Horse Bidder.

98.     The Debtor submits that, in light of the nature of the relief requested, no further notice of this Motion is required.

## NO PRIOR REQUEST

99.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter the Bid Procedures Order, in substantially the form attached hereto as **Exhibit A**; (b) enter the Sale Order, which shall be filed prior to the Sale Hearing; and (c) grant such other and further relief as is just and proper.

Dated: August 30, 2021

*/s/      Owen R. Graham*
**HINCKLEY, ALLEN & SNYDER LLP**
Daniel M. Deschenes (Bar No. 14889)
Owen R. Graham (Bar No. 266701)
650 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 225-4334
Facsimile: (603) 224-8350
ddeschenes@hinckleyallen.com

-and-

Jennifer V. Doran (*Pro Hac Vice* Pending)
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 345-9000
Facsimile: (617) 345-9020
jdoran@hinckleyallen.com

-and-

**POLSINELLI PC**
Jeremy R. Johnson (*Pro Hac Vice* Pending)
Stephen J. Astringer (*Pro Hac Vice* Pending)
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

*Proposed Counsel to the Debtor and Debtor in Possession*

**<u>Exhibit A</u>**

Proposed Bid Procedures Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

**ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS,
(B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (C)
AUTHORIZING THE DEBTOR TO ENTER INTO THE STALKING HORSE
AGREEMENT, (D) AUTHORIZING PAYMENT OF THE STALKING HORSE
PAYMENT AS AN ADMINISTRATIVE EXPENSE, (E) SCHEDULING AN AUCTION
AND A SALE HEARING, (F) APPROVING PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtor as debtor-in-possession

(the "Debtor") for entry of an order (this "Order") (a) authorizing and approving the bidding

procedures attached hereto as **Exhibit 1** (the "Bid Procedures") in connection with the sale of

substantially all of the Debtor's assets (the "Assets"), (b) approving the form and manner of

notice in substantially the form attached hereto as **Exhibit 2** (the "Sale Notice") of an auction

(the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets

free and clear of liens, claims, encumbrances, and other interests (the "Sale"), (c) authorizing

the Debtor to enter into the Stalking Horse Agreement (as defined hereinafter), (d) authorizing

payment of the Stalking Horse Payment as a super priority administrative expense,

(e) scheduling the Auction and the Sale Hearing, and (f) approving procedures for the possible

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431

[2] Reference is made herein to the Motion, the procedures that are attached to this Order as **Exhibit 1** (the "Bid Procedures"), and that certain Asset Purchase Agreement dated as of August 17, 2021 between Covenant Living Services (the "Stalking Horse") and Debtor (the "Stalking Horse Agreement"). Capitalized terms used but not defined in this Order shall have the meanings stated in the Motion, the Bid Procedures, or the Stalking Horse Agreement, as applicable.

assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Contracts"); the Court having reviewed the Motion and the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. 157 and §§ 1334(b); and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, the estate, creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore,

**THE COURT FINDS THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The Debtor has articulated good and sufficient reasons for this Court to (i) approve the Bid Procedures; (ii) authorize the Debtor to enter into the Stalking Horse Agreement; (iii) authorize payment of the Stalking Horse Payment as an allowed super-priority administrative expense; (iv) schedule the Auction and Sale Hearing and approve the manner of notice of the Auction and Sale Hearing; and (v) approve procedures for the assumption and assignment of the Contracts, including notice of the proposed cure amounts.

C.      The Debtor reasonably determined in the exercise of the business judgment that the Bid Procedures are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Assets for the benefit of the Debtor and its estate.

D.      The Bid Procedures were negotiated in good faith by the Debtor and the Stalking Horse for purposes of Bankruptcy Code section 363(m).

E.      <u>Assumption and Assignment Procedures</u>. The Motion, this Order, and the assumption and assignment procedures (the "<u>Assignment Procedures</u>") provide counterparties with proper and reasonable notice of the potential assumption by the Debtor and assignment to the Successful Bidder of their Contracts, the procedures associated therewith, and any cure amounts relating thereto.

F.      <u>Sale Notice</u>. The Sale Notice provides interested parties with timely and proper notice of the proposed Sale, including, without limitation: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) reasonably specific information concerning the Assets to be sold; (e) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (collectively, "<u>Interests</u>"), with all such Interests attaching with the same validity and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of Contracts to the Successful Bidder. No other or further notice of the Sale shall be required.

G.      The Debtor has demonstrated a compelling business justification for the payment of the Stalking Horse Payment under the circumstances set forth in the Stalking Horse Agreement, including without limitation, (i) the amount of the proposed Stalking Horse Payment is reasonable as compared to other cases with similar circumstances, (ii) the presence of a stalking horse will

encourage competitive bidding, and (iii) because any Overbid must surpass the amount of the

Stalking Horse Payment, the estate will benefit even if the Stalking Horse Payment is made.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn,

waived, or settled, and all reservations of rights included therein, are overruled.

3.      The Bid Procedures, in the form attached hereto as **<u>Exhibit 1</u>**, are approved in their

entirety and incorporated into this Order by reference, and the Bid Procedures shall govern the sale

of the Assets, including the Auction, and the Debtor is authorized to take any and all actions

necessary to implement the Bid Procedures.

**II.      The Auction**

4.      As further described in the Bid Procedures, the Auction, if any, shall take place on

November 3, 2021 at 10:00 a.m. (prevailing Eastern Time), at [●] or such later time on such day

or other place as may be set pursuant to the Bid Procedures. The Debtor may permit bidders to

participate remotely subject to all of the other terms contained herein.

5.      The Bond Trustee shall be deemed to be a Qualified Bidder and is not required to

make any Good Faith Deposit. The Bond Trustee may participate in the Auction and may credit

bid up to the conclusion of the Auction, in its sole and absolute discretion, any portion and up to

the entire amount of the Bond Trustee's claims at any time on all the Assets constituting its

collateral; provided, however, the Bond Trustee must bid in cash at least the amount of the Stalking

Horse Payment, which amount must be payable in cash at the Closing (the "<u>Credit Bid</u>"). Upon

exercise of a Credit Bid, the Bond Trustee shall not be required to take title to or ownership of, or

have any obligation in connection with, or be deemed to have taken title to or ownership of, or

have any obligation in connection with, any Assets, and the Bond Trustee shall have the right to

designate any person or entity in its sole and absolute discretion that shall take title to the Assets that are subject to the Credit Bid. The Bond Trustee will not be a Backup Bidder unless the Bond Trustee consents in writing otherwise. If the Bond Trustee elects to exercise its right to Credit Bid, such bid shall provide that the Stalking Horse Payment must be paid in cash.

6.        Subject to the prior paragraph, the Stalking Horse shall have the right (including as part of any Overbid) to credit bid all or a portion of its Stalking Horse Payment (if any) pursuant to Bankruptcy Code section 363(k).[3]

7.        In the event of a competing Qualified Bid, all Qualified Bidders will be entitled, but not obligated, to submit Overbids. The initial Overbid shall be equal to or exceed $34,010,000, the aggregate amount of the Stalking Horse Bid ($33,000,000), Stalking Horse Payment ($910,000), and the Minimum Bid Increment ($100,000).

8.        The Debtor may, in consultation with the Bond Trustee (a) determine which Qualified Bid (including the Credit Bid) is the highest or otherwise best offer; (b) reject at any time before the entry of the Sale Order any Bid (other than the Stalking Horse Bid and any Credit Bid) that, in the discretion of the Debtor, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interest of the Debtor's estate and its creditors; (c) impose such other terms and conditions upon Qualified Bidders as the Debtor determines to be in the best interest of the Debtor's estate; and (d) continue or cancel the Auction (provided that the Auction may be cancelled if, by the Bid Deadline, no Qualified Bid, other than the Stalking Horse Bid, has been received by the Debtor and the Bond Trustee has not indicated its intention to exercise its right to submit a Credit Bid).

---

[3]  The Stalking Horse credit bid shall include the full amount of the eligible Expense Reimbursement.

9.      No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fee, topping or termination fee, or other similar fee or payment, and by submitting a Bid, such person or entity is deemed to have waived its right to request or file with this Court any request for expense reimbursement or any other fee of any nature in connection with the Auction and the Sale, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## III.      Assumption and Assignment Notices & Procedures

10.      As soon as practicable, the Debtor shall serve on all non-Debtor counterparties (the "Contract Counterparties") to any Contract that may be assumed by the Debtor and assigned to the Successful Bidder a notice, which shall be substantially in the form attached hereto as **Exhibit 3** (a "Cure and Possible Assumption and Assignment Notice"), setting forth the Debtor's calculation of the cure amount, if any, that would be due and owing to such Contract Counterparty if the Debtor decided to assume, or assume and assign, such Contract, and alerting such Contract Counterparty that its Contract may be assumed and assigned to the Successful Bidder.

11.      The presence of a Contract on the Cure and Possible Assumption and Assignment Notice does not constitute an admission that such Contract is an executory contract or unexpired lease, and the presence of a Contract on any notice shall not prevent the Debtor from subsequently withdrawing such request for assuming or rejecting such Contract any time before such Contract is actually assumed and assigned or rejected pursuant to the Sale Order.

12.      Any Contract Counterparty that objects to the cure amount set forth on the Cure and Possible Assumption and Assignment Notice or to the possible assignment of its Contract must file an objection with the Bankruptcy Court (a "Contract Objection") on or before 4:00 p.m. (prevailing Eastern Time) on October 15, 2021, which Contract Objection must also be served on (a) counsel for the Debtor, (i) Polsinelli PC, 600 Third Avenue, 42nd Floor, New York, New York 10016, Attn: Jeremy R. Johnson (jeremy.johnson@polsinelli.com) and Attn: Stephen J. Astringer

(sastringer@polsinelli.com), and (ii) Hinckley, Allen & Snyder LLP, 650 Elm Street, Manchester, New Hampshire 03101, Attn: Daniel M. Deschenes (ddeschenes@hinckleyallen.com) and 28 State Street, Boston, Massachusetts 02109, Attn: Jennifer V. Doran (jdoran@hinckleyallen.com); (b) counsel for the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck (dsbleck@mintz.com); (c) counsel for the Stalking Horse, (i) Covenant Living Communities & Services, 5700 Old Orchard Rd, Skokie, Illinois 60077, Attn: David G. Erickson, and (ii) Erickson Peterson Cramer, 350 St. Peter Street, Suite 601, St. Paul, Minnesota 55102, Attn: Julie A. Peterson (jpeterson@epclawyers.com); (d) the Office of the United States for the District of New Hampshire; and (e) the Clerk of the Bankruptcy Court for the District of New Hampshire (collectively, the "Notice Parties").

13.     If a Contract Counterparty does not timely file and serve a Contract Objection, that party will be forever barred from objecting to (a) the Debtor's proposed cure amount, or (b) the potential assignment of that party's Contract to the Successful Bidder. If a Contract Counterparty files a timely Contract Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or objecting to the possible assignment of that Contract Counterparty's Contract, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtor's ability to assign the Contract to the Successful Bidder will be determined at the Sale Hearing.

14.     No later than 4:00 p.m. (prevailing Eastern Time), on October 29, 2021 (the "Bid Deadline"), each bidder other than the Stalking Horse (each an "Other Bidder") shall (i) designate in writing to the Debtor which of the Contracts are to be assumed by the Debtor and assigned to such Other Bidder if such Other Bidder becomes the Successful Bidder and (ii) submit to the

Debtor financial and other information about such Other Bidder to demonstrate that such Other Bidder is able to provide adequate assurance of future performance as required by Bankruptcy Code section 365 (the "Other Bidder Adequate Assurance Information").

15.     If the Successful Bidder or Backup Bidder is an Other Bidder, at least three (3) days before the Sale Hearing, the Debtor shall provide written notice to the Contract Counterparties to each Contract designated by such Other Bidder for assumption by the Debtor and assignment to such Other Bidder (each an "Other Bidder Designated Contract") advising that such Other Bidder is the Successful Bidder or Backup Bidder (as applicable) and that Contract has been designated for assumption by the Debtor and assignment to such Other Bidder.

16.     By November 4, 2021, the Debtor shall file with the Court and serve on the Contract Counterparties who are parties to a Contract to be assumed and assigned a further notice, substantially in the form attached hereto as **Exhibit 4** (the "Assumption Notice"), identifying the Successful Bidder, stating which Contracts will be assumed and assigned to the Successful Bidder, and providing such Contract Counterparties with the Successful Bidder's assurance of future performance.

17.     Any Contract Counterparty that objects to the adequacy of the assurance set forth in the Assumption Notice must file an objection (an "Adequate Assurance Objection") with the Bankruptcy Court prior to the Sale Hearing, or note its Adequate Assurance Objection at the Sale Hearing.

18.     If a Contract Counterparty does not make an Adequate Assurance Objection prior to or at the Sale Hearing, such party will be forever barred from objecting to the adequacy of the assurance to be provided by the Successful Bidder. If a Contract Counterparty makes an Adequate Assurance Objection prior to or at the Sale Hearing, and the parties are unable to consensually

resolve the dispute, the adequacy of the assurance provided by the Successful Bidder will be determined at the Sale Hearing.

**IV.     Notice of the Sale Process**

19.     The Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, in substantially the forms attached to this Order as **Exhibit 2**, **Exhibit 3**, and **Exhibit 4** are approved.

20.     Within five (5) business days after the entry of this Order, the Debtor (or its agents) shall serve the Sale Notice by first-class mail upon: (a) the Office of the United States Trustee for Region 1, James C. Cleveland Building, 53 Pleasant Street, Suite 2300, Concord, NH 03301; (b) counsel to the Bond Trustee; (c) the Contract Counterparties; (d) all parties who have expressed a written interest in the Assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (f) the Internal Revenue Service; (g) all other applicable state and local taxing authorities; (h) all the Debtor's other creditors; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

**V.     The Sale Hearing**

21.     The Sale Hearing shall be held before the Court on November 8, 2021 at [●] (prevailing Eastern Time) or at such time thereafter as counsel may be heard or at such other time the Bankruptcy Court may determine. The Debtor will seek entry of an order of the Court at the Sale Hearing approving and authorizing the Sale of the Assets to the Successful Bidder. Upon entry of this Order, the Debtor is authorized to perform any obligation intended to be performed prior to the Sale Hearing or entry of the Sale Order with respect thereto. The Sale Hearing may be

continued from time to time without further notice other than such announcement being made in open court or a notice of adjournment being filed with the Court and served on the Notice Parties.

## VI. Objections to the Sale

22.      Objections, if any, to the relief requested in the Motion relating to the Sale (except for any objection that arises at the Auction), including the transaction contemplated by the Stalking Horse Agreement (the "Stalking Horse Bid"), must be in writing, filed with the Court, and be served so that it is actually received no later than October 29, 2021 no later than 4:00 p.m. (prevailing Eastern time). Objections shall be served on the Notice Parties. A party's failure to timely file or make an objection in accordance with this Order shall forever bar the assertion of any objection to the Sale, entry of the Sale Order, and/or consummation of the Sale with the Successful Bidder pursuant to the applicable purchase agreement, including, without limitation, the assumption and assignment of the Contracts to the Successful Bidder pursuant to the applicable purchase agreement, and shall be deemed to constitute such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto, including, without limitation such assumption and assignment.

## VII. The Stalking Horse Payment

23.      If the Stalking Horse Agreement has not been terminated by the Debtor based on a material breach by the Stalking Horse and the Debtor sells all or any substantial portion of the Assets in a transaction or series of transactions with one or more persons other than the Stalking Horse pursuant to the terms of the Bid Procedures, upon consummation of such transaction or transactions, from the proceeds of such a sale or sales (such a transaction, an "Alternative Transaction"), the Debtor shall pay the Stalking Horse the sum of $660,000 plus up to $250,000 of actual expenses (the "Stalking Horse Payment"). The Stalking Horse Payment shall be treated as a super priority post-petition claim, the liability on which is an administrative expense in this

78932905.16

case under Bankruptcy Code section 503(b)(1) and as a direct cost of such a sale or sales. No further order of this Court shall be required to pay the Stalking Horse Payment to the Stalking Horse (other than if a dispute arises with respect to the appropriate amount of the Expense Reimbursement); *provided, however*, that under no circumstances shall the Stalking Horse Payment be paid to the Stalking Horse other than from the first proceeds received by or upon behalf of the Debtor from the Alternative Transaction pursuant to the Bid Procedures. For the purposes of all calculations used in the Bid Procedures, the Stalking Horse Payment shall be equal to $910,000.

## VIII.  Other Relief Granted

24.    Nothing in this Order, the Stalking Horse Agreement or the Motion shall be deemed to or constitute the assumption or assignment of a Contract.

25.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a). The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

26.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, and the Debtor may, in its discretion and without further delay, take any action and perform any act authorized by this Order.

27.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


 Dated: _____, 2021
 Concord, New Hampshire

_____
     UNITED STATES BANKRUPTCY JUDGE

78932905.16

**<u>Exhibit 1 to Bid Procedures Order</u>**

Bid Procedures

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

## BIDDING PROCEDURES

By the Motion dated August 30, 2021, the above-captioned debtor and debtor in possession (the "Debtor") sought approval of, among other things, the procedures through which it will determine the highest or otherwise best price for the sale of substantially all of the Debtor's assets and operations being offered for sale (the "Assets") described in that certain Asset Purchase Agreement dated as of August 17, 2021 between Covenant Living Communities and Services (the "Stalking Horse") and the Debtor (the "Stalking Horse Agreement"), a copy of which is attached to the Motion as **Exhibit A**.

On September [●], 2021, the U.S. Bankruptcy Court for the District of New Hampshire (the "Bankruptcy Court") entered an order (the "Sale Procedures Order"), which, among other things, authorized the Debtor to determine the highest or otherwise best bid for the Assets through the process and procedures set forth below (the "Bid Procedures")[2] to be employed for the proposed sale (the "Sale") of the Assets. It is contemplated that the Sale will be implemented through a purchase agreement, subject to the receipt of higher and better bids at an auction (the "Auction") and the corresponding entry into a sale agreement with a Successful Bidder (as defined below) according to these Bid Procedures. The Bankruptcy Court has jurisdiction with respect to any dispute that may arise with respect to these Bid Procedures. These Bid Procedures set forth the process (the "Bidding Process") by which the Debtor is authorized to conduct the Auction for the Sale of its Assets.

**Important Dates (All times are prevailing Eastern Time)**

- **September 24, 2021 at 4:00 p.m.:** Debtor to send Cure and Possible Assumption and Assignment Notices to All Contract Counterparties and Notice of the Sale

- **October 29, 2021 at 4:00 p.m.:** Deadline to (a) submit Bid to be considered for the Auction; (b) file and serve any Cure Objection; and (c) file and serve objections to relief requested at Sale Hearing (except for any objection that arises at the Auction)

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bid Procedures Order.

- **November 3, 2021 at 10:00 a.m.:** Proposed date of Auction

- **November 4, 2021 at 4:00 p.m.:** Debtor to file notice of Successful Bidder, Backup Bidder, and Assumption Notices

- **November 8, 2021 at [●]:** Proposed date of Sale Hearing and deadline to make an Adequate Assurance Objection (either by filing such Adequate Assurance Objection with the Court prior to the Sale Hearing or noting its Adequate Assurance Objection at the Sale Hearing)

**Marketing Process**

The Debtor, in consultation with Grandbridge Real Estate Capital LLC ("Grandbridge"), developed a list of parties who the Debtor believes may potentially be interested in and who the Debtor reasonably believes would have the financial resources to consummate a Sale, which list includes both potential strategic investors and financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties"). The Debtor shall consult with the Bond Trustee and any official committee appointed in the Chapter 11 Case (together, the "Consultation Parties") on all aspects of the Bidding Process and the Sale process. Grandbridge has or will contact the Contact Parties to explore their interest in pursuing a Sale. The Contact Parties may include parties that the Debtor or its advisors have previously contacted regarding a Sale, regardless of whether such parties expressed any interest, at such time, in pursuing a Sale. The Debtor will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate and in consultation with the Consultation Parties.

The Debtor shall distribute to each Contact Party an "Information Package" that is comprised of:

(a)     a cover letter;

(b)     a copy of these Bid Procedures; and

(c)     a copy of a confidentiality agreement (the "Confidentiality Agreement").

To participate in the Bidding Process and to receive access to any materials relating to the Assets (the "Diligence Materials"), a party must submit to the Debtor an executed Confidentiality Agreement, signed and transmitted by the person or entity wishing to have access to the Diligence Materials.

A party who qualifies for access to the Diligence Materials shall be a "Preliminarily Interested Investor." All due diligence requests must be directed to Grandbridge.

78932905.16

## Bid Qualification Process[3]

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtor, in consultation with the Consultation Parties, to satisfy each of the following conditions:

(1)  Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of One Million Dollars ($1,000,000) to be deposited into an interest-bearing escrow account to be identified and established by the Debtor (the "Good Faith Deposit").

(2)  Terms: A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Sale, including an asset purchase agreement (the "Transaction Documents"). The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtor that the Bidder wishes to have assumed and assigned to it pursuant to the Sale (collectively, the "Assigned Contracts").

(3)  Principal Terms: A Bid must have a Purchase Price of at least $34,010,000.[4] A Bid must include an executed asset purchase agreement similar in form and substance to Stalking Horse Agreement, as modified by the potential purchaser, pursuant to which the Bidder proposes to effectuate the contemplated transaction and a black-lined copy of the asset purchase agreement marked to show all changes requested by the Bidder, including specifications of the proposed purchase price and any changes to any exhibits or schedule to the agreement. A Bid must identify with particularity each and every condition to closing and all executory contracts to be assumed and assigned pursuant to the asset purchase agreement as well which liabilities it will be assuming, which must include the Residency Agreements (as defined in the Stalking Horse Agreement). A Bid should propose a transaction involving substantially all, or a portion of, the Debtor's Assets or operations. The Debtor, in consultation with the Consultation Parties, shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtor's estate as a whole. The asset purchase agreement must include a commitment to close by no later than the Closing Date (as defined in the Stalking Horse Agreement).

(4)  Corporate Authority: Each Bidder must provide written evidence, reasonably acceptable to the Debtor, in consultation with the Consultation Parties, demonstrating appropriate corporate authorization to consummate the proposed transaction; *provided, however,* that, if the Bidder is an entity specially formed for the purpose of effectuating the transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor, in consultation with the Consultation Parties, of the approval of the transaction by the equity holder(s) of such Bidder.

---

[3] None of the Bid Qualification Process requirements apply to the Stalking Horse or the Stalking Horse Agreement, as may be amended (the "Stalking Horse Bid"). For avoidance of doubt, the Stalking Horse Bid is a Qualified Bid and the Stalking Horse Bidder is a Qualified Bidder.

[4] The Purchase Price must be higher than the aggregate of the Stalking Horse Bid ($33,000,000), Stalking Horse Payment ($910,000), and Initial Overbid ($100,000).

78932905.16

(5) <u>Government Approvals Timeframe</u>: Each Bid must set forth an estimated timeframe for obtaining any required governmental, licensing, regulatory or other approvals or consents for consummating any proposed purchase.

(6) <u>Consent to Jurisdiction</u>: By submitting a Bid, each Bidder agrees and shall be deemed to have agreed to submit to the jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Debtor's qualification of bids, the Auction, if any, the construction and enforcement of the Bidding Procedures, the sale documents and the closing, as applicable.

(7) <u>Proof of Financial Ability to Perform</u>: Each Bidder must provide written evidence, sufficient for the Debtor to reasonably conclude, in consultation with the Consultation Parties, that the Bidder has the necessary financial ability to close the transaction and provide adequate assurance of future performance under all Assigned Contracts to be assumed and assigned in such transaction. Such information should include, *inter alia*, the following:

> (a) contact names and numbers for verification of financing sources,
>
> (b) evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction;
>
> (c) the Bidder's current financial statements; and
>
> (d) any such other form, financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the transaction; *provided, however*, that the Debtor shall determine, in its reasonable discretion, in consultation with the Debtor's advisors and the Consultation Parties, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(8) <u>Contingencies</u>: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties.

(9) <u>Irrevocable</u>: A Bid must be irrevocable through the Auction; *provided, however*, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bid Procedures.

(10) <u>Disclaimer of Fees</u>: Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive any break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.

     (11)   <u>Bid Deadline</u>: Regardless of when a party qualifies as a Preliminarily Interested Investor, the Debtor must receive a Bid in writing, on or before October 29, 2021 at 4:00 p.m. (the "<u>Bid Deadline</u>"). Bids must be sent to the following by the Bid Deadline to be considered: (a) counsel for the Debtor, (i) Polsinelli PC, 600 Third Avenue, 42nd Floor, New York, New York 10016, Attn: Jeremy R. Johnson (jeremy.johnson@polsinelli.com) and Attn: Stephen J. Astringer (sastringer@polsinelli.com), and (ii) Hinckley, Allen & Snyder LLP, 650 Elm Street, Manchester, New Hampshire 03101, Attn: Daniel M. Deschenes (ddeschenes@hinckleyallen.com) and 28 State Street, Boston, Massachusetts 02109, Attn: Jennifer V. Doran (jdoran@hinckleyallen.com); (b) broker for the Debtor, Grandbridge Real Estate Capital LLC, 1408 North Westshore Boulevard, Suite 910, Tampa, Florida 33607, Attn: Allen McMurtry; (c) counsel to the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck (dsbleck@mintz.com); and (d) counsel to the Committee, if any (collectively, the "<u>Notice Parties</u>").

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>," and such Bidder shall constitute a "<u>Qualified Bidder</u>."

## **Credit Bid**

The Bond Trustee shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit in submitting a Credit Bid (defined below). The Bond Trustee may participate in the Auction and may Credit Bid at any time up to the conclusion of the Auction, in its sole and absolute discretion, any portion and up to the entire amount of its claim; provided, however, the Bond Trustee must bid in cash at least the amount of the Stalking Horse Payment, which amounts must be payable in cash at the Closing (a "<u>Credit Bid</u>"). Upon exercise of a Credit Bid, the Bond Trustee shall not be required to take title to or ownership of, or have any obligation in connection with, or be deemed to have taken title to or ownership of, or have any obligation in connection with, the Assets, and the Bond Trustee shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the Assets that are subject to the Credit Bid. The Bond Trustee will not be a Backup Bidder unless it consents in writing otherwise. If the Bond Trustee elects to exercise its right to Credit Bid, such bid shall provide that the Stalking Horse Payment must be paid in cash. If the Bond Trustee or its designee elects to Credit Bid, the Bond Trustee shall no longer be a Consultation Party.

## **Auction**

If one or more Qualified Bids is received by the Bid Deadline (other than the Stalking Horse Bid) and/or the Bond Trustee has indicated its intent to submit a Credit Bid, the Debtor will conduct the Auction to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtor, upon consultation with the Consultation Parties, reasonably deems relevant to the value of the Qualified Bid to the estate, including, *inter alia,* the following: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities and/or Assigned Contracts, if any; (c) the ability of the Qualified Bidder to close the proposed Transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (e) any purchase

price adjustments; (f) the impact of the Sale on any actual or potential litigation; and (g) the net after-tax consideration to be received by the Debtor's estate (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline and the Bond Trustee has not indicated its intent to submit a Credit Bid, no Auction shall be conducted and the Stalking Horse Bid shall be deemed the Successful Bid. Only Qualified Bidders may participate in the Auction.

The Auction, if necessary, shall take place on November 3, 2021 at 10:00 a.m., at Hinckley, Allen & Snyder LLP, 28 State Street, Boston, Massachusetts 02109 or other place as the Debtor shall notify all Bidders who have submitted Qualified Bids. The Debtor may permit bidders to participate remotely subject to all of the other terms contained herein. The Auction shall be transcribed or videotaped, and shall be conducted according to the following procedures:

**The Debtor Shall Conduct the Auction**

The Debtor and its professionals shall direct and preside over the Auction in consultation with the Consultation Parties. At the start of the Auction the Debtor shall describe the terms of the highest and best Qualified Bid(s) (the "Auction Baseline Bid").

All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis and all material terms of each Overbid shall be fully disclosed to all Bidders who have submitted Qualified Bids. The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid and all Overbids.

**Stalking Horse Rights**

The Stalking Horse Payment shall be taken into account with each round of bidding and in each phase of the Auction by adding the amount of the Stalking Horse Payment to the amount of each bid made by the Stalking Horse. Any credit bids submitted by a party other than the Stalking Horse shall include a cash component that is sufficient to pay the amount of the Stalking Horse Payment. Within at least two days prior to the Auction, if the Stalking Horse is not the highest and best Bid, the Debtor shall advise the Stalking Horse of the Auction Baseline Bid and shall provide a copy of the asset purchase agreed associated with such Auction Baseline Bid. The Stalking Horse Payment used in the bidding calculations hereunder shall be $910,000.

**Terms of Overbids**

An "Overbid" is any Bid made at the Auction subsequent to the Debtor's announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(1)    **Minimum Overbid Increment**

The initial minimum Overbid shall be $100,000. In advance of the Auction and after a review of the Qualified Bids received, the Debtor, in consultation with its advisors and the Consultation Parties, shall determine the increments of any subsequent Overbid after the Auction Baseline Bid but such amount shall not be less than $100,000 (the "Minimum Overbid Increment") for a Bid for all of the Debtor's Assets, and in an amount to be determined by the Debtor, in consultation with the

78932905.16

Consultation Parties at the Auction; *provided*, that the Debtor shall retain the right to modify the bid increment requirements at the Auction in consultation with the Consultation Parties. Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include only cash, the assumption of debt, or a Credit Bid.

(2)     **Remaining Terms are the Same as for Qualified Bids**

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided, however*, that the Bid Deadline shall not apply. Any Overbid shall remain open and binding on the Bidder unless and until the Debtor, in consultation with the Consultation Parties, accepts a higher Overbid, subject to such Bidder remaining a Backup Bidder.

To the extent not previously provided (which shall be determined by the Debtor in consultation with the Consultation Parties), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure, credit-quality support information or other enhancement reasonably acceptable to the Debtor in consultation with the Consultation Parties) demonstrating such Bidder's ability to close the transaction proposed by such Overbid.

(3)     **Announcing Overbids**

The Debtor shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtor's estate based on, *inter alia,* the Bid Assessment Criteria.

(4)     **Consideration of Overbids**

The Debtor reserves the right, in its reasonable business judgment, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtor and individual Bidders, allow individual Bidders to consider how they wish to proceed, and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment and in consultation with the Consultation Parties, may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

**No Collusion; Good-Faith Bona Fide Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the Sale or Bidding Process (including that it has no agreement with any other Bidder or Qualified Bidder to control the price) and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder or the Backup Bidder.

**Backup Bidder**

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction, as determined by the

78932905.16

Debtor, in the exercise of its business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its final Bid at Auction (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until sixty (60) days after entry of the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtor's estate, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be the later of (a) sixty (60) days after the date that the Debtor provides notice to the Backup Bidder that the Successful Bidder failed to consummate a Sale and that the Debtor desires to consummate the transaction with the Backup Bidder, or (b) March 31, 2022 (the "Outside Closing Date"). The deposit, if any, of the Backup Bidder shall be held by the Debtor until the earlier of two (2) business days after (a) the closing of the Sale with the Successful Bidder and (b) the Outside Backup Date; provided, however, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtor provides notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtor fails to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtor's estate, and the Debtor specifically reserves the right to seek all available damages from the defaulting Backup Bidder.

### Additional Procedures

The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bid Procedures.

### Consent to Jurisdiction as Condition to Bidding

All Qualified Bidders, and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Stalking Horse Agreement, the Auction or the construction and enforcement of any Transaction Documents.

### Rights to Credit Bid

The Bond Trustee shall have the right to Credit Bid as set forth in the Bid Procedures Order. The Stalking Horse Bidder shall have the right (including as part of any Overbid) to credit bid all or a portion of the value of the Stalking Horse Payment at the Auction, including the full amount of the potential Expense Reimbursement for the Assets pursuant to Bankruptcy Code section 363(k).

78932905.16

**Closing the Auction**

The Auction shall continue until there is only one or more Qualified Bid(s) that the Debtor determines in its reasonable business judgment, after consultation with its financial and legal advisors and the Consultation Parties, is the highest and best Qualified Bid(s) at the Auction (the "Successful Bid" and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtor, in consultation with its financial and legal advisors and the Consultation Parties, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid. Prior to the conclusion of the Auction, the Successful Bidder and the Backup Bidder shall have submitted fully executed Transaction Documents memorializing the terms of the Successful Bid(s) and Backup Bid and the Successful Bidder shall have increased the amount of its Good Faith Deposit to 3% of the cash purchase price of the Successful Bid.

**Bid Protections**

The Stalking Horse is entitled to the Stalking Horse Payment, to the extent it becomes payable, pursuant to the terms of the Stalking Horse Agreement and the Bid Procedures Order.

Except for the Stalking Horse, no other party submitted an offer or Bid for the Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination, or similar fee or payment or any other protection against the Debtor designating another party as the Successful Bidder or Backup Bidder.

**Procedures for Determining Cure Amounts and Adequate Assurance for Contract Counterparties to Assigned Contracts.**

By September 24, 2021, the Debtor shall send a notice to each counterparty to an executory contract or unexpired lease (each a "Contract Counterparty") setting forth the Debtor's calculation of the cure amount, if any, that would be owing to such Contract Counterparty if the Debtor decided to assume or assume and assign such executory contract or unexpired lease, and alerting such Contract Counterparty that its contract may be assumed and assigned to the Successful Bidder (the "Cure and Possible Assumption and Assignment Notice"), a copy of which is attached to the Bid Procedures Order as **Exhibit 3**. Any Contract Counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of its executory contract or unexpired lease must file an objection (a "Contract Objection") on or before 4:00 p.m. (prevailing Eastern Time) on October 15, 2021, which Contract Objection must be served on the Notice Parties. If a Contract Counterparty does not timely file and serve a Contract Objection, that party will be forever barred from objecting to (a) the Debtor's proposed cure amount, or (b) the assignment of that party's executory contract or unexpired lease to the Successful Bidder. Where a Contract Counterparty to an Assigned Contract files a timely Contract Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or an objection to the possible assignment of that Contract Counterparty's executory contract or unexpired lease, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the

case may be, the Debtor's ability to assign the executory contract or unexpired lease to the Successful Bidder will be determined at the Sale Hearing.

By November 4, 2021, the Debtor shall file with the Court and serve on the Contract Counterparties a further notice substantially in the form attached to the Bid Procedures Order as **Exhibit 4** (the "Assumption Notice") identifying the Successful Bidder, stating which Contracts will be assumed and assigned to the Successful Bidder, and providing such Contract Counterparties with the Successful Bidder's assurance of future performance. Any Contract Counterparty that objects to the adequacy of the assurance set forth in the Assumption Notice must file an objection with the Bankruptcy Court (an "Adequate Assurance Objection") prior to the Sale Hearing or note its Adequate Assurance Objection at the Sale Hearing. If a Contract Counterparty does not make an Adequate Assurance Objection prior to or at the Sale Hearing, such party will be forever barred from objecting to the adequacy of the assurance to be provided by the Successful Bidder. If a Contract Counterparty makes an Adequate Assurance Objection prior to or at the Sale Hearing, and the parties are unable to consensually resolve the dispute, the adequacy of the assurance provided by the Successful Bidder will be determined at the Sale Hearing.

## Sale Hearing

The Bankruptcy Court has scheduled a hearing (the "Sale Hearing") on November 8, 2021, at [●] (prevailing Eastern Time), at which the Debtor will seek approval of the Sale to the Successful Bidder. Objections to the Sale of the Assets to the Successful Bidder or Back-Up Bidder must be filed and served so that they are actually received by the Debtor no later than 4:00 p.m. (ET) on October 29, 2021 (except for any objection that arises at the Auction) on the Notice Parties.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by Connecticut Attorneys Title Insurance Company and shall not become property of the Debtor's estate absent further order of the Court. The Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price. The forgoing notwithstanding, the Good Faith Deposit of the Stalking Horse shall be returned to the Stalking Horse pursuant to the provisions of the Stalking Horse Agreement.

## Reservation of Rights

The Debtor reserves the right to modify these Bid Procedures in its reasonable business judgment in any manner, after consultation with the Consultation Parties, that will best promote the goals of the Bidding Process or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

**<u>Attachment A to Bid Procedures</u>**

Form of Confidentiality Agreement

78932905.16

## CONFIDENTIALITY AGREEMENT

Date:_____

_____
_____
_____

Re:     Confidentiality Agreement Regarding Potential Transaction

Ladies and Gentlemen:

In connection with your consideration of a possible acquisition of substantially all of the assets and assumption of certain liabilities ("Transaction") of The Prospect-Woodward Home d/b/a Hillside Village Keene (the "Company"), you have requested certain confidential and other information concerning the Company. You agree to treat any information concerning the Company, its affiliates, subsidiaries, management companies, and parent companies, whether furnished to you before or after the date of this letter, together with any and all analyses or other documents prepared by you or any of your directors, employees, advisors, attorneys, accountants, consultants, subcontractors, representatives or lending institutions (collectively, "Representatives") which contain or otherwise reflect such information (collectively, "Evaluation Material"), in accordance with this agreement. The term "Evaluation Material" does not include information that (a) was already in your possession prior to the time of disclosure to you by the Company or its Representatives, provided that such information was not furnished to you by a source known by you to be bound by a confidentiality agreement with the Company, or otherwise prohibited from disclosing the information to you, (b) was or becomes generally available to the public other than as a result of a disclosure by you or your Representatives, (c) becomes available to you on a non-confidential basis from a source other than the Company or its Representatives, provided that such source is not known by you to be bound by a confidentiality agreement with the Company, or otherwise prohibited from disclosing the information to you, or (d) that was or is independently developed by you without violating your obligations hereunder.

The Evaluation Material will be used solely for the purpose of evaluating the Transaction between the Company and you, will not be used in any way detrimental to the Company and its Representatives, and will be kept confidential by you and your Representatives, except to the extent that disclosure (a) has been consented to in writing by the Company, or (b) is made to your Representatives who need to know such information for the purpose of evaluating the Transaction (it being understood that such Representatives shall be informed by you of the confidential nature of the Evaluation Material). You shall be responsible for any breach of this agreement by any of your Representatives as if such Representative had been substituted for "you" as a party and signatory to this letter. You will not contact any shareholders, lenders, creditors, employees or directors of the Company regarding the Company without the prior written consent of the undersigned.

In the event that you or any of your Representatives are requested or required by law, regulatory authority or other applicable judicial or governmental order to disclose any Evaluation

Material, you will provide the Company with prompt notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this agreement. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the terms hereof, you may disclose only that portion of the Evaluation Material that is legally required.

In addition, without the prior written consent of the Company, you will not, and will direct your Representatives not to, disclose to any person (a) that the Evaluation Material has been made available to you or your Representatives, (b) that discussions are taking place concerning a Transaction, or (c) any terms or other facts with respect to the Transaction, including the status thereof.

It is understood and agreed that money damages may not be a sufficient remedy for any breach of this agreement, and that the Company is entitled to seek specific performance and injunctive or other equitable relief. Such remedy shall not be deemed to be the exclusive remedy for breach of this agreement, but shall be in addition to all other remedies available at law or equity to the Company.

The Company shall not be deemed to have made any representations or warranties as to the accuracy or completeness of the Evaluation Material. Only those representations or warranties that are made by the Company in a final definitive agreement regarding a Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

Within ten days after being so requested by the Company or its Representatives, except to the extent you are advised by legal counsel that complying with such request would be prohibited by law or regulatory authority, you will return or destroy all Evaluation Material. Any destruction of materials shall be confirmed by you in writing. Any Evaluation Material that cannot be returned or destroyed (such as oral Evaluation Material) shall remain confidential, subject to the terms of this agreement.

This agreement binds the parties hereto only with respect to the matters expressly set forth herein. As such, unless and until a subsequent definitive written agreement regarding a Transaction between the Company and you has been executed, (a) neither the Company nor you will be under any legal obligation of any kind whatsoever to negotiate or consummate a Transaction, and (b) you shall have no claim whatsoever against the Company or any of its respective directors, officers, owners, affiliates or Representatives arising out of or relating to any Transaction or Evaluation Material. No interest, license or any right respecting the Evaluation Material, other than expressly set out herein, is granted under this agreement by implication or otherwise.

Additionally, you agree not to solicit for employment any Company employees to whom you may be introduced or with whom you otherwise had contact as a result of your consideration of a Transaction for a period of two  (2 ) years after the date of this agreement, provided that you shall not be restricted in any general solicitation for employees (including through the use of

employment agencies) not specifically directed at any such persons, and provided further that you shall not be restricted in hiring any such person who responds to any such general solicitation.

You hereby acknowledge that you are aware, and further agree that you will advise your Representatives, that Federal and State securities laws limit the circumstances in which any person who has material, non-public information about a company may purchase or sell securities of such a company and prohibit any such person from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. Moreover, you agree that you shall not use any of the Evaluation Materials to purchase or attempt to purchase or otherwise engage in trading of claims of the Company (including, without limitation, claims held by trade creditors, bank lenders, other secured and unsecured lenders or any other parties).

You further acknowledge and confirm that (a) you have had the opportunity to have this agreement reviewed by counsel and have either utilized or waived this opportunity; and (b) the undersigned has due authority to bind you and your Representatives to the terms of this agreement.

This agreement shall be governed by and construed in accordance with the internal laws of the State of New Hampshire, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby. Venue for any action to enforce the provisions of this letter agreement shall be properly laid in the United States Bankruptcy Court for the District of New Hampshire. This agreement shall be binding upon and shall insure to the benefit of the Company and its successors and assigns. This agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof. No amendments, changes or modifications may be made to this agreement without the express written consent of each of the parties hereto. If any term or provision of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of this agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. No failure or delay by the Company in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or preclude any other or further exercise of any right hereunder.

Your obligations under this agreement shall remain in effect for a period of two years from the date hereof, except as otherwise stated herein.

Very truly yours,

The Prospect-Woodward Home d/b/a Hillside Village Keene:

_____

Name:
Title:

Confirmed and Agreed to:

By:  _____

Name:
Title:

78932905.16

**<u>Exhibit 2 to Bid Procedures Order</u>**

Sale Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| The Prospect-Woodward Home, | ) Case No. 21-10523 (BAH) |
| | ) |
| Debtor.[1] | ) |
| | ) |

**NOTICE OF BID PROCEDURES, AUCTION, HEARING AND DEADLINES**
**RELATING TO THE SALE OF SUBSTANTIALLY**
**ALL OF THE ASSETS OF THE DEBTOR**

 **PLEASE TAKE NOTICE** that on August 30, 2021, The Prospect-Woodward Home, as debtor and debtor-in-possession (the "Debtor") in the above-captioned case (the "Bankruptcy Case"), filed a *Motion of the Debtor for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtor and the Successful Bidder, and (B) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. ●] (the "Bid Procedures and Sale Motion").[2] The Debtor seeks to complete a sale (the "Transaction") of substantially all its assets (the "Assets") to a prevailing bidder or bidders (the "Successful Bidder") at an auction (the "Auction") free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363.

 **PLEASE TAKE FURTHER NOTICE** that, on September [●], 2021 the Bankruptcy Court entered an order [Docket No. ●] (the "Bid Procedures Order") approving the bidding procedures set forth in the Bid Procedures and Sale Motion (the "Bid Procedures"), which set the key dates and times related to the sale of the Debtor's Assets under the asset purchase agreement with the Successful Bidder. **All interested bidders should carefully read the Bid Procedures**. To the extent that there are any inconsistencies between the Bid Procedures and the summary description of its terms and conditions contained in this notice, the terms of the Bid Procedures shall control. Pursuant to the Bid Procedures Order, the Debtor has entered into an Asset Purchase Agreement (the "Stalking Horse Agreement") for the sale of substantially all of the Debtor's assets to Covenant Living Communities and Services (the "Stalking Horse") subject to competitive bidding as set forth in the Bid Procedures Order.

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431
[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures, the Debtor must receive a Qualified Bid from interested bidders in writing, on or before October 29, 2021, or such later date as may be agreed to by the Debtor (the "Bid Deadline"). To be considered, Qualified Bids must be sent to the following at or before the Bid Deadline: (a) counsel for the Debtor, (i) Polsinelli PC, 600 Third Avenue, 42nd Floor, New York, New York 10016, Attn: Jeremy R. Johnson (jeremy.johnson@polsinelli.com) and Attn: Stephen J. Astringer (sastringer@polsinelli.com), and (ii) Hinckley, Allen & Snyder LLP, 650 Elm Street, Manchester, New Hampshire 03101, Attn: Daniel M. Deschenes (ddeschenes@hinckleyallen.com) and 28 State Street, Boston, Massachusetts 02109, Attn: Jennifer V. Doran (jdoran@hinckleyallen.com); (b) broker for the Debtor, Grandbridge Real Estate Capital LLC, 1408 North Westshore Boulevard, Suite 910, Tampa, Florida 33607, Attn: David Kliewer (david.kliewer@grandbridge.com); and (c) counsel for the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck (dsbleck@mintz.com).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, if the Debtor receives one or more Qualified Bids (other than the Credit Bid) by the Bid Deadline, the Auction will be conducted on **November 3, 2021 at 10:00 a.m.** (prevailing Eastern Time) at Hinckley, Allen & Snyder LLP, 28 State Street, Boston, Massachusetts 02109, or at such other place, date and time as may be designated by the Debtor. The Debtor may conduct the Auction remotely to the extent necessary to comply with applicable COVID-19 health guidelines.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, the Debtor has designated certain Assigned Contracts that may be assumed or assumed and assigned to the Successful Bidder. By **September 24, 2021**, the Debtor shall send a notice to each counterparty to an Assigned Contract setting forth the Debtor's calculation of the cure amount, if any, that would be owing to such counterparty if the Debtor decided to assume or assume and assign such Assigned Contract, and alerting such non-debtor party that its contract may be assumed and assigned to the Successful Bidder (the "Cure and Possible Assumption and Assignment Notice").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, any counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of its Assigned Contract(s) must file with the Bankruptcy Court and serve an objection (a "Cure or Assignment Objection") so that it is actually received on or before **4:00 p.m. ET on October 15, 2021** by (a) counsel for the Debtor, (i) Polsinelli PC, 600 Third Avenue, 42nd Floor, New York, New York 10016, Attn: Jeremy R. Johnson (jeremy.johnson@polsinelli.com) and Attn: Stephen J. Astringer (sastringer@polsinelli.com), and (ii) Hinckley, Allen & Snyder LLP, 650 Elm Street, Manchester, New Hampshire 03101, Attn: Daniel M. Deschenes (ddeschenes@hinckleyallen.com) and 28 State Street, Boston, Massachusetts 02109, Attn: Jennifer V. Doran (jdoran@hinckleyallen.com); (b) counsel for the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck (dsbleck@mintz.com); (c) the Office of the United States Trustee for the District of New Hampshire; and (d) the Clerk of the Bankruptcy Court for the District of New Hampshire (collectively, the "Notice Parties"). Where a counterparty to an Assigned Contract files a timely Cure or Assignment Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or an objection to the possible assignment of that counterparty's Assigned Contract, and the parties are unable to

2

consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtor's ability to assign the Assigned Contract to the Successful Bidder will be determined at the Sale Hearing (as defined below).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, if a Contract Counterparty does not make an Adequate Assurance Objection prior to or at the Sale Hearing, such party will be forever barred from objecting to the adequacy of the assurance provided by the Successful Bidder. Where a Contract Counterparty makes an Adequate Assurance Objection prior to or at the Sale Hearing, and the parties are unable to consensually resolve the dispute, the adequacy of the assurance provided by the Successful Bidder will be determined at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Assets to the Successful Bidder (the "Sale Hearing") at the Bankruptcy Court on **November 8, 2021 at [●] (prevailing Eastern Time)**, or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or on the agenda for such Sale Hearing. Objections to the sale of the Assets to the Successful Bidder must be filed and served so that they are received no later than **October 29, 2021 at 4:00 p.m. (prevailing Eastern Time)** by the Notice Parties. Any Contract Counterparty that objects to the adequacy of the assurance set forth in the Assumption Notice must file an objection (an "Adequate Assurance Objection") with the Bankruptcy Court prior to the Sale Hearing, or note its Adequate Assurance Objection at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Bid Procedures and Sale Motion, the Bid Procedures Order and the Bid Procedures, which shall control in the event of any conflict, and the Debtor encourages parties in interest to review such documents in their entirety. A copy of the Bid Procedures and Sale Motion, the Stalking Horse Agreement, the Bid Procedures and the Bid Procedures Order may be obtained (a) upon request to Donlin, Recano & Company, Inc. (the notice and claims agent retained in the Chapter 11 Case) by calling (877) 739-9997; (b) by visiting the website maintained in the Chapter 11 Case at https://www.donlinrecano.com/hvk or (c) for a fee via PACER by visiting https://ecf.nhb.uscourts.gov/.

78932905.16

Dated ●, 2021

/s/      Draft
_____

**HINCKLEY, ALLEN & SNYDER LLP**
Daniel M. Deschenes (Bar No. 14889)
Owen R. Graham (Bar No. 266701)
650 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 225-4334
Facsimile: (603) 224-8350
ddeschenes@hinckleyallen.com

-and-

Jennifer V. Doran (*Pro Hac Vice* Pending)
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 345-9000
Facsimile: (617) 345-9020
jdoran@hinckleyallen.com

-and-

**POLSINELLI PC**
Jeremy R. Johnson (*Pro Hac Vice* Pending)
Stephen J. Astringer (*Pro Hac Vice* Pending)
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

*Proposed Counsel to the Debtor and Debtor
in Possession*

**<u>Exhibit 3 to Bid Procedures Order</u>**

Cure and Possible Assumption and Assignment Notice

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

## NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES REGARDING CURE AMOUNTS AND POSSIBLE ASSIGNMENT TO SUCCESSFUL BIDDER AT AUCTION

**PLEASE TAKE NOTICE** that on August 30, 2021, the above-captioned debtor and debtor in possession (the "**Debtor**") filed a motion (the "Bid Procedures and Sale Motion") with the United States Bankruptcy Court for the District of New Hampshire (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on September [●], 2021, the Bankruptcy Court entered an order [Docket No. ●] (the "Bid Procedures Order") approving Bid Procedures (the "Bid Procedures"), which set key dates, times and procedures related to the sale of substantially all of the Debtor's assets (the "Assets"). To the extent that there are any inconsistencies between the Bid Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bid Procedures shall control. Pursuant to the Bid Procedures Order, the Debtor has entered into an Asset Purchase Agreement (the "Stalking Horse Agreement") for the sale of substantially all of the Debtor's assets to Covenant Living Communities and Services (the "Stalking Horse") subject to competitive bidding as set forth in the Bid Procedures Order.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE LISTED BELOW WITH THE DEBTOR:[2]**

| [Counterparty Name] | [Contract/Lease] | Cure Amount |
|---|---|---|

**Pursuant to the Bid Procedures, the Debtor may assume the Executory Contract(s) or Unexpired Lease(s) listed above to which you are a counterparty. Also pursuant to the Bid Procedures, the Debtor may assign the Executory Contract(s) or Unexpired Lease(s) to the successful bidder (the "Successful Bidder") at an auction of substantially all of the Debtor's assets currently scheduled for November 3, 2021 at 10:00 a.m. (prevailing Eastern Time).** The Debtor has conducted a review of its books and records and has determined that the cure amount for unpaid monetary obligations under such contract or lease is $**[AMOUNT]** (the "Cure

---

[1] The last four digits of the Debtor's federal taxpayer identification number are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431.

[2] This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases. This Notice is not an admission by the Debtor that such contract or lease is executory or unexpired.

Amount"). If you (a) object to the proposed assumption or disagree with the proposed Cure Amount, or (b) object to the possible assignment of such Executory Contract(s) or Unexpired Lease(s) to the Successful Bidder, **you must file an objection with the Bankruptcy Court no later than October 15, 2021 at 4:00 p.m. (prevailing Eastern Time)**, (the "Objection Deadline") and serve such objection on the following parties:

| Counsel to the Debtor | Counsel to Bond Trustee |
|---|---|
| Polsinelli PC<br>600 Third Avenue<br>42nd Floor<br>New York, New York 10016<br>Attn: Jeremy R. Johnson<br>Jeremy.johnson@polsinelli.com<br>Attn: Stephen Astringer<br>sastringer@polsinelli.com<br><br>-and-<br><br>Hinkley, Allen & Snyder LLP<br>650 Elm Street<br>Manchester, New Hampshire 03101<br>Attn: Daniel M. Deschenes<br>ddeschenes@hinckleyallen.com<br><br>-and-<br><br>28 State Street<br>Boston, Massachusetts 02109<br>Attn: Jennifer V. Doran<br>jdoran@hinckleyallen.com | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111<br>Attn: Daniel S. Bleck<br>dsbleck@mintz.com |
| **Clerk of the Bankruptcy Court** | **The United States Trustee** |
| United States Bankruptcy Court for the District of New Hampshire | Office of the United States Trustee for the District of New Hampshire |
| **Counsel to the Committee** | |
| If appointed | |

If no objection to the Cure Amount or the assignment of your Executory Contract(s) or Unexpired Lease(s) to the Successful Bidder is filed by the Objection Deadline, **you will be deemed to have stipulated that the Cure Amount as determined by the Debtor and set forth above is correct and you shall be forever barred, estopped and enjoined from (a) asserting any additional cure amount under the above-listed Executory Contract(s) and Unexpired**

2

78932905.16

Lease(s) or (b) objecting to the assumption and assignment of the above-listed Executory Contract(s) and Unexpired Lease(s) to the Successful Bidder.

Dated: ●, 2021

*/s/      Draft*

**HINCKLEY, ALLEN & SNYDER LLP**
Daniel M. Deschenes (Bar No. 14889)
Owen R. Graham (Bar No. 266701)
650 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 225-4334
Facsimile: (603) 224-8350
ddeschenes@hinckleyallen.com

-and-

Jennifer V. Doran (*Pro Hac Vice* Pending)
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 345-9000
Facsimile: (617) 345-9020
jdoran@hinckleyallen.com

-and-

**POLSINELLI PC**
Jeremy R. Johnson (*Pro Hac Vice* Pending)
Stephen J. Astringer (*Pro Hac Vice* Pending)
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

*Proposed Counsel to the Debtor and Debtor in Possession*

78932905.16

**<ins>Exhibit 4 to Bid Procedures Order</ins>**

Assumption Notice

78932905.16

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

**NOTICE OF PROPOSED ASSIGNMENT**
**OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

      **PLEASE TAKE NOTICE** that on August 30, 2021, the above-captioned debtor and debtor in possession (the "Debtor") filed a petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Hampshire (the "Bankruptcy Court"). On August 30, 2021, the Debtor filed a motion (the "Sale Motion")[2] to sell substantially all of its assets (the "Assets") free and clear of all liens, claims, encumbrances, and other interests (the "Sale") and assume and assign certain of its executory contracts and unexpired leases (collectively, the "Contracts") to the purchaser of the Assets.[3]

      **PLEASE TAKE FURTHER NOTICE** that the Debtor is soliciting offers for the purchase of its Assets consistent with the bidding procedures (the "Bid Procedures") approved by the Court by the entry of an order on September [●], 2021 (the "Bid Procedures Order").[4] The Bid Procedures include, among other things, procedures for the assumption and assignment of the Contracts (the "Assumption Procedures").

      **PLEASE TAKE FURTHER NOTICE** that, accordingly, pursuant to the Bid Procedures Order, the Debtor has selected [●] as the Successful Bidder for the Sale of its Assets and, by this written notice, the Debtor notifies you that the Successful Bidder has determined, in the exercise of its business judgment, that the Contracts and any modifications thereto set forth on **Schedule 1** attached hereto (collectively, the "Assigned Contracts") shall be assumed and assigned to the

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431

[2] *Motion of the Debtor for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtor and the Successful Bidder, and (B) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. ●]

[3] Capitalized terms used but not defined herein shall have all the meanings ascribed to them in the Sale Motion.

[4] *Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granted Related Relief* [Docket No. ●].

Successful Bidder, subject to the Successful Bidder's payment of the cure amount set forth on **<u>Schedule 1</u>**, or such other cure amounts as are agreed by the parties.

**PLEASE TAKE FURTHER NOTICE** that the Successful Bidder has the right under certain circumstances to designate additional Contracts as Assigned Contracts or remove certain Contracts from the list of Assigned Contracts prior to closing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bid Procedures, and the Bid Procedures Order, as well as all related exhibits, including the proposed Sale Order, are available: (a) upon request to Donlin, Recano & Company, Inc. (the notice and claims agent retained in the Chapter 11 Case) by calling (877) 739-9997; (b) by visiting the website maintained in the Chapter 11 Case at https://www.donlinrecano.com/hvk; or (c) for a fee via PACER by visiting https://ecf.nhb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided by the Bid Procedures Order, the time for filing objections to (a) the cure amounts related to the Assigned Contracts and (b) the Debtor's ability to assume and assign the Assigned Contracts has passed and no further notice or action is necessary with respect to such matters.

**PLEASE TAKE FURTHER NOTICE** that any Contract Counterparty that objects to the adequacy of the Successful Bidder's assurance of continued performance set forth in **<u>Schedule 1</u>** hereto must file an objection with the Bankruptcy Court prior to the Sale Hearing or note such objection at the Sale Hearing.

78932905.16

Dated: ●, 2021

_/s/      Draft_

**HINCKLEY, ALLEN & SNYDER LLP**
Daniel M. Deschenes (Bar No. 14889)
Owen R. Graham (Bar No. 266701)
650 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 225-4334
Facsimile: (603) 224-8350
ddeschenes@hinckleyallen.com

-and-

Jennifer V. Doran (_Pro Hac Vice_ Pending)
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 345-9000
Facsimile: (617) 345-9020
jdoran@hinckleyallen.com

-and-

**POLSINELLI PC**
Jeremy R. Johnson (_Pro Hac Vice_ Pending)
Stephen J. Astringer (_Pro Hac Vice_ Pending)
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

_Proposed Counsel to the Debtor and Debtor
in Possession_

## Schedule 1 to Assumption Notice

## Assigned Contracts[1]

| Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

---

[1]  The presence of a contract or lease on this **Schedule 1** does not constitute and admission by the Debtor that such contract is an executory contract or such lease in an unexpired lease pursuant to Bankruptcy Code section 365 or any other applicable law, and the Debtor reserves all rights to withdraw any proposed assumption and assignment or to reject any contract or lease at any time before such contract or lease is assumed and assigned pursuant to an order of the Court.

78932905.16

**<u>Exhibit B to Motion</u>**

Proposed Form of Sale Order

[To be filed prior to the Sale Hearing]

78932905.16

**Exhibit B**

Stalking Horse Agreement[1]

---

[1] Schedules and other exhibits available upon request

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**THE PROSPECT-WOODWARD HOME D/B/A HILLSIDE VILLAGE KEENE, A NEW HAMPSHIRE NOT-FOR-PROFIT VOLUNTARY CORPORATION,**

**AS SELLER,**

**AND**

**COVENANT LIVING SERVICES, AN ILLINOIS NOT-FOR-PROFIT CORPORATION,**

**AS PURCHASER.**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of August 17, 2021 (the "**Execution Date**"), by and between The Prospect-Woodward Home d/b/a Hillside Village Keene, a New Hampshire voluntary not-for-profit corporation ("**Hillside Village**" or the "**Seller**"), and Covenant Living Services, an Illinois not-for-profit corporation, or its assignee ("**Buyer**" or "**Purchaser**").  The Seller and the Buyer are sometimes individually referred to as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, Seller owns and operates a licensed continuing care retirement facility with 222 units, comprised of 141 independent living units, 43 assisted living units, 18 memory care units, and 20 licensed but not yet opened long term nursing care units (the "**Facility**") located on or about 95 Wyman Road, Keene, New Hampshire, comprising approximately 66 acres (the "**Premises**");

WHEREAS, Seller is having financial difficulties, and in connection with discussions with its bondholders (the "**Bondholders**"), residents, and other stakeholders, Seller in its business judgment believes a sale of the Facility and related assets to be in its best interests;

WHEREAS, Buyer desires to acquire the Facility, the Premises, and the assets owned by Seller and used in Seller's operation of the Facility (the "**Business**", and collectively, with the Facility and the Premises, the "**Purchased Assets**") on the terms and conditions contained in this Agreement, and desires to act as the stalking horse pursuant to the Bid Procedures (as defined below);

WHEREAS, Seller intends to file a voluntary bankruptcy petition (the "**Chapter 11 Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Hampshire (the "**Bankruptcy Court**") promptly following expiration of the Diligence Period (the date of such filing, the "**Petition Date**");

WHEREAS, Seller will seek approval of bid procedures (the "**Bid Procedures**") pursuant to the Bid Procedures Order (as defined below) by the Bankruptcy Court;

WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Seller pursuant to this Agreement, the Sale Order, the Sale Motion and Sections 105, 363, and 365 of Title 11 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities of the Seller as specifically provided herein;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order;

WHEREAS, the sale will be subject to (i) Approvals (as defined below) and (ii) the conditions expressly set forth herein;

WHEREAS, the Parties acknowledge and agree that the terms of the Contemplated Transactions are the result of arm's length negotiations and the Seller has solicited bids for the Purchased Assets to obtain the highest and best stalking horse offer for the Purchased Assets; and

WHEREAS, Seller has determined that the Buyer's offer to purchase the Purchased Assets is the highest and best stalking horse offer received to date for the Purchased Assets and constitutes a fair and adequate purchase price for the Purchased Assets.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties hereby agree as follows:

# ARTICLE 1

## DEFINITIONS

As used herein, the following terms have the meanings set forth below:

(a)    **"Accounts Receivable"** means accounts receivable for goods and services rendered by Seller to the residents of the Facility or related to the Business, which term shall include, without limitation, out-of-pocket (self-pay) payments and commercial insurance payments, as well as any promissory notes.

(b)    **"Accrued PTO"** has the meaning set out in <u>Section 5.7</u>.

(c)    "**Action**" means any action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

(d)    "**Affiliate**" shall mean, as to the entity in question, any person or entity that directly or indirectly controls, is controlled by or is under common control with, the entity in question and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity whether through ownership of voting securities, by contract or otherwise.

(e)    "**Alternative Transaction**" means any agreement or transaction, whether pursuant to a plan or otherwise, involving the sale or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the Purchased  Assets, or the issuance, sale or other transfer (in a single transaction or series of related transactions) of all or substantially all of the of equity interests of Seller or any of its successors, to any party other than Buyer or a designee of Buyer as a result of the auction pursuant to the Bid Procedures.

(f)    "**Applicable Law**" means any federal, state, municipal, county, local, foreign or other statute, law, regulation, code, rule, or order.

(g)    "**Approvals**" means all consents and approvals from any Governmental Authority, including without limitation any Governmental Authority with regulatory oversight of healthcare organizations, charitable trusts, or continuing care retirement communities, which are necessary for the transfer of the Purchased Assets or the operation of the Business, and including to the extent applicable, without limitation, the regulatory change in control approvals under New Hampshire RSA 420-D:13 and RSA 7:19-b, all as set forth on <u>Schedule 1(g)</u>, and a written license granted by the City of Keene for the use and operation of the underground walkway which benefits the Premises.

(h)    "**Assumed Contracts**" means all of the rights and interests of Seller in and to the Contracts that Buyer designates for assumption and assignment, as listed on <u>Schedule 5.9(f)</u>, and including all Residency Agreements and the Option Agreements.

(i)    "**Assumed Liabilities**" has the meaning set forth in <u>Section 2.3</u>.

(j)    "**Avoidance Actions**" means any and all claims for relief of Seller under Chapter 5 of the Bankruptcy Code.

(k)    "**Bankruptcy Code**" has the meaning set forth in the Recitals.

(l)    "**Bankruptcy Court**" has the meaning set forth in the Recitals.

78263910.34

(m)      "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as now in effect.

(n)      "**Bid Procedures**" has the meaning set out in the Recitals.

(o)      "**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures, a form of which is attached hereto as **Exhibit D**.

(p)      "**Bond Trustee**" means UMB Bank, N.A. as bond trustee with respect to the Series 2017 Bonds authorized and issued by the New Hampshire Health And Education Facilities Authority for the benefit of the Seller.

(q)      "**Books and Records**" means the books and records of Seller relating to the Purchased Assets, to the extent assignable; provided, however, that "Books and Records" shall not include the originals of Seller's minute books, stock books and Tax returns.

(r)      "**Break-Up Fee**" has the meaning set forth in Section 7.2.

(s)      "**Business**" has the meaning set forth in the Recitals.

(t)      "**Business Day**" means any day other than any Saturday, Sunday or legal holiday in New York, New York.

(u)      "**Chapter 11 Case**" has the meaning set forth in the Recitals.

(v)      "**Claim**" has the meaning set forth in Section 101(b) of the Bankruptcy Code

(w)      "**Closing**" and "**Closing Date**" have the meaning set forth in Section 2.6.

(x)      "**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

(y)      "**Confidentiality Agreement**" has the meaning set forth in Section 8.3(a).

(z)       "**Contract**" means agreements, contracts, commitments, personal property leases, real property leases, and other arrangements to which Seller is a party, including without limitation the Residency Agreements and Option Agreements.

(aa)      "**Contract Party**" has the meaning set forth in Section 2.5(d).

(bb)      "**Cure Amount**" or "**Cure Amounts**" means, respectively, the amount necessary pursuant to 11 U.S.C. Section 365 to cure defaults under an Assumed Contract, or under all Assumed Contracts.

(cc)      "**Deposit**" has the meaning set forth in Section 2.5(b) and shall include any interest earned thereon.

(dd)      "**Designation Deadline**" means 5:00 p.m., Eastern Standard Time, on the date that is five (5) Business Days prior to the Closing Date or such later date as Buyer and Seller shall mutually agree and as the Bankruptcy Court may authorize; provided that the Designation Deadline for any Executory Contract with respect to which a dispute regarding a Cure Amount exists on such date shall be five (5) days after the date of the resolution of such dispute.

(ee)      "**Diligence Period**" has the meaning set forth in Section 2.9.

4

(ff)     "**Effective Time**" has the meaning set forth in Section 2.6.

(gg)     "**Endowment**" has the meaning set forth in Section 2.1(i).

(hh)     "**Entrance Fee And Option Deposits**" means (i) if any, entrance fee deposits on hand, including reservation deposits on hand, subject to Residency Agreements, (ii) deferred entrance fee arrangements and promissory notes issued by any Prospective Resident or Resident for the payment of entrance fee or reservation deposits, subject to Residency Agreements, and (iii) Option Deposits subject to the Option Agreements, all of which are described on Schedule 5.9(e) hereto. Schedule 5.9(e) shall be modified from time to time to include any additional entrance fees deposits, Option Deposits or arrangements from the Execution Date through the Closing Date.

(ii)     "**Entrance Fee Obligations**" means all obligations owed to Residents pursuant to the Residency Agreements, including any refund obligations.

(jj)     "**Equipment**" means the equipment owned by Seller and used in the Business, including the equipment identified on Schedule 2.1(d).

(kk)     "**Escrow Agent**" means the Title Company.

(ll)     "**Excluded Assets**" has the meaning set forth in Section 2.2.

(mm)     "**Executory Contract**" means any executory contract related to the Business or to which Seller is a party and that is subject to Section 365 of the Bankruptcy Code.

(nn)     "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, which is unappealed, unappealable, unstayed, and not subject to a pending motion for reconsideration, rehearing, or Rule 59 or 60 (or equivalent) relief.

(oo)     "**Governmental Authority**" means the Bankruptcy Court, any tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

(pp)     "**Inventory**" means all inventory of any kind or nature located at the Facility.

(qq)     "**Knowledge of Seller**" or "**Knowledge**" shall mean the actual knowledge of Toby V. Shea, as Chief Restructuring Officer without a duty to investigate.

(rr)     "**Lien**" means any security interest, pledge, mortgage, lien, charge, adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or other similar right), defect of title, encroachments, or other encumbrance of any kind or character.

(ss)     "**Necessary Consents**" has the meaning set forth in Section 5.9(c).

(tt)     "**Objectionable Title Exception**" has the meaning set out in Section 5.13(c).

(uu)     "**Option Agreements**" means the Option Deposit Agreements between the Seller and each Resident or Prospective Resident, setting forth the terms and conditions for the return of the Option Deposits of such Residents or Prospective Residents, and any escrow agreements related thereto.

(vv)     "**Option Deposits**" means the amounts paid under Option Agreements and held in escrow by TMI Trust Company.

Case: 21-10523-BAH  Doc #: 10  Filed: 08/30/21  Desc: Main Document    Page 95 of 140

(ww)   "**Permits**" means to the extent transferrable, all licenses, permits (including occupancy permits), certificates, registrations, approvals, franchises, consents and other authorizations of Seller obtained from or filed with a Governmental Authority and used in connection with the Business.

(xx)   "**Permitted Liens**" means (i) statutory Liens for Taxes, assessments or other governmental charges not yet due and payable, (ii) workers', repairers', landlords' and similar Liens which arose or were incurred in the ordinary course of business and which secure obligations which are not yet due and payable and which do not exceed $10,000 in the aggregate, (iii) Liens which are expressly assumed or consented to by Buyer herein (including, without limitation, liens included in the Assumed Liabilities), (iv) Liens which are created by Buyer, (v) easements, restrictions, covenants, and all other matters of record and legal highways with respect to the Premises or leased real property under an Assumed Contract, (vi) matters which would be shown on an accurate survey of the Premises, or any leased real property under an Assumed Contract, (vii) those matters that become Permitted Liens in accordance with Section 5.13 of this Agreement, and (viii) those matters of record identified on Schedule B, Part II of the Commitment as exceptions 5 through 16.

(yy)   "**Person**" means any natural person, corporation, limited liability company, general partnership, limited partnership, sole proprietorship, trust, union, association, Governmental Authority or other business organization.

(zz)   "**Petition Date**" has the meaning set out in Section 5.8(c).

(aaa)   "**Premises**" has the meaning set out in the Recitals, and includes Seller's fee interest in any and all land, buildings, structures, improvements, fixtures or other interest in real property which is owned by the Seller and used in the Business.

(bbb)   Reserved.

(ccc)   "**Prospective Resident**" means any natural person who has entered into a Residency Agreement, Option Agreement, or deposit agreement with Seller under which there is any continuing obligation to either such natural person or Seller, including without limitation any such agreements under which an Entrance Fee Obligation is due now or may be in the future, who has not yet moved into his or her unit.

(ddd)   "**Purchase Price**" has the meaning set forth in Section 2.5(a).

(eee)   "**Purchased Assets**" has the meaning set forth in Section 2.1.

(fff)   "**Related Agreements**" means Bill of Sale, the Assignment and Assumption Agreement, and the quitclaim deed, each substantially in the form attached hereto as **Exhibits A,  B**, and **C**, respectively, and other agreements, documents, and instruments related to the transactions contemplated herein.

(ggg)   "**Related Person**" means, with respect to a specific Person, any officer, director, member, manager, employee, agent, shareholder, representative, successor or assign of such Person.

(hhh)   "**Representatives**" means, with respect to a Person, such Person's directors, officers, employees, stockholders, funding sources, affiliates, representatives, and agents.

(iii)   "**Residency Agreements**" means the agreements identified on Schedule 1(iii) hereto, including to the extent there are any continuing obligations to any party thereto, (i) the continuing care contracts executed between Seller and each Resident detailing the residential and other rights and obligations of the Resident and the rights and obligations of Seller, including without limitation lifecare obligations and Entrance Fee Obligations; (ii) deposit agreements executed between Seller and certain Prospective Residents pursuant to

78263910.34

which a Prospective Resident has put down a deposit toward or paid an entrance fee on an independent living unit; and (iii) the occupancy contract executed between each Resident of the assisted living, memory care, or long term nursing care units and Seller detailing the rights and obligations of the Resident and the rights and obligations of Seller thereunder, including without limitation, any lifecare obligations or Entrance Fee Obligations.  For the avoidance of doubt, Residency Agreements include all agreements with Residents (both current and former, as well as Prospective) under which Seller currently owes or will owe contractual obligations to such Residents (whether such obligation has already triggered or will trigger in the future), and will be updated as of Closing to reflect any changes between the Execution Date and Closing.

(jjj)     "**Resident**" means a present or former occupant of the Facility who is a party to a Residency Agreement.

(kkk)     "**Retained Liabilities**" has the meaning set forth in <u>Section 2.4</u>.

(lll)     "**Sale and Procedures Motion**" means a motion or motions for approval of the appropriate terms of this Agreement and the Bid Procedures, including, without limitation, the Break-Up Fee and an overbid process, a form of which is attached hereto as **Exhibit E**.

(mmm)   "**Sale Order**" means an Order of the Bankruptcy Court approving the consummation of this Agreement, to be prepared by the parties subsequently subject to <u>Section 5.8</u>.

(nnn)     "**Seller's Title Notice**" has the meaning set out in <u>Section 5.13(c)</u>.

(ooo)     "**Taxes**" means any and all taxes, fees, levies, duties, tariffs, import charges and other charges imposed by any taxing authority, together with any related interest, penalties or other additions thereto, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom, duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

(ppp)     "**Title Company**" means Connecticut Attorneys Title Insurance Company.

(qqq)     "**Title Policy**" shall have the meaning set forth in <u>Section 5.13</u>.

(rrr)     "**Transferred Employees**" shall have the meaning set forth in <u>Section 5.7(e)</u>.

(sss)     "**Woodside Balcony Repair**" shall have the meaning set forth in <u>Section 4.7</u>.

## ARTICLE 2

## PURCHASE AND SALE OF ASSETS

**2.1**     <u>Sale of Assets to Buyer</u>.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all Liens except Permitted Liens, all of Seller's right, title and interest in and to all of the following to the extent owned by the Seller and used in the Business (collectively, the "**Purchased Assets**"):

(a)     The Facility, the Premises, and the improvements thereon;

(b)     the Books and Records, Resident medical records, and Transferred Employee records;

(c)    the Assumed Contracts (including for Residency Agreements, any rights of Seller in the Entrance Fee And Option Deposits);

(d)    the Equipment;

(e)    the Inventory;

(f)    to the extent transferable under Applicable Law, the Permits;

(g)    all intellectual property, including any trademarks, trade secrets, and the like;

(h)    general intangibles, and community specific intellectual property, including domain name www.hillsidevillagekeene.org, as well as the names "The Prospect-Woodward Home" and "Hillside Village Keene" and related logos and marketing materials; and

(i)    subject to Buyer being a non-profit, such funds being transferable, and the restrictions on the use of any such funds (such funds and restrictions as described in Schedule 2.1(i) and to be updated for any change in such funds as of Closing), all of Seller's rights in any endowment or donor-restricted funds held by Seller (collectively, the "**Endowment**").

2.2    Excluded Assets. The Parties acknowledge that Seller shall not sell, assign, transfer or convey to Buyer, and Buyer shall not purchase, acquire or accept from Seller, the assets consisting of the following (all such assets, the "**Excluded Assets**"):

(a)    all cash and cash equivalents (other than Seller's rights in the Entrance Fee And Option Deposits);

(b)    the Purchase Price and all rights under this Agreement;

(c)    except for Entrance Fees And Option Deposits and Resident (or Prospective Resident) promissory notes as addressed elsewhere, all Accounts Receivable of the Business;

(d)    all claims and causes of action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code;

(e)    all set-off rights to claims filed or asserted in the Chapter 11 Case (except to the extent arising in connection with an Assumed Contract which is subject to cure);

(f)    hold-backs and escrows for any prorations or Taxes being paid by Seller in connection with the Closing or afterward;

(g)    all insurance policies of Seller, any prepaid insurance premiums and any rights or claims or proceeds arising from such policies;

(h)    all Tax refunds, rebates, and overpayments owed to Seller which are related to Seller's operation of the Business prior to the Closing;

(i)    all (i) corporate seals, corporate organizational records, minute books, charter documents, record books, and stock transfer books pertaining to Seller, (ii) original Tax, accounting and financial records which pertain exclusively to the Excluded Assets, and (iii) such other files, books and records which pertain exclusively to the Excluded Assets or to the formation, existence or capitalization of Seller or of any other Person;

(j)        all Inventory and Assets disposed of or exhausted prior to Closing in the ordinary course of business;

(k)        any records which Seller is legally required to retain in its possession and any records related to Excluded Assets or Excluded Liabilities (as hereinafter defined);

(l)        all equipment and tangible property located at the Business but not owned by Seller, or subject to an equipment lease or vehicle lease that is not an Assumed Contract, and all other assets, properties and rights not related to or used in the Business, all as described in Schedule 2.2(l);

(m)        personnel records for Employees who are not Transferred Employees and, to the extent the transfer of such records (whether directly or by means of the sale of a Seller) to Buyer or its affiliates is prohibited by Applicable Law, for Transferred Employees, and all organizational documents and minute books of the Seller;

(n)        board designated, restricted and trustee-held or other escrowed funds (such as the debt service reserves, self-insurance trusts, workers compensation trusts, working capital trust assets, and assets and investments restricted as to use), donor restricted assets (except as provided in Section 2.1(i)), beneficial interests in charitable trusts and accrued earnings on all of the foregoing; and

(o)        Seller's attorney-client and work-product privileges.

2.3        Assumed Liabilities.   Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Buyer shall assume or otherwise be responsible for, which amounts shall be in addition to the Purchase Price, for (collectively, the "**Assumed Liabilities**"):

(a)        all Entrance Fee Obligations and obligations under Residency Agreements and Option Agreements;

(b)        all liabilities and obligations under the Purchased Assets accruing or arising after the Closing;

(c)        all liabilities and obligations associated with the Assumed Contracts from and after Closing and all Cure Amounts associated with such Assumed Contracts; and

(d)        all liabilities required to be paid by Buyer pursuant to this Agreement (such as, without limitation, any recording fee, one-half of the real property transfer Taxes, and to the extent the Endowment is transferred to Buyer, any obligations with regard to the use after the Effective Time of the Endowment in accordance with law).

 Seller shall have no liability for any such liabilities or obligations.

2.4        Excluded Liabilities.

(a)        Except for the Assumed Liabilities, Buyer shall not assume or be liable for any liability, obligation, debt, claim against or contract of the Business, Seller or any of its Affiliates which, in any case, pertain to the ownership, operation or conduct of the Business or the ownership of the Purchased Assets prior to the Closing Date, at any time existing or asserted, whether or not accrued, fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the Books and Records of Seller or any of its Affiliates (collectively, the "**Retained Liabilities**").

2.5        Closing Proceedings.

78263910.34

(a)      As full consideration for the sale of the Purchased Assets by Seller to Buyer, at the Closing, Buyer shall assume the Assumed Liabilities as provided in Section 2.3 and shall pay to the Seller,  cash in the amount of Thirty-Three Million and NO/00 Dollars ($33,000,000.00), ("**Purchase Price**") as adjusted in accordance with this Section 2.5.

(b)      One Million Dollars and NO/00 ($1,000,000.00)  shall be paid as an earnest money deposit (the "**Deposit**") to Title Company ("**Escrow Agent**") within one Business Day of execution of this Agreement, which will be held by Escrow Agent in accordance with the terms and conditions of this Agreement and the escrow agreement (the "**Escrow Agreement**").  The Deposit will be credited against the Purchase Price at Closing, and will otherwise be disbursed as provided in this Agreement, the Escrow Agreement and the Sale Order.  Any interest on the Deposit shall follow the Deposit.

(c)      At the Closing, in addition to such other actions as may be provided for herein, Buyer shall pay to the Seller, in cash, an amount equal to the Purchase Price by wire transfer of immediately available funds, with the Deposit being transferred to Seller and credited to the Purchase Price.

(d)      At the Closing, Buyer shall assume the Assumed Liabilities (which shall be in addition to, and not a credit against, the Purchase Price), and with regard to Assumed Contracts, shall pay to each party to an Assumed Contract (a "**Contract Party**") any Cure Amounts, in cash, by wire transfer of immediately available funds, necessary to acquire any Assumed Contract, at such time as may be designated by the Court in the Sale Order.

(e)      At the Closing, Buyer shall pay all escrow fees, recording costs or fees, one-half of the real property transfer Taxes, and the cost of any title insurance policy and endorsements thereto obtained by Buyer.  Buyer shall be solely responsible for the fees and costs of Buyer's counsel and other professional advisors.

(f)      At the Closing, Buyer shall pay to Seller an amount equal to Accrued PTO not to exceed $200,000, due to employees pursuant to New Hampshire law, which Seller shall pay to the employees as of Closing.

(g)      Except as otherwise set forth in this Agreement, all utility charges, rents or other payments under the Purchased Assets and all ad valorem, real property, personal property and similar Taxes with respect to the Purchased Assets shall be prorated as of the Closing Date. Taxes (excluding any transfer Taxes) shall be prorated based on the most recent available tax duplicate.  The majority of the Premises is not currently subject to any real estate Taxes due to the non-profit status of Seller and instead Seller is currently participating in a PILOT program (the "**PILOT Program Premises**"), so there shall be no proration as to real estate Taxes for the PILOT Program Premises. Seller shall pay its prorated portion of the PILOT program payment, and if Buyer is eligible for and enters into a new PILOT program agreement, Buyer shall be responsible for its pro-rated portion of the PILOT program payment for the year in which the Closing happens; if Buyer is not eligible for or does not enter into a new PILOT program agreement, Buyer shall be responsible for all real estate Taxes related to Buyer's ownership and acquisition of the PILOT Program Premises. All prorations shall be final.  The prorations and adjustments provided for in this Section shall be made so that Seller shall receive the income and be charged with the expense of the operation of the Purchased Assets up to the Closing Date.  Buyer shall receive a credit for all prorations due from Seller as of Closing, and Buyer shall pay all such expenses following the Closing Date; Buyer shall be charged for all prorations due from Buyer as of Closing which have already been paid to third parties by Seller, provided such payments to third parties have been disclosed to and reasonably agreed upon by Buyer, prior to the Closing Date.

(h)      At the Closing, the Parties will execute and deliver the Related Agreements.

2.6     Time and Place of Closing.  Subject to the terms of this Agreement, the closing of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Hinckley Allen, 650 Elm Street, Manchester, New Hampshire, within seven (7) days after satisfaction or waiver of the conditions to Closing set out in Article 6 (the "**Closing Date**"), and in no event later than March 31, 2022 (the "**Outside Closing Date**") (unless otherwise mutually agreed by the Parties, including with regard to a remote closing). The transactions contemplated hereby shall take place pursuant to, and in accordance with, the terms and conditions hereof.  The Closing shall be effective as of 11:59 p.m. **Eastern Time** on the Closing Date or such other date and time as the parties may agree in writing (the "**Effective Time**").

2.7     Purchase Price Allocation.  For tax purposes only, Buyer and Seller shall allocate the Purchase Price (together with Assumed Liabilities properly included, if any) among the Purchased Assets in a manner consistent with the fair market values determined in good faith and on a reasonable basis by Buyer and Seller prior to the Closing Date, provided that such allocation shall not be binding on any Party for any other purpose. Such allocation shall be consistent with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder.  Buyer and Seller covenant and agree that all filings with Governmental Authorities regarding Taxes will be consistent with such allocation.

2.8     Casualty. If any material part of the Purchased Assets is condemned, damaged or destroyed (whether by fire, theft, or other casualty event) prior to the Closing, upon the Closing, Seller shall immediately notify Buyer of such condemnation, damage or destruction.  In the event Seller's reasonable estimate of such damage or destruction is in excess of ten percent (10%) of the Purchase Price, then Buyer shall have the option to: (x) terminate this Agreement by written notice delivered to Seller within ten (10) days after Buyer's receipt of notice of such damage or destruction, in which case the Deposit shall be returned to Buyer and the Parties shall have no further obligations hereunder, or (y) proceed with the transaction contemplated in this Agreement without abatement of the Purchase Price, in which case at and after Closing (i) all insurance proceeds relating to such damage or casualty shall be deemed to have been absolutely and irrevocably assigned to and be payable directly to Buyer, less any amounts reasonably expended by Seller prior to Closing for partial restoration, (ii) Buyer shall have the right to conduct all settlement proceedings with respect to such insurance claims, and (iii) Seller shall deliver to Buyer through escrow an unconditional assignment of all such insurance proceeds.  If this Agreement is not terminated, Seller shall not be obligated to repair any damage or destruction.  Any notice or documents required to be provided pursuant to this Section shall be provided by the disclosing Party to counsel for the Bond Trustee within one (1) Business Day of such required disclosure.

2.9     Diligence Period.  During the period commencing on June 24, 2021 and continuing until 5:00 p.m. Eastern Time on that date that is sixty (60) days immediately following (the "**Diligence Period**"), Buyer shall have the right to conduct customary due diligence with respect to the Purchased Assets, and to elect, in its sole and absolute discretion, to either continue or terminate this Agreement.  Buyer may terminate this Agreement, and receive a full refund of the Deposit, by delivering written notice of termination to Seller at any time prior to the expiration of the Diligence Period.  If Buyer does not so terminate this Agreement during the Diligence Period, the Deposit shall thereafter be nonrefundable except as set forth in Section 7.3. The obligations in this paragraph shall survive the termination of this Agreement.

2.10     Bankruptcy Court Approval.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts and Residency Agreements are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the contemplated transactions to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance under the to-be-assigned Executory Contracts.

(b)     From and after the Execution Date and prior to the Closing or the termination of this Agreement in accordance with Article 7, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bid Procedures, Sale Order or this Agreement; provided, however, that the Seller may act in accordance with the Bid Procedures, the Sale Order, and other orders of the Bankruptcy Court.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement, Seller makes the representations and warranties set forth below which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing.

**3.1** Organization.  Subject to entry of the Sale Order, Necessary Consents, and the Approvals, the Seller has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**3.2** Execution and Delivery.  Subject to entry of the Sale Order, Necessary Consents, and the Approvals, this Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by the Seller of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms.

**3.3** Permits.   The Facility is duly licensed in accordance with the applicable laws of the State of New Hampshire, and all other ancillary departments or services located at or operated for the benefit of, the Facility that are required to be separately licensed are duly licensed by the appropriate Governmental Authority.  Except as set out on Schedule 3.3(i), Seller has all Permits which are needed or required by Applicable Law to operate its business related to or affecting the Facility or any ancillary services related thereto as currently conducted. Schedule 3.3(ii) is a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Facility or the Purchased Assets and such Permits constitute all material Permits necessary for the conduct of the Business and operation of the Facility as currently conducted and for the ownership of the Facility by Seller and operation and use of the Purchased Assets by Seller, all of which are in full force and effect.

**3.4** Litigation Proceedings; Judgments.  Schedule 3.4 is an accurate list of all pending litigation or proceedings with respect to the Facility and the Purchased Assets. Except as set forth on Schedule 3.4 there are no claims, actions, suits, proceedings, or investigations, pending or to Seller's Knowledge, threatened, against or related to Seller, the Facility or the Purchased Assets, at law or in equity.  There are no judgments presently outstanding and unsatisfied against the Facility and Business, Seller or any of the Purchased Assets.  Except as set forth on Schedule 3.4, Seller has not received any written notice or written claim for tort or violation of any applicable order, or an investigation thereof with respect to its ownership or operation of the Facility or the Business.

**3.5** Employee Relations.   Seller is in compliance in all material respects with all Applicable Laws and contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours. Except as set forth on Schedule 3.5, Seller has no Knowledge of any complaints before or claims brought by a Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like.

3.6     Compliance.  Except as set forth on Schedule 3.6, to the Knowledge of Seller, Seller is in compliance in all material respects with all applicable statutes, rules, regulations, and requirements, including healthcare laws and regulations, of each Governmental Authority having jurisdiction over the Seller and the Purchased Assets and the operations of the Facility and the Purchased Assets. To the extent of any material deficiencies are determined during a healthcare survey by the appropriate Governmental Authority, Seller has corrected such deficiencies as of the Closing Date or has proposed a plan of correction which as of the Closing Date has been accepted or is reasonably anticipated to be accepted by the applicable Governmental Authority.

3.7     Broker. Except for the engagement of Grandbridge, whose fee shall be paid by Seller from the proceeds of the sale at Closing, neither Seller nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Buyer.

3.8     Environmental Matters.  Except as set forth on Schedule 3.8: (a) there are no material environmental liabilities on or affecting any of the Facility, (b)  Seller has at all times operated the Facility and conducted the Business and, during the period that Seller owned the Facility and any third party operated any such Business, such third party operated the Business, in each case, in compliance with all applicable environmental laws and permits required thereunder or issued pursuant thereto in all material respects; and (c) to Seller's Knowledge, there are no proceedings pending or threatened before any Governmental Authority with respect to Seller's ownership or operation of the Premises alleging violations of environmental laws, or claiming material remediation obligations under applicable environmental laws, and Seller has not received any written notice of any alleged or actual violation or non-compliance with any environmental law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Premises or the ownership or operation thereof.

3.9     Financial Information.

(a)     Schedule 3.9 hereto contains the following financial statements and financial information:

(i)     Audited financial statements of the Business for calendar years 2018, 2019 and 2020; and

(ii)     Unaudited financial statements for each month from January 2021 through March 31, 2021.

The foregoing financial statements are true, correct and complete in all material respects and have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated except that the Unaudited Financial Information may not included footnote disclosures or reflect normal year-end adjustments, including any future service obligation adjustment.  Except as set forth on Schedule 3.9, the foregoing financial statements present fairly, in all material respects, the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

3.10     Real Property.

(a)     Schedule 3.10 contains an accurate and complete legal description, street address and tax parcel identification number for the Premises.  Seller holds good and indefeasible fee simple title to all of the Premises, and shall convey the Premises in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens).  Seller does not lease any portion of the Premises as a tenant or subtenant.  Seller agrees that title to the Premises shall not be altered between the date of this Agreement and Closing.

13

78263910.34

(b)     Seller has not received written notice from any Governmental Authority of (and otherwise has no knowledge of): (i) any pending or threatened condemnation proceedings affecting the Premises, or any part thereof; (ii) asserting or alleging any material violations or potential violations of any Applicable Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Premises, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened proceedings, nor any claims or actions against Seller or the Premises, relating to the ownership, lease, use or occupancy of such Premises or any portion thereof which is reasonably likely to result in a material change in the condition of the Premises or the ownership or operation of the Premises.  Seller has not received any written notice of any pending zoning or other land use change affecting the Premises.

(c)     Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Premises in any material respect.

**3.11**    Insurance.  Schedule 3.11 sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Seller or its representatives or agents with respect to the Facility and Seller as of the Execution Date covering the ownership and operation of the Business, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).

**3.12**    Intellectual Property.  Seller owns or has the right to use all intellectual property used in connection with the ownership or operation of the Facility.  Schedule 3.12 lists all of the registered intellectual property owned by Seller.  Except as set forth on Schedule 3.12, the conduct of the Business does not infringe or otherwise violate any intellectual property or other proprietary rights of any other Person, and there is no action pending or, to the Knowledge of Seller, threatened, alleging any such infringement or violation or challenging Seller's rights in or to any of its intellectual property.

**3.13**    Tax Matters.  Except as set forth on Schedule 3.13:

(a)     All Taxes due and owing by Seller (whether or not shown on any tax return) have been timely paid when due (taking into account any applicable extensions), including all Taxes with respect to the Facility.

(b)     There are no liens relating to Taxes on any of the Purchased Assets other than liens for Taxes not yet due and payable.

(c)      Proper and accurate amounts have been withheld by Seller in compliance with the payroll tax and other withholding provisions of all Applicable Laws, and all of such amounts have been timely remitted to the proper taxing authority.

(d)     Seller has timely filed all tax returns required to be filed by it, including all tax returns relating to the Purchased Assets (all of which are true, complete and correct in all material respects).  Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a tax assessment or deficiency, which currently remains in effect.  Seller is not currently the beneficiary of any extension of time within which to file any tax return.

(e)     To Seller's Knowledge, no deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority for which Seller may have any liability or which may attach to the Purchased Assets.  There are no pending or, to Seller's Knowledge, threatened proceedings for or relating to any liability in respect of Taxes for which Seller may have any liability or which may attach to the Purchased Assets.  There are no matters under discussion by Seller with any Governmental Authority with respect to Taxes that may result in an additional amount of Taxes for which Seller may have any liability or which may

14

attach to the Purchased Assets.  No Governmental Authority has notified Seller that it has conducted an audit of any Taxes that may be due and owing by Seller or as the result of the Business audited by Seller, which currently remains outstanding or unresolved.

**3.14**     No Other Representation and/or Warranty.  Except for the representations and warranties contained in this Article 3 (including the related portions of the Schedules), Seller has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of or with respect to Seller, the Purchased Assets, the Premises, the Facility or the Business, including any representation or warranty arising from statute or otherwise in law.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

In order to induce Seller to enter into this Agreement, Buyer makes the representations and warranties set forth below which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing.

**4.1**     Organization.  Buyer has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**4.2**     Execution and Delivery.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes and, upon the execution and delivery by Buyer of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms.

**4.3**     Governmental Approvals and Filings.  No consent, approval or action of, filing with or notice to any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

**4.4**     Brokers.  Neither Buyer nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Seller.

**4.5**     Adequate Funds.  Buyer has adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder.

**4.6**     Fitness for Obtaining Permits and Approvals.  Buyer has no knowledge of any material fact or other information related to Buyer or any of its Affiliates which could be reasonably expected to have an adverse impact on Buyer's ability to obtain the Permits or Approvals.

**4.7**     Construction Dispute. Buyer acknowledges that Seller is in a construction dispute with its original contractor regarding allegations of substandard and incomplete work on the Premises, and Seller has retained Bergeron construction as a new contractor to complete approximately $570,000 of construction and remediation repairs to the Woodside building balconies (the "**Woodside Balcony Repair**"), as set out on Schedule 4.7.  Seller shall promptly pay for all construction and remediation associated with the Woodside Balcony Repair, and Seller shall make commercially reasonable efforts to have the work completed by September 30, 2021, but in any event, the work shall be completed on or before Closing. Seller shall furnish

Title Company with all documentation required to enable Title Company to issue an owner's policy that insures over all mechanic's liens.  Buyer is assuming no liability, for continuing litigation or otherwise, with respect to the construction dispute.

**4.8**     Condition of Assets; Disclaimers.

(a)     Buyer acknowledges that it has fully inspected or waived the right to inspect the Purchased Assets prior to the execution of this Agreement and has made its own determinations as to the Purchased Assets.  Buyer expressly acknowledges and warrants that Buyer is accepting the Purchased Assets in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION"  and all latent or patent defects, with regard to all aspects of the Purchased Assets without warranty or representation of any kind by Seller or any of Seller's managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates, contractors subcontractors, successors and assigns.  BUYER ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE PROVIDED FOR IN THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE PURCHASED ASSETS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS; THE PHYSICAL CONDITION OF THE PURCHASED ASSETS; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE PURCHASED ASSETS OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE PURCHASED ASSETS; THE HABITABILITY OF THE PURCHASED ASSETS; THE ZONING OF THE PURCHASED ASSETS; THE POSSIBILITY OF DEVELOPING OR USING THE PURCHASED ASSETS IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE PURCHASED ASSETS; THE MERCHANTABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR USE.

## ARTICLE 5

## COVENANTS

**5.1**   Access to Books and Records.  From and after the Closing, unless such other date is set by the Bankruptcy Court, each Party shall afford, for a period ending on the later of (i) three (3) years from the Closing Date and (ii) the date of the entry of a final decree or an order converting or dismissing the Chapter 11 Case, the other Party, its Affiliates and the Bond Trustee reasonable access, during normal business hours, to the books, records and other data relating to the operation of the Business prior to the Closing in its possession to the extent that such access may be reasonably required by the requesting Party in connection with (a) the preparation of Tax returns, (b) the determination or enforcement of rights and obligations under this Agreement, (c) compliance with the requirements of any Governmental Authority, (d) in connection with any threatened or actual legal proceeding, (e) in connection with any audit of the Business for any pre-Closing period, or (f) in connection with administering the Chapter 11 Case, or any subsequent Chapter 7 case.  During such period neither Party shall dispose of or destroy any books, records or other data relating to the operation of the Business prior to the Closing unless such Party gives the other Party thirty (30) days' prior written notice thereof and the option to retain such books, records or other data.  Further, Buyer shall maintain all records including healthcare records for the periods required by law.

**5.2**     Cooperation; Approvals; Ordinary Course.

(a)     Subject to the terms and conditions herein provided, the Parties shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions (whether set forth in this Agreement or otherwise) necessary to effect the consummation of the transactions contemplated by this Agreement.

(b)     From the Execution Date until the Closing, Seller will operate in the ordinary course of business consistent with past practice, as modified pursuant to the proceedings before the Bankruptcy Court. Seller will advise Buyer before Seller enters into any material contracts or incurs any material obligations outside of the ordinary course of business.

**5.3**     Regulatory Filings.  Within three (3) Business Days of entry of the Sale Order, the Parties shall promptly file all applications and documents which are necessary to obtain the consent of each applicable Government Authority as may be appropriate in connection with the transactions contemplated by this Agreement and the Parties shall, at the same time as filed, provide a copy to the other Party. The Parties shall diligently prosecute such applications and take any other actions which are or may be reasonable and appropriate in connection therewith. Each Party shall provide the other Party with (a) copies of said Party's responses to written requests for additional information from any Government Authority that in any way relates to the Business or Purchased Assets within two (2) Business Days after sending such responses, and (b) copies of all written correspondence from any Government Authority that in any way relates to the Business or Purchased Assets within two (2) Business Days after receiving such correspondence. The Parties will maintain in confidence all documents provided pursuant to this Section, unless public disclosure is required by Applicable Law, or is otherwise made to a Government Authority, in which case, to the extent practicable, the Parties will use their commercially reasonable efforts to reach mutual agreement prior to making such disclosure. Notwithstanding the foregoing, any documents provided pursuant to this Section shall be provided by Seller to counsel for the Bond Trustee within two (2) Business Days of receipt from Buyer.

**5.4**     Further Assurances.  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at Buyer's reasonable request and at the Buyer's sole cost and expense, the Seller will execute and deliver to Buyer such other instruments of sale, transfer, conveyance and assignment, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, all of the Purchased Assets.

**5.5**     Buyer's Closing Deliveries.  At the Closing, Buyer shall deliver the following to Seller:

(a)     the Purchase Price, net of the cash portion of the Deposit to be applied thereto;

(b)     the Accrued PTO funds;

(c)     the Related Agreements to which Buyer is a party, duly executed by Buyer;

(d)     a certificate executed as of the Closing Date by a duly authorized representative of the Buyer, certifying that the conditions set forth in this Agreement have been satisfied;

(e)     a certificate of a duly authorized representative of Buyer (i) certifying that attached to such certificate are true and complete copies of (A) Buyer's organizational documents, each as amended through and in effect on the Closing Date and (B) resolutions of the authorized representative of Buyer, authorizing the execution, delivery and performance of this Agreement and the related agreements to which Buyer is a party and the consummation of the transactions contemplated by this Agreement and the Related Agreements, and (ii) certifying as to the incumbency of the officer of Buyer executing this Agreement and the Related Agreements to which Buyer is a party;

(f)     a certificate of good standing for Buyer from the New Hampshire Secretary of State; and

(g)     all instruments of transfer and/or assignment, certificates, deeds, bills of sale, evidence of filing an/or recording, and other documents as are reasonably necessary to effectuate the sale of the Purchased

17

Assets, including customary documents required in order for title policies to be issued by the Title Company to Buyer at Closing.

**5.6**    Seller's Closing Deliveries.  At the Closing, Seller shall deliver the following to Buyer:

(a)    Keys and passcodes to the Facility;

(b)    the Related Agreements to which the Seller is a party, duly executed by the Seller;

(c)    evidence of payment of the Accrued PTO to Seller's employees;

(d)    the Sale Order entered by the Bankruptcy Court providing authority for Seller to conduct the transactions hereunder;

(e)    all promissory notes entered into by Residents; and

(f)    Resident trust funds, if any.

**5.7**    Employees.

(a)    Immediately prior to the Effective Time (the "**Termination Date**"), Seller shall terminate all of its employees, and, as of the Effective Time, Buyer shall offer employment to such persons on an at-will basis and subject to Buyer's pre-employment screenings and employment practices, policies and procedures. Seller agrees to use its commercially reasonable efforts to make employment records and other related information reasonably requested by Buyer available to Buyer.

(b)    Following the Effective Time, Buyer shall provide benefits and other terms and conditions of employment to the Employees at levels consistent, in the aggregate, with those provided by Buyer and its Affiliates to their employees, with credit for prior service time and seniority.

(c)    Seller shall provide Buyer, at least twenty (20) days prior to the Closing Date, a Schedule 5.7(c) setting forth, for each employee, the amount of accrued but unused paid time off or unused sick time (excluding any unused paid time off or unused sick time above the 200 hour cap provided for in Seller's employee policies) for each employee as of the Closing Date (collectively, "**Accrued PTO**") and the aggregate value of the Accrued PTO. Seller shall provide Buyer on the Closing Date with an updated version of such schedule reflecting Accrued PTO amounts (and the value of those amounts) as of the Closing Date (as so updated, the "**Accrued PTO Schedule**").  On the Closing Date, Buyer shall pay Seller, in addition to the Purchase Price, an amount equal to the Accrued PTO due to each employee as required by New Hampshire law, and Seller shall pay such funds to each employee as of Closing.

(d)    Not more than fifteen (15) days after the Execution Date, Seller shall provide Buyer with a Schedule 5.7(d) (the "**Schedule of Employees**") of all employees of Seller working at the Facility, including, for each listed employee, his or her name, date of hire, job title, full-time/part-time status, exempt/non-exempt status, bonus eligibility, commission eligibility, severance entitlement, current compensation paid or payable, and status (e.g., leave of absence, disability, layoff, active, temporary).  The Schedule of Employees shall be updated fifteen (15) days prior to Closing.

(e)    Buyer shall offer immediate employment (so that no period of unemployment shall occur between employment with Seller and employment with Buyer) to a such number of Seller's employees as it deems necessary, in Buyer's sole discretion, to commence at 12:01 a.m. on the Closing Date (such employees who accept such offer from Buyer, the **"Transferred Employees").** If Buyer fails to offer immediate employment to a sufficient number of employees on terms to avoid a violation of the WARN Act or any comparable state or local laws, Buyer agrees that it shall be responsible for any associated liabilities arising

under the WARN Act or comparable state or local laws.  Buyer shall deliver to Seller within ten (10) days prior to the Closing Date, an updated schedule of Transferred Employees identifying to Seller all of Seller's employees to whom offers will be made by Buyer.  In furtherance and not in limitation of the foregoing, Buyer shall treat prior service with Seller reflected in the information provided above as service with Buyer for purposes of determining eligibility to participate and vesting in all benefits programs maintained by Buyer.  Seller shall cooperate with Buyer in providing information reasonably requested by Buyer to facilitate hiring and establishing benefits for Transferred Employees who accept employment with Buyer.  This Agreement shall not be deemed to create or grant to any Transferred Employee any third party beneficiary rights or claims or any cause of action of any kind or nature.

(f)     At Buyer's sole cost and expense (other than for employee cost-sharing), Buyer shall be responsible for offering Transferred Employees group health plan coverage on and after the Closing Date sufficient to extinguish any rights a Transferred Employee may have to continuation of coverage under any of Seller's group health plans including, but not limited to, COBRA insurance coverage, if a Transferred Employee so elects such coverage.  Buyer shall provide COBRA continuation coverage (within the meaning of Section 4980B of the Code and the Treasury regulations thereunder) to all individuals who are "M&A qualified beneficiaries" (within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4) with respect to the transaction contemplated herein for the duration of the period to which such individuals are entitled to such coverage.

**5.8**    Bankruptcy Filings.

(a)     Seller, Bond Trustee and Buyer have negotiated an order approving the Bid Procedures (the "**Bid Procedures Order**"), which Bid Procedures Order shall be included in the Sale and Procedure Motion. The Sale and Procedure Motion, Bid Procedures Order, and Sale Order shall be acceptable to Buyer, the Seller and the Bond Trustee in their reasonable discretion.

(b)     Promptly after expiration of the Diligence Period (and no later than August 31, 2021 if the Diligence Period ends at least seven days prior thereto), Seller shall file: (i) a voluntary petition for relief under chapter 11 of the Bankruptcy Code, (ii) a motion or motions for approval of the appropriate terms of this Agreement and the Bid Procedures, including, without limitation, the Break-Up Fee and an overbid process (collectively, the "**Sale and Procedure Motion**"), and (iii) to schedule a hearing(s) to approve the contemplated transaction pursuant to Sections 363 and 365 of the Bankruptcy Code, as applicable.

(c)     Seller shall use its commercially reasonable efforts to obtain entry of the Bid Procedures Order within twenty one (21) days of the commencement of the Petition Date, naming Buyer as the Stalking Horse and approving the Break-Up Fee and Expense Reimbursement. The Sale Procedures Order shall be in form and substance reasonably acceptable to Buyer and its counsel and the Bond Trustee and shall be a condition precedent for Buyer completing the contemplated transaction.

(d)     Bids shall be required to be submitted under the Bid Procedures no later than sixty (60) days after the Petition Date.

(e)     The auction concerning the contemplated transaction shall take place pursuant to the Bid Procedures Order on or about sixty five (65) days following the Petition Date.

(f)     Seller shall request that the Bankruptcy Court schedule a hearing on the contemplated transaction on or about seventy (70) days following the Petition Date (subject to availability of the Bankruptcy Court).

(g)       Seller shall use its commercially reasonable efforts to obtain entry of the Sale Order on or about seventy (75) days following the Petition Date (subject to availability of the Bankruptcy Court); provided, however, that the Seller may act in accordance with the Bid Procedures Order.

(h)       In the event that the entry of a Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).

(i)       Notwithstanding the foregoing, any resulting changes to this Agreement or any other Related Agreement or resulting material changes to the proposed Sale Order shall be subject to the approval of Buyer, Seller and Bond Trustee in their reasonable discretion. Seller shall (i) provide Buyer with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the contemplated transactions, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer, and (ii) make commercially reasonable efforts to consult and cooperate with Buyer regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions).

(j)       During the Chapter 11 Case, Seller shall not commence, assign, convey or abandon any Avoidance Actions against any of Seller's ordinary course vendors, contract counterparties, contractors and other suppliers of services related to the Business who are doing business with Buyer following the Closing, without the prior written consent of Buyer.

(k)       In the event that Buyer is not selected as the winning bidder at any auction pursuant to the Bid Procedures, Buyer understands and acknowledges that at Seller's election and subject to the Bid Procedures Order, Buyer will remain obligated hereunder as the "Back-Up Bidder" until termination by Seller or the closing of an Alternative Transaction for the period required under the Bid Procedures Order.

**5.9**      Assumed Contracts and Cure Amounts.

(a)       Subject to the approval of the Bankruptcy Court by Final Order and effective on the Closing Date, the Assumed Contracts and Residency Agreements and Option Agreements will be assumed by the Seller and assigned to the Buyer on the Closing Date, in accordance with Section 365 of the Bankruptcy Code. The final determination of which Contracts (other than Residency Agreements and Option Agreements) shall be Assumed Contracts shall be within the Buyer's sole discretion. The Cure Amounts of the Assumed Contracts and Residency Agreements shall be paid by the Buyer in accordance with the provisions herein.

(b)       At the Closing or such time as may be approved by the Court in the Sale Order or any subsequent order, Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses (not including any refund claims which shall be paid after Closing in due course) that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts. For the avoidance of doubt, (i) Buyer shall pay all Cure Amounts as determined by the Bankruptcy Court for any Assumed Contracts in cash at Closing or at such time as ordered by the Bankruptcy Court, (ii) the Cure Amounts are separate and apart from, and in addition to, the Purchase Price and, (iii) Buyer shall not be required to make any payment of Cure Amounts for, and shall not assume any liabilities with respect to, any Contract that is not an Assumed Contract.

(c)       Non-Assignment of Assumed Contracts.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract for any reason (each such action, a "**Necessary Consent**").  In such event, Seller and Buyer shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price.

Nothing in this Section 5.9 shall in any way diminish or enlarge (x) Buyer's obligations hereunder to obtain the Approvals, or (y) the Parties' obligations hereunder to obtain the Necessary Consents.

(d)     Except regarding Residency Contracts and Option Agreements, notwithstanding anything in this Agreement to the contrary, a Contract that is validly rejected or otherwise not assumed and assigned to the Buyer pursuant to this Section 5.9 shall constitute an Excluded Asset.

(e)     Schedule 5.9(e) of the Disclosure Schedules sets forth each Executory Contract with annual payments of at least $10,000.00, and Seller's good faith estimate of the amount of the Cure Amounts payable in respect of each such Executory Contract (and if no Cure Amount is estimated to be payable in respect of any particular Executory Contract, the amount of such Cure Amount designated for such Contract shall be $0.00). Buyer shall have the right to review Schedule 5.9(e) delivered by Seller and exclude any contract (other than a Residency Agreement or Option Agreement) listed on such Schedule at any time that is at least 5 days prior to Closing. Schedule 5.9(e) shall be updated automatically to reflect any cure findings of the Bankruptcy Court.

(f)     At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "**Contract Notice**") of Buyer's election to designate any Executory Contract (including any Contract that is an Assumed Contract immediately before such designation but excluding the Residency Agreements or Option Agreements) (1) as an Excluded Asset, and upon such designation, such Executory Contract shall constitute an Excluded Asset and, if applicable, shall cease to constitute an Assumed Contract or (2) to the extent not already rejected, as an Assumed Contract, and upon such designation, such Executory Contract shall constitute an Assumed Contract and shall cease to constitute an Excluded Asset. Buyer shall provide Seller a Schedule 5.9(f) on or before the Designation Deadline reflecting the Executory Contracts that are Assumed Contracts and that are Excluded Assets.

(g)     If Buyer exercises its rights in Section 5.9(f) above to designate a Contract, including a Contract that was an Assumed Contract immediately before such designation, as an Excluded Asset, there shall be no reduction in the Purchase Price as a result of such designation or change in designation.

5.10     Covenants Relating to Residency Agreements. Buyer agrees that all Residency Agreements identified on Schedule 1(iii) shall be Assumed Contracts (or to the extent non-executory, Assumed Liabilities) to be assumed by and assigned to Buyer; *provided, however*, the Buyer's obligations under this Section 5.10 are expressly subject to any and all defenses, causes of action, claims, other rights or privileges that Buyer may have under the applicable Residency Agreement(s), including, without limitation, defenses based on a Resident or Prospective Resident's failure to pay all monthly fees and other fees and assessments with respect to each such applicable Residency Agreement.

5.11     Charity Care, Endowment, and Trust Funds. Buyer shall implement and maintain a charity care policy which provides for the treatment and care of residents who are unable to pay. Further, (i) to the extent that Buyer is receiving the Endowment in connection with the transaction, Buyer shall comply with all restrictions and requirements on the use and maintenance of such funds following transfer, which restriction and requirements are described in Schedule 2.1(i), (ii) to the extent that Buyer is receiving Resident trust funds or Resident deposits, Buyer shall comply with all restrictions and requirements on the use and maintenance of such funds following transfer, and (iii) Buyer shall comply with the obligations of the Option Agreements regarding the Option Deposits.

5.12     Accounts Receivable.

(a)     Seller shall retain whatever right, title and interest it may have in and to all outstanding Accounts Receivable with respect to the Facility which relate to periods ending on or before the Effective Time

(including without limitation any amounts due on or before Closing for any Resident promissory notes being transferred pursuant to Section 5.6(e), which amounts shall be collected by Buyer using commercially reasonable efforts and paid over to Seller upon receipt).

(b)      Payments received by Buyer after the Effective Time from third party payors including, but not limited to managed care and health insurance, shall be handled as follows:

(i)      If such payments either specifically indicate on the accompanying remittance advice, or if Buyer and Seller agree that such payments relate to the period ending before the Effective Time, they shall be forwarded by Buyer to Seller, along with the applicable remittance advice, within ten (10) days after receipt thereof; and

(ii)      If such payments indicate on the accompanying remittance advice, or if Buyer and Seller agree that such payments relate to the period after the Effective Time, they shall be retained by Buyer.

(c)      Payments received by Seller after the Effective Time from third party payors including, but not limited to managed care and health insurance, shall be handled as follows:

(i)      If such payments either specifically indicate on the accompanying remittance advice, or if Buyer and Seller agree that such payments relate to the period after the Effective Time, they shall be forwarded by Seller to Buyer, along with the applicable remittance advice, within ten (10) days after receipt thereof; and

(ii)      If such payments indicate on the accompanying remittance advice, or if Buyer and Seller agree that they relate to the period ending on or before the Effective Time, they shall be retained by Seller.

(d)      If the remittance advice indicates or the Parties agree that any payment relates to periods both prior to or on and after the Effective Time, the Party receiving the payment shall forward the amount relating to the other Party's operation of the Business, along with the applicable remittance advice, within ten (10) days after receipt thereof.  If the remittance advice does not indicate the period to which a payment relates or whether it is for Buyer or Seller, or if there is no accompanying remittance advice, or the payment is not otherwise identifiable using commercially reasonable efforts, and if the Parties do not otherwise agree as to how to apply such payment, then 100% of such payments received within the first one-hundred twenty (120) days after the Effective Time shall be deemed to have been collected in respect of Seller's Accounts Receivable due from the payee in respect of services provided on or prior to the Effective Time.  All such payments received in excess of the amount of Seller's Accounts Receivables due from said payee and all such payments received one-hundred twenty (120) days after the Effective Time shall be deemed to belong to Buyer.  If the party receiving the funds is not the party entitled to the funds hereunder, such party shall forward such funds to the other party within ten (10) days.  For the avoidance of doubt, no party shall have the right to setoff or recoup against amounts it is required to send to the other party under this paragraph.

**5.13**      Title and Survey Matters.

(a)      Buyer has received the title commitment listed in Schedule 5.13(a) (the "**Commitment**") from the Title Company, for the Title Company to issue as of the Closing an ALTA owner's policy of title insurance (Form 2006) (the "**Title Policy**") for the Premises, together with improvements, buildings and fixtures thereon, unless otherwise noted in such Commitment, in an amount equal to the amount of the Purchase Price allocated by Buyer and Seller in accordance with Section 2.7 of this Agreement to the Premises, and all improvements, buildings and fixtures thereon.  The Commitment provides for the issuance of the Title Policy to Buyer as of the Closing and shall insure title to the Premises and all improvements, buildings

22

and fixtures thereon, subject only to the Permitted Liens. Subject to and consistent with the Sale Order, Seller agrees to deliver any information as may be reasonably required by the Title Company under the requirements Section of the Commitments or otherwise in connection with the issuance of the Title Policy to issue the Title Policy in accordance with the Commitment. Seller also agrees to provide an affidavit of title consistent with a quitclaim deed (or the State equivalent thereof) and/or such other information as the Title Company may reasonably require in order for the Title Company to insure over the "gap" (i.e., the period of time between the effective date of the title insurance company's last check-down of title to the Premises and the Closing Date).

(b)     Prior to the Closing, Buyer may order updates or continuations of, and supplements to, the Commitment (each a "**Title Update**") for the Premises, at Buyer's sole cost. Buyer shall instruct Title Company to simultaneously deliver directly to Buyer and Seller copies of each Title Update (including tax and departmental searches) ordered by Buyer or otherwise issued by Title Company, at Buyer's cost, and copies of all underlying documentation referenced as an exception in such Title Update as soon as and if reasonably available.

(c)     Buyer shall have the right to deliver one or more written notices relating to each of the Title Updates (each, a "**Title Objection Notice**") to Seller objecting to any items contained in any one or more of the Title Updates which are not Permitted Liens unless and until agreed by Buyer pursuant to this Section 5.13 to become part of the Permitted Liens (said objections listed on each Title Objection Notice, the "**Objectionable Title Exceptions**"). Each such Title Objection Notice relating to any Title Update will be delivered by Buyer to Seller within ten (10) days after Buyer's receipt of such applicable Title Update, and, unless due to a late change from the Title Company outside of Buyer's control, at least fifteen (15) days prior to the Closing Date. Failure of Buyer to provide a Title Objection Notice within such period (or to include any such matters in a timely delivered and valid Title Objection Notice) shall be deemed Buyer's approval of all items contained in the applicable Title Update. All such items in the applicable Title Update that are not objected to by Buyer in a timely delivered and valid Title Objection Notice shall be deemed to be part of the Permitted Liens. Seller shall notify Buyer in writing ("**Sellers Title Notice**") within seven (7) days after receipt of the applicable Title Objection notice from Buyer of those Objectionable Title Exceptions Seller elects to remove or cure and Seller's proposed manner of removal or cure, as well as those Objectionable Title Exceptions Seller will not remove or cure. Seller's failure to deliver Seller's Title Notice to Buyer in a timely manner shall be deemed an election by Seller not to remove or cure Objectionable Title Exceptions included in the applicable Title Objection Notice. If Seller proposes in Seller's Title Notice to remove or cure all or some of the Objectionable Title Exceptions contained in the applicable Title Objection Notice, and Buyer does not terminate this Agreement as provided in this paragraph, then at or prior to Closing, Seller shall remove or cure the Objectionable Title Exceptions as Seller has agreed, and such Objectionable Title Exceptions shall not be exceptions to coverage in the Title Policy. If Seller in the applicable Seller Title Notice elects not to remove or cure any or all of the Objectionable Title Exceptions (or is deemed to have elected not to remove or cure such Objectionable Title Exceptions), then Buyer may notify Seller within seven (7) days after receipt of the applicable Seller Title Notice (or date of deemed election, as applicable) whether Buyer elects to proceed to the Closing, taking title subject to such exceptions, or elects to terminate pursuant to Section 7.1(g); *provided that*, Buyer may only elect to terminate under Section 7.1(g) if the Objectionable Title Exceptions Seller declines (or is deemed to decline) would materially interfere with the use or occupancy of the Premises or materially affect the value of the Premises if not removed or otherwise cured. Failure of Buyer to provide such notice in a timely manner shall be deemed an election by Buyer to proceed to the Closing. If Buyer elects (or is deemed to have elected) to take title subject to any such Objectionable Title Exceptions under this Section 5.13, such Objectionable Title Exceptions shall become Permitted Liens and the Purchase Price shall not be reduced. Notwithstanding the foregoing, for the avoidance of doubt, Seller agrees to obtain the removal, waiver, termination, discharge, or satisfaction of any mortgages, mechanic's or materialmen's liens, judgment liens and other monetary liens and monetary encumbrances against the Property of parties claiming by, through or under the Seller which are curable solely (i) by the payment of money either prior to Closing or simultaneously with Closing by using proceeds from the sale, or (ii) by discharge by or through the Sale Order. All such matters referenced in the foregoing sentence shall automatically be deemed Objectionable Title Exceptions, regardless

of whether Buyer provided a Title Objection Notice to Seller including such matters as Objectionable Title Exceptions, and Buyer under no circumstances shall be deemed to have waived any such matters, nor shall same be considered waived or Permitted Liens under Section 1(xx)(vii), unless such waiver shall be an express waiver in writing executed by Buyer.

## ARTICLE 6

## CONDITIONS TO CLOSING

**6.1**     Conditions to Obligations of Seller to Close.  The obligation of the Seller to effect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions (any of which may, in sole discretion of the Seller, be waived in whole or in part):

(a)     Bankruptcy Matters.  The Bankruptcy Court shall have entered the Sale Order in form reasonably satisfactory to Buyer and Seller, and it shall not be subject to a stay pending appeal.

(b)     Observance and Performance.  Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, and all representations and warranties of Buyer shall remain true and correct in all material respects as of Closing.

(c)     No Legal Actions.  No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

(d)     Approvals.  Seller shall have obtained the Approvals, or assurances of issuance thereof, so that Buyer is authorized to operate the Business.

**6.2**     Conditions to Obligation of Buyer to Close.  The obligation of Buyer to affect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions (any of which may, in Buyer's sole discretion, be waived in whole or in part):

(a)     Entry of Sale Order.  The entry of the Sale Order on or before December 1, 2021, and such Sale Order becoming a Final Order on or before February 28, 2022.

(b)     Observance and Performance.  Seller shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, and all representations and warranties of Seller shall remain true and correct in all material respects as of Closing.

(c)     No Legal Actions.  No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

(d)     Approvals.  Buyer shall have obtained the Approvals, or assurances of issuance thereof, so that Buyer is authorized to operate the Business and utilize the underground walkway pursuant to a written license acceptable to Buyer from the City of Keene.

(e)     Title.  The Title Company is prepared to issue, as of the Closing Date, the Title Policy.

(f)     Due Diligence.  Buyer has not terminated this Agreement pursuant to Section 2.9.

## ARTICLE 7

## TERMINATION AND BREAK-UP FEE

**7.1**    <u>Termination</u>.  This Agreement may be terminated at any time before the Closing by written notice to the applicable Party:

(a)    by mutual written agreement of Buyer and Seller;

(b)    by either Buyer or Seller, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, which breach is not cured within ten (10) Business Days after written notice thereof is received, provided, however, that the terminating party is not in material breach or default of this Agreement;

(c)    by either Buyer or Seller if the sale is disapproved by the Bankruptcy Court, or there is an Alternative Transaction;

(d)    by either Buyer or Seller if the Closing has not occurred by the Outside Closing Date by no fault of the Party terminating, and Buyer is not at that time the Back Up Bidder;

(e)    by Seller, if Buyer is not diligently pursuing the Closing such that the Closing can occur on or prior to the Outside Closing Date;

(f)    by either Buyer or Seller, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided by an order of a court of competent jurisdiction; or

(g)    by Buyer pursuant to <u>Section 5.13</u>, <u>Section 2.8,</u> or <u>Section 2.9.</u>

**7.2**    <u>Break-Up Fee</u>. Subject to Bankruptcy Court approval, if after the Execution Date , (i) any third party other than Buyer purchases the Purchased Assets or (ii) Seller completes an Alternative Transaction, then (a) the Deposit shall be returned to Buyer, and in connection therewith, Seller shall promptly take all action necessary to cause Title Company to pay the Deposit to Buyer, and (b) Seller shall pay to Buyer an additional amount of $660,000 plus up to Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) of actual expenses incurred by Buyer (collectively, the "**Break-Up Fee**"), which Break-Up Fee shall be paid solely from the proceeds of the sale of the Purchased Assets to a third party and shall be paid on the closing of such Alternative Transaction and Seller agrees that any court order related to the Alternative Transaction shall include a carve-out from the holders of the Bonds' collateral permitting the Break-Up Fee. The terms and conditions of the Break-Up Fee and the payment thereof will be more specifically set forth in the Bid Procedures Order.

**7.3**    <u>Remedies</u>.

(a)    Termination, plus any rights the parties shall have under this Section regarding the Deposit and the Break-Up Fee shall be the sole remedy of the Parties for a breach of this Agreement, except for the Parties' rights under <u>Section 8.17</u>. Immediately upon the occurrence of any termination of this Agreement pursuant to <u>Sections 7.1(a)</u>, <u>7.1(b)</u> (where Buyer is the terminating Party), <u>7.1(d)</u>, <u>7.1(f)</u>, or <u>7.1(g)</u>, Seller shall refund the Deposit to Buyer.  If the termination is pursuant to <u>Section 7.1(c)</u> as the result of an Alternative Transaction, then subject to and in accordance with the terms of the Bid Procedures Order, upon the closing of the Alternative Transaction, Seller shall (i) immediately refund the Deposit to Buyer and (ii) pay Buyer the Break-Up Fee from the proceeds of such Alternative Transaction.  If the termination is pursuant to <u>Section</u>

7.1(b)(where Seller is the terminating Party) or 7.1(e), the Deposit shall be forfeited to the Seller and the Seller shall be released from all obligations to Buyer hereunder.

(b)     The Parties intend that the Deposit constitute compensation, and not a penalty. The Parties acknowledge and agree that either Party's harm caused by the other Party's default or breach of this Agreement would be impossible or very difficult to accurately estimate as of the date of this Agreement, and that the Deposit (or return of the Deposit, as the case may be, and the Break-Up Fee and Expense Reimbursement in circumstances where applicable) is a reasonable estimate of the anticipated or actual harm that might arise from such a default or breach. The transfer and/or return of the Deposit (and payment of the Break-Up Fee and Expense Reimbursement in circumstances where applicable) is each Party's sole liability and entire obligation and the exclusive remedy for the other Party's default or breach of this Agreement.  If the Closing does not occur on or before the Outside Closing Date, the Deposit shall be disbursed in accordance with this Section 7.3, and the Break-Up Fee and Expense Reimbursement paid if and at such time as may be otherwise provided in this Agreement and the Bid Procedures Order. If the Seller enters into an Alternative Transaction during the Due Diligence Period, Seller shall pay Buyer the sum of $125,000 to compensate Buyer for its time and expenses incurred in connection with this Agreement.

(c)     Article 7 and Article 8 shall survive any termination.

**ARTICLE 8**

**MISCELLANEOUS**

**8.1**     Expenses.  Except as specifically set forth in this Agreement or any Related Agreement, and except for the Break-Up Fee, the Parties shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any attorneys, accountants and other advisors, in connection with this Agreement, the Related Agreements, and the transactions contemplated hereby and thereby.  This Section shall not apply, if the Closing does not occur, to any existing or future litigation, if a right to attorneys' fees and expenses otherwise exists.

**8.2**     Notices.  All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (b) transmitted by hand delivery, (c) sent by electronic means, or (d) sent by nationally recognized overnight courier for next Business Day delivery, addressed as follows:

Seller:                          Hillside Village Keene
                                 95 Wyman Road
                                 Keene, New Hampshire 03431
                                 Attention:  Toby Shea, Chief Restructuring Officer
                                 tshea@onepoint-partners.com

With simultaneous copies to (which
shall not constitute notice):    Polsinelli PC
                                 401 Commerce Street, Suite 900
                                 Nashville, Tennessee 37219
                                 Attention:  Jeremy Johnson; Bobby Guy; Robert Dempsey
                                 jjohnson@polsinelli.com; bguy@polsinelli.com;
                                 rdempsey@polsinelli.com

78263910.34

|  | And |
|--|--|
|  | Hinckley Allen<br>650 Elm Street<br>Manchester, NH 03101-2596<br>Attention: Mark McCue<br>mmccue@hinckleyallen.com |
| Buyer: | Covenant Living Services<br>5700 Old Orchard Road<br>Chicago, IL 60077<br>Attention:  David Erickson<br>dgerickson@covenantliving.org |
| With a simultaneous copy to: | Erickson Peterson Cramer<br>350 St. Peter Street, Suite 601<br>St. Paul, MN 55102<br>jpeterson@epclawyers.com |
| If to the Bond Trustee: | UMB Bank, National Association<br>120 Sixth Street South, Suite 1400<br>Minneapolis, MN 55402<br>Attention: Michael Slade<br>michael.slade@umb.com |
| With copy to: | Mintz, Levin, Cohn, Ferris, Glovsky and<br>Popeo, P.C.<br>One Financial Center<br>Boston, MA 02111<br>Attention:  Daniel Bleck<br>dsbleck@mintz.com; |

or, in each case, such other address as may be specified in writing to the other Party.

All such notices, requests, demands, waivers and other communications shall be deemed to have been received (w) if by first-class, registered or certified mail, on the fifth Business Day after the mailing thereof, (x) if by hand delivery, on the day after such delivery, (y) if by electronic means and the transmitting Party receives a transmission receipt dated the day of transmission, on the same day as the transmission, and (z) if by nationally recognized overnight courier, on the next Business Day after deposit with such courier.

With respect to any notice required under Sections 2.8 (Casualty), 5.1 (Access to Books and Records), 5.3 (Regulatory Filings), and 7.1 (Termination) hereof, the Parties shall also send notice to the Bond Trustee.

**8.3** Confidentiality and Exclusivity.

(a) Buyer has previously entered into a Confidentiality Agreement (the "***Confidentiality Agreement***"), and that Agreement remains in place.  Further, each Party hereto agrees that the provisions of this Agreement, all understandings, agreements and other arrangements between the Parties, and all other non-public information received from the other Party or otherwise relating to such other Party or (prior to Closing) the

27

Premises, shall be confidential, and shall not be disclosed or otherwise released to any other Person (other than such first Party's Affiliates, counsel to the Bond Trustee, or another party hereto), without the written consent of the other Party.  The obligations of the Parties hereunder shall not apply to: (a) the extent that the disclosure of information otherwise determined to be confidential is anticipated hereunder or required by Applicable Law, including bankruptcy law, to be disclosed or filed with the Bankruptcy Court; (b) the disclosure of confidential information to any financial advisors, legal advisors, other professional advisors, shareholders, directors, investors and lenders (both actual and potential) of a party who agree to hold confidential such information substantially in accordance with this Section or who are otherwise bound by a duty of confidentiality to such party; and (c) such disclosures as may be contained in any transaction-specific press release approved by both Buyer and Seller, each party agreeing not to unreasonably withhold, condition or delay its approval.

(b)     From the signing hereof until the end of the Diligence Period, in consideration of the time, resources, effort and expense that the Buyer will expect to expend in conducting due diligence and otherwise evaluating the transaction contemplated hereby, Seller shall not, and the Seller shall cause its Representatives not to, directly or indirectly, solicit, initiate, entertain, conduct, facilitate, encourage, or respond to any proposals or offers from any third party  relating to any Alternative Transaction, or, participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or enter into, any Alternative Transaction. The Seller agrees to immediately cease (and cause its Representatives to case), and to not reopen during the Diligence Period (and to cause its Representatives to not reopen during the Diligence Period), any current discussions or interactions with any third parties regarding an Alternative Transaction. The Seller shall not disclose (and shall not permit its Representatives to disclose) during the Diligence Period any non-public information (other than in the ordinary course of business or to the Bond Trustee or the holders of the Bonds) relating to the Seller or afford access during the Diligence Period to the properties, books, or records of the Seller to any other person reasonably believed to be considering an Alternative Transaction, provided that Seller may keep its electronic data room open to third parties, so long as Seller abides by all the other provisions of this paragraph.

(c)     In connection with its diligence process, Buyer is obtaining certain third party reports, including without limitation a Phase 1 Environmental Review, a survey of the Premises, and potentially an appraisal.  Upon the expiration or termination of the Diligence Period, Buyer will provide these reports to Seller (including future third party reports reasonably promptly after Buyer's receipt), and Seller shall be permitted to share them in its electronic data room with other potential bidders who are under confidentiality agreements. This subsection shall survive termination of this Agreement.

**8.4**     Amendment; Waivers, Etc.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

**8.5**     Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**8.6**     Assignment.  Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by either Party without the prior written consent of the other Party, except that Buyer may assign its rights under this Agreement to an Affiliate with five (5) days' notice to Seller.  No permitted assignment of this Agreement by a Party will relieve the Party of any of its obligations under this Agreement.

**8.7**     Parties in Interest.  This Agreement and the Related Agreements shall be binding upon and inure solely to the benefit of the Parties and their successors and permitted assigns, and nothing in this Agreement or any Related Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement or any Related Agreement.

78263910.34

**8.8**    No Personal Liability. No individual officer, director, employee, manager, agent, or representative shall have personal liable for any of the obligations hereunder or claims of any kind in connection herewith except for fraud or gross negligence.

**8.9**    Counterparts; Facsimile Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties.  Counterparts may be executed by hand or by any electronic signature complying with state or federal law, including the U.S. federal ESIGN Act of 2000, as amended (the "**ESIGN Act**").  Executed counterparts may be delivered via facsimile, electronic mail or other similar transmission method, and any executed counterpart so delivered shall be valid and effective for all purposes.  No Party shall raise the use of any electronic signature that complies with the ESIGN Act (including www.docusign.com), or the use of a facsimile machine, electronic mail or other similar transmission method as a means to deliver a signature to this Agreement or any amendment hereto as a defense to the formation or enforceability of a contract and each Party forever waives any such defense.

**8.10**    Governing Law.  Except to the extent inconsistent with the Bankruptcy Code, this Agreement and the Related Agreements shall be governed by and construed and enforced in accordance with the laws of the State of New Hampshire, without regard to its conflicts of law rules.

**8.11**    Jurisdiction.  Each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding. Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Related Agreement or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Related Agreement. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDINGS BROUGHT BY ANY OTHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE PROPERTY OR THE RELATIONSHIP OF THE PARTIES HEREUNDER. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**8.12**    Severability.  If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever, so long as this Agreement, taken as a whole, still expresses the material intent of the Parties.  The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

**8.13**    Entire Agreement.  This Agreement and the Related Agreements constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.  There are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

**8.14**    Employees Not Third-Party Beneficiaries.  Nothing in this Agreement or the Related Agreements is intended to confer upon any past, present or future employee of Seller or its Affiliates or his or her legal representatives or heirs any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement or by the Related Agreements, including, without limitation, any rights of employment, continued

78263910.34

employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

**8.15**    Bulk Sales or Transfer Laws.  Buyer hereby waives compliance by Seller with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

**8.16**    No Inferences.  Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party.

**8.17**    Enforcement Expenses.  In the event any Party elects to incur legal expenses to enforce, defend or interpret any provision of this Agreement, as between it and any other Party, the prevailing Party shall be entitled to recover from the other party such legal expenses, including reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such Party may be entitled.

**8.18**    Survival of Representations and Warranties.  None of the representations or warranties of Seller set forth in this Agreement, any Related Agreement, or in any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.  Other than the requirements of further assurances and actions specifically identified to be taken post-Closing, all other covenants of Seller shall expire upon Closing.

**8.19**    Interpretation.  In this Agreement, unless the context otherwise requires: (a) references to this Agreement are references to this Agreement and to the Schedules and Exhibits hereto; (b) references to Articles and Sections are references to articles and Sections of this Agreement; (c) references to any party to this Agreement shall include references to its respective successors, its designees, and permitted assigns; (d) references to a judgment shall include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (e) the terms "hereof," "herein," "hereby," and any derivative or similar words will refer to this entire Agreement; (f) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties thereof from time to time; (g) references to any law are references to that law as of the Closing Date, unless the context requires otherwise, and shall also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise; (h) the word "including" shall mean including without limitation; (i) references to time are references to Eastern Standard or Daylight time (as in effect on the applicable day) unless otherwise specified herein; and (j) in the event the time for an act or notice falls on a day that is not a Business Day, the time will automatically be extended to the next Business Day. At any time, and from time to time on or prior to the Closing Date, Seller may supplement or amend the Schedules to this Agreement (collectively, a "**Disclosure Update**").  The representations, warranties, and Schedules will be deemed supplemented and amended by any Disclosure Update in order to cause the representations and warranties of Seller to be true as of the Closing; provided that, solely for purposes of Buyer's obligation to close, matters disclosed in any Disclosure Update(s) shall not be considered to have modified the representations and warranties herein.  In the event a Disclosure Update materially modifies Buyer's obligations hereunder, Buyer may terminate pursuant to its rights under Section 7.1(b); provided that Schedule updates specifically anticipated under this Agreement, so long as ordinary course, shall not be a basis for termination.

**8.20**    **SUBMISSION TO JURISDICTION**.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW HAMPSHIRE, AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH

78263910.34

COURT.  EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR
PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.  TO THE EXTENT THAT
THE BANKRUPTCY COURT LACKS JURISDICTION, THEN THE REFERENCE ABOVE TO THE
BANKRUPTCY COURT FOR THE DISTRICT OF NEW HAMPSHIRE SHALL BE "THE NEW
HAMPSHIRE STATE TRIAL AND APPELLATE COURTS" WITH JURISDICTION OVER CHESHIRE
COUNTY, NEW HAMPSHIRE."

**8.21**   **WAIVER OF JURY TRIAL**.   EACH PARTY TO THIS AGREEMENT HEREBY
UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF
ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE DOCUMENTS
RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT
MATTER OF THIS AGREEMENT OR ANY RELATED TRANSACTIONS.

**8.22**   <u>Time of the Essence</u>.  Time is of the essence for purposes of this Agreement and the rights and
obligations of the Parties hereunder.

[Signatures Follow on Next Page]

78263910.34

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by their duly authorized representatives as of the date first above written.

**THE PROSPECT-WOODWARD HOME D/B/A HILLSIDE VILLAGE KEENE:**

_____
By: Toby Shea
Its: Chief Restructuring Officer

**COVENANT LIVING SERVICES:**

_____
By: Terri Cunliffe
Its: Chief Executive Officer

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

DocuSign Envelope ID: FFDA8135-7A4E-42B7-85B2-66CC466E97A5

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by their duly authorized representatives as of the date first above written.

**THE PROSPECT-WOODWARD HOME D/B/A HILLSIDE VILLAGE KEENE:**

By: _____

Its: _____

**COVENANT LIVING SERVICES:**

*Terri Cunliffe*
8D332B469D5945C

By: Terri Cunliffe

Its: Chief Executive Officer

78263910.17

**EXHIBIT A**
**(Bill of Sale)**

78263910.34

## BILL OF SALE

THIS BILL OF SALE (the "*Bill of Sale*"), dated as of _____, 2021, is made and entered into by and between Covenant Living Services, an Illinois not for profit corporation ("*Buyer*"),  and The Prospect-Woodward Home d/b/a Hillside Village Keene, a New Hampshire not-for-profit voluntary corporation ("*Seller*"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

### RECITALS:

WHEREAS, Seller is a debtor in bankruptcy before the United States Bankruptcy Court for the District of New Hampshire (the "*Court*"), and Seller and Buyer are parties to that certain Asset Purchase Agreement, dated August __, 2021, as may be amended from time to time (the "*Purchase Agreement*"), pursuant to which Buyer and/or its affiliates are purchasing substantially all of the assets of Seller; and

WHEREAS, the Court has approved the transaction pursuant to the Purchase Agreement, including the sale of the Purchased Assets from Seller to Buyer pursuant to, among other things, 11 U.S.C §363; and

WHEREAS, pursuant to the Purchase Agreement, Seller has agreed to sell, assign, transfer, deliver and convey to Buyer or its other assigns, as applicable, and Buyer has agreed to purchase, acquire and accept, from Seller, all right, title and interest of Seller in and to the Purchased Assets, on the conditions and subject to the terms set forth in the Purchase Agreement, for consideration in the amount and on the terms and conditions provided therein; and

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  <u>Conveyance</u>.  Effective as of the date first set forth above (the "*Effective Date*"), Seller hereby sells, assigns, transfers, delivers and conveys,  to Buyer, and Buyer hereby purchases from Seller, all of Seller's right, title and interest in, to and under the Purchased Assets, including without limitation the Equipment and Inventory, but excluding the Excluded Assets, free and clear of all Liens as set forth on the Purchase Agreement:

2.  <u>Acceptance</u>.  Effective as of the Effective Date, Buyer hereby accepts the foregoing Purchased Assets from Seller.

3.  <u>Reference to the Purchase Agreement</u>.  The provisions of this Bill of Sale are subject in all respects to the terms of the Purchase Agreement.  Nothing contained in this Bill of Sale shall be deemed or construed to alter, modify, add to or waive any of the rights, obligations, terms, covenants, conditions, or other provisions contained in the Purchase Agreement.

4.  <u>No Third Party Beneficiaries</u>.  This Bill of Sale is solely for the benefit of Buyer and Seller and their respective successors and assigns, and this Bill of Sale shall not be deemed to confer upon or give to any other third party any remedy, claim, cause of action or other right.

5.  <u>Captions</u>.  The Section headings contained in this Bill of Sale are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Bill of Sale or the intent of any provision of this Bill of Sale.

1

6.      <u>Further Assurances</u>.  The parties hereto shall from time to time after the date hereof execute and deliver such additional instruments of conveyance in addition to this Bill of Sale as one may reasonably request of the other to evidence more fully the transfer by Seller to Buyer of the Purchased Assets.

7.      <u>Controlling Law</u>.  This Bill of Sale shall be governed by and construed and enforced in accordance with the internal laws of the State of New Hampshire without reference to its choice of law rules.

8.      <u>Amendment; Waiver</u>.  This Bill of Sale may be modified or supplemented only by written agreement of the parties hereto.

9.      <u>Counterparts</u>.  This Bill of Sale may be executed in separate counterparts, each of which shall be an original and all of which shall be deemed to be one and the same bill of sale. Electronic signatures shall be deemed to be original signatures.

(SIGNATURE PAGE FOLLOWS)

2

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed and delivered as of the date and year first above written.

**BUYER:**

COVENANT LIVING SERVICES

By: _____
Name: Terri S. Cunliffe
Title:   President and CEO


**SELLER:**

THE  PROSPECT-WOODWARD  HOME  D/B/A
HILLSIDE VILLAGE KEENE

By: _____
Name: Toby Shea
Title:   Chief Restructuring Officer

[Signature Page to Bill of Sale]

79060356.2

**EXHIBIT B**
**(Assignment and Assumption Agreement)**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "*Agreement*") is made as of _____, 2021 by and among Covenant Living Services, an Illinois not for profit corporation, ("*Buyer*"), The Prospect-Woodward Home d/b/a Hillside Village Keene, a New Hampshire not-for-profit voluntary corporation ("*Seller*"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

### RECITALS:

WHEREAS, Seller is a debtor in bankruptcy before the United States Bankruptcy Court for the District of New Hampshire (the "*Court*"), and Seller and Buyer are parties to that certain Asset Purchase Agreement, dated July 30, 2021, as may be amended from time to time (the "*Purchase Agreement*"), pursuant to which Buyer and/or its affiliates are purchasing substantially all of the assets of Seller; and

WHEREAS, the Court has approved the transaction pursuant to the Purchase Agreement, including the assignment and assumption of the Assumed Liabilities and the Assumed Contracts And Leases (each as defined below) from Seller to Buyer pursuant to 11 U.S.C §363; and

WHEREAS, Seller is a party to certain executory contracts which are being assumed by Seller and assigned to Buyer (the "*Assumed Contracts and Leases*") pursuant to the Purchase Agreement and, among other things, 11 U.S.C §365; and

WHEREAS, pursuant to the Purchase Agreement, and in consideration for the sale, assignment, transfer, delivery and conveyance of the Purchased Assets to Buyer, Buyer, as applicable, has agreed to assume from Seller and agrees to pay, perform and discharge when due in accordance with their respective terms and subject to the respective conditions thereof, (i) all of the Assumed Liabilities from Seller, and (ii) all of the Assumed Contracts And Leases.

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Assignment and Assumption of Assumed Liabilities</u>. Effective as of the date first set forth above (the "*Effective Date*"), Seller hereby assigns and Buyer hereby assumes and agrees to pay, perform and discharge when due in accordance with their respective terms and subject to the respective conditions thereof, all of the Assumed Liabilities as set forth in the Purchase Agreement. Except for the Assumed Liabilities, Buyer will not assume any liability or obligation of Seller whatsoever, and Seller will retain all Excluded Liabilities.

2.     <u>Assignment of Assumed Contracts And Leases</u>.  Effective as of the Effective Date, Seller hereby transfers and assigns to Buyer all right, title and interest of Seller in and to the Assumed Contracts And Leases set out on <u>Exhibit A</u> hereto.  Pursuant to Section [__] of the Sale Order entered by the Bankruptcy Court on [_____], 2021 as Docket No. [___], Buyer reserves the right to add additional matters to <u>Exhibit A</u> as provided in the Purchase Agreement.

3.     <u>Assumption</u>.    Effective as of the Effective Date, Buyer hereby assumes all obligations of Seller under the Assumed Contracts And Leases arising from and after the Effective Date and assumes and agrees to fully perform all of the terms, conditions, covenants and agreements of the Assumed Contracts And Leases on the part of the Seller thereunder to be kept and performed during the remaining term of the

Assumed Contracts And Leases and any extension or renewal thereof, accruing on and after the Effective Date or otherwise attributable to the period commencing on such date and continuing thereafter.  Seller shall have no further liability therefore pursuant to 11 U.S.C §365(k).

4.      <u>Reference to the Purchase Agreement</u>.  The provisions of this Agreement are subject in all respects to the terms of the Purchase Agreement.  Nothing contained in this Agreement shall be deemed or construed to alter, modify, add to or waive any of the rights, obligations, terms, covenants, conditions, or other provisions contained in the Purchase Agreement.

5.      <u>Captions</u>.  The Section headings contained in this Assignment are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Assignment or the intent of any provision of this Assignment.

6.      <u>Further Assurances</u>.  The parties hereto shall from time to time after the date hereof execute and deliver such additional instruments of conveyance in addition to this Assignment as one may reasonably request of the other to evidence more fully the assumption of the Assumed Liabilities and the assumption and assignment of the Assumed Contracts and Leases.

7.      <u>Notice</u>.  Notices shall be as provided in the Purchase Agreement.

8.      <u>Applicable Law</u>.  This Assignment shall be governed by and construed in accordance with the laws of the State of New Hampshire without regard to principles of conflicts of law.

9.      <u>Amendment; Waiver</u>.  This Assignment may be modified or supplemented only by written agreement of the parties hereto.

10.     <u>Counterparts</u>.  This Assignment may be executed in separate counterparts, each of which shall be an original and all of which shall be deemed to be one and the same bill of sale. Electronic signatures shall be deemed to be original signatures.

[Signature Pages Follow]

79060781.4

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment and Assumption Agreement to be executed and delivered as of the date and year first above written.

**BUYER:**

COVENANT LIVING SERVICES

By:_____
Name: Terri S. Cunliffe
Title:   President and CEO

**SELLER:**

THE  PROSPECT-WOODWARD  HOME  D/B/A
HILLSIDE VILLAGE KEENE

By: _____
  Name: Toby Shea
  Title:   Chief Restructuring Officer

79060781.4

**<u>EXHIBIT A</u>**
**(Assumed Contracts And Leases)**

79060781.4

**EXHIBIT C**
**(Form of Deed)**

Return to:

**QUITCLAIM DEED**

KNOW ALL PERSONS BY THESE PRESENTS THAT, **THE PROSPECT – WOODWARD HOME**, a New Hampshire non-profit corporation, with a principal office address of 194-202 Court Street, Keene, New Hampshire 03894, for consideration paid, grants to _____, a_____, with a principal office address of, _____, with [QUITCLAIM COVENANTS]: the following property:

**PARCEL ONE:**

Two parcels of land, with the buildings thereon, located in the City of Keene, County of Cheshire and State of New Hampshire, bounded and described as follows:

**East Parcel**

Beginning at a granite bound in the southeasterly sideline of Wyman Road at a corner of lands now or formerly of Bruce L. Borden Revocable Trust & Phyllis R. Borden Revocable Trust; Thence

South 30° 06' 19" East along said Trusts and a barbed wire fence line a distance of 80.54 feet to a 5/8" capped rebar; Thence

South 40° 34' 37" East along said Trusts and a barbed wire fence line a distance of 157.49 feet to a 5/8" capped rebar; Thence

South 53° 50' 21" East along said Trusts and a barbed wire fence line a distance of 198.00 feet to a 5/8" capped rebar at a corner of lands now or formerly of Kendal J. & Patricia L. Dicey; Thence

South 49° 22' 58" East along said Dicey and a barbed wire fence line a distance of 129.10 feet to a 5/8" capped rebar at a corner of  other lands now or formerly of Bruce L. Borden Revocable Trust & Phyllis R. Borden Revocable Trust ; Thence

South 52° 05' 34" West along said Trusts a distance of 247.64 feet to a 5/8" capped rebar; Thence

South 43° 30' 35" East along said Trusts and crossing Black Brook a distance of 618.89 feet to a 5/8" capped rebar; Thence

North 69° 56' 24" East along said Trusts and again crossing Black Brook a distance of 384.68 feet to a 5/8" capped rebar in the westerly line of lands now or formerly of Caitlin Whitehead and being in the northerly bank of said Brook; Thence

South 35° 17' 13" East along said White head, crossing the Brook and along lands now or formerly of Monadnock Economic Development Corporation (MEDC) a distance of 83.47 feet to a 5/8" capped rebar; Thence

South 35° 17' 13" East along (MEDC) a distance of 600.39 feet to a 5/8" capped rebar at a corner; Thence

South 83° 19' 36" West along MEDC a distance of 550.19 feet to a 5/8" capped rebar at a lot corner; Thence

South 83° 19' 36" West along MEDC a distance of 228.72 feet to a 36" white pine; Thence

South 85° 10' 21" West along MEDC a distance of 475.98 feet to a 5/8" capped rebar; Thence

South 85° 34' 16" West along MEDC and partially along a barbed wire fence and crossing a woods road a distance of 387.36 feet to a 1" pipe at the north east corner of lands now or formerly of Lory Family Revocable Trust; Thence

South 84° 37' 53" West along Lori and partially along a wire fence a distance of 118.53 feet to a 5/8" capped rebar in a stone wall in the easterly sideline of Wyman Road, as laid out and shown on a plan titled, "Road Layout & Widening Plan, Prepared for City of Keene & The Prospect-Woodward Home," dated February 1, 2017; by Russell J. Huntley, SVE Associates; Thence

North 5° 04' 49" West along the wall and Road a distance of 14.81 feet to a 5/8" capped rebar; Thence

North 10° 41' 52" West along the wall and Road a distance of 133.61 feet to a 5/8" capped rebar; Thence

North 6° 04' 08" West along the wall and Road a distance of 98.44 feet to a 5/8" capped rebar; Thence

North 6° 02' 17" West along the Road a distance of 121.26 feet to a granite bound with a disk; Thence

North 6° 36' 08" West along the Road a distance of 200.00 feet to a granite bound with a disk; Thence

South 83° 23' 52" West along the Road a distance of 12.49 feet to a granite bound with a disk; Thence

North 5° 42' 48" West along the Road a distance of 373.56 feet to a granite bound with a disk; Thence

Following a curve to the right with a Delta Angle of 43° 46' 13" and a radius of 300.00 feet along the road an arc length of 229.18 feet to a granite bound with a disk; Thence

North 38° 02' 17" East along the Road a distance of 21.93 feet to a granite bound with a disk; Thence

South 51° 57' 43" East along the Road a distance of 5.00 feet to a granite bound with a disk; Thence

North 38° 02' 17" East along the road a distance of 70.00 feet to a granite bound with a disk; Thence

Following a curve to the left with a delta Angle of 3° 48' 53" and a radius of 1151.50 feet along the Road an arc length of 76.66 feet to a granite bound with a drill hole; Thence

North 34° 13' 24" East a distance of 97.16 feet to a granite bound with a drill hole; Thence

Following a curve to the right with a Delta Angle of 16° 20' 50" and a radius of 237.87 feet along the Road an arc length of  67.87 feet to a granite bound with a disk; Thence

North 50° 34' 12" East along the Road a distance of 282.19 feet to the Point of Beginning.

**West Parcel**

Beginning at a granite bound in the westerly sideline of Wyman Road at a corner of lands now or formerly of  Spofford Stage Real Estate, LLC; Thence

South 84° 41' 40" West along said Spofford Stage a distance of 148.97 feet to a 5/8" capped rebar; Thence

South 86° 51' 14" West along said Spofford Stage a distance of 101.63 feet to a 5/8" capped rebar; Thence

South 85° 56' 04" West along said Spofford Stage a distance of 141.21 feet to a 5/8" capped rebar; Thence

South 82° 37' 14" West along said Spofford Stage a distance of 36.61 feet to a 5/8" capped rebar at the southeasterly corner of Shalldu LTD; Thence

North 6° 02' 39" East a distance of 436.91 feet to a 5/8" capped rebar; Thence

North 10° 53' 53" West a distance of 34.20 feet to a 5/8" capped rebar; Thence

North 10° 53' 53" West a distance of 982.01 feet to a 5/8" capped rebar; Thence

North 85° 26' 08" East a distance of 354.04 feet to a 5/8" capped rebar; Thence

South 30° 29' 51" East a distance of 323.46 feet to a 5/8" capped rebar in a stone wall in the westerly sideline of Wyman Road, as laid out and shown on a plan titled, "Road Layout & Widening Plan, Prepared for City of Keene & The Prospect-Woodward Home," dated February 1, 2017; by Russell J. Huntley, SVE Associates; Thence

South 35° 36' 21" West along the wall and the Road a distance of 60.85 feet to a point; Thence

South 32° 58' 21" West partially along the wall and along the Road a distance of 38.21 feet to  a granite bound with a disk; Thence

South 4° 46' 31" East along the Road a distance of 305.92 feet to a 5/8" capped rebar at the end of a stone wall; Thence

South 8° 15' 21" East along the wall and the Road a distance of 136.54 feet to a 5/8" capped rebar; Thence

South 7° 10' 09" East along the wall and the Road a distance of 60.99 feet to a granite bound with a disk; Thence

South 83° 23' 52" West along the Road a distance of 6.65 feet to a granite bound with a disk; Thence

South 6° 36' 08" East along the Road a distance of 202.21 feet to a granite bound with a disk; Thence

South 5° 20' 47" East along the Road a distance of 134.80 feet to a granite bound with a drill hole; Thence

Following a curve to the left with a Delta Angle of 2° 59' 18" and a radius of 2421.72 feet along the Road an arc length of 126.30 feet to a granite bound with a disk; Thence

South 8° 20' 05" East along the Road a distance of 105.61 feet to the Point of Beginning.

**PARCEL TWO:**

A certain tract of land with the buildings thereon situate on the northerly side of Wyman Road in the City of Keene, County of Cheshire and State of New Hampshire, bounded and described as follows:

Beginning at a 5/8" capped rebar (to be set) in the northerly side of Wyman Road at the southwesterly corner of the premises herein conveyed, being the northeasterly corner of other land now or formerly of Kendall W. Lane, et al;

thence N. 16° 41' 18" W. three hundred twenty-four and twenty-six hundredths (324.26) feet, more or less, along said other land of Lane to a 5/8" capped rebar (to be set);

thence N. 80° 44' 45" W. three hundred fifty-four and four hundredths (354.04) feet, more or less, along said other land of Lane to a 5/8" capped rebar (to be set) at the northwesterly corner of said other land of said Lane, being the southeasterly corner of land now or formerly of Monadnock Economic Development Corp.;

thence N. 02° 55' 00" E. seven hundred seventy-two and thirty-eight hundredths (772.38) feet, more or less, along said Monadnock Economic Development Corp. land to a 5/8" capped rebar up 8" at the northwesterly corner of the premises herein conveyed;

thence N. 89° 29' 27" E. two hundred forty-one and fifty-eight hundredths (241.58) feet, more or less, along a stone wall to the end of said stone wall;

thence N. 89° 29' 27" E. five hundred twenty-four and eighty-one hundredths (524.81) feet, more or less, to a 5/8" rebar with cap (to be set) at the northeast corner of the premises herein conveyed;

thence S. 13° 57' 27" E. eight hundred six and fifty hundredths (806.50) feet, more or less, along land now or formerly of Thomas D. Borden, et al, to the 5/8" rebar with cap (to be set) in the north line of Wyman Road, being the southeast corner of the premises herein conveyed;

thence S. 64° 23' 24" W. three hundred twenty-nine and two hundredths (329.02) feet, more or less, to a point at the end of a stone wall;

thence S. 48° 38' 51" W. one hundred eighty-three and fifty-six hundredths (183.56) feet, more or less, along a stone wall to a point at the end of said stone wall;

thence S. 51° 23' 44" W. one hundred five and eighty-seven hundredths (105.87) feet, more or less, to a point in the end of a stone wall;

thence S. 50° 21' 11" W. fifty-two and forty-eight hundredths (52.48) feet, more or less, along a stone wall to the 5/8" rebar with cap (to be set} at the point of beginning, the last four courses being along the northerly side of said Wyman Road.

Being Lot 919-08-003.02 as shown on a plan entitled "Two Lot Subdivision Plan prepared for Kendall Lane of land located at Tax Map 919, Block 8, Lot 3, dated 8/15/05, revised 9/26/05 &10/24/05, by SVE Associates and approved by the City of Keene Planning Board November 1, 2005, recorded in Cabinet 13, Drawer 1- 140 of the Cheshire County Registry of Deeds.

**PARCEL THREE:**

A certain tract or parcel of land off Black Brook Road in Keene, Cheshire County, New Hampshire, shown as "Area to be Conveyed" on a plan entitled "Boundary Line Adjustment Plan" prepared by SVE Associates for The Prospect-Woodward Home, dated August 17, 2017, revised on February 12, 2018, and recorded at the Cheshire County Registry of Deeds as Plan No. 18047, more particularly bounded and described as follows:

Beginning at an iron rebar to be set along the boundary between land of the within Grantor and land of the within Grantee, said rebar to be located 270.92 feet, more or less, east of the easterly sideline of Wyman Road,

Thence North 85° 34' 16" East 234.97 feet, more or less, along said boundary line to an iron rebar to be set,

Thence South 5° 25' 53" East 100.00 feet, more or less, to an iron rebar to be set,

Thence South 85° 33' 57" West 103.74 feet, more or less, to an iron rebar to be set,

Thence North 5° 25' 53" West 65.01 feet, more or less, to an iron rebar to be set,

Thence South 85° 34' 16" West 131.23 feet, more or less, to an iron rebar to be set,

Thence North 5° 25' 53" West 35.01 feet, more or less, to the point of beginning.

Together with the sewer line easement granted to The Prospect-Woodward Home as recorded in said Registry at Book 3001 Page 444.

Subject to those Permitted Exceptions listed on Exhibit A attached hereto, insofar as they may be in force and applicable.

Meaning and intending to convey the premises conveyed to The Prospect – Woodward Home by Warranty deed of Kendall W. Lane and Molly B. Lane dated April 12, 2017 and recorded in the Cheshire County Registry of Deeds at Book 2989, Page 328 and Warranty deed of Miracles In Motion dated September 29, 2017 and recorded in the Cheshire County Registry of Deeds at Book 3002 Page 151 and Warranty deed of NH Black Brook LLC dated March 15, 2018 and recorded in the Cheshire County Registry of Deeds at Book 3035 Page 945.

[SIGNATURE(S) ON FOLLOWING PAGE(S)]

Executed by its duly-authorized officer this _____ day of _____, 202__.

THE PROSPECT – WOODWARD HOME

By _____
Name:
Title:

STATE OF NEW HAMPSHIRE
COUNTY OF _____ SS

      The foregoing instrument was acknowledged before me this _____ day of _____, 202__ by _____, _____ of The Prospect – Woodward Home, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same as the duly authorized _____ of The Prospect – Woodward Home for the purposes therein contained.

_____
Notary Public/Justice of the Peace
Commission expires

## EXHIBIT A
## PERMITTED EXCEPTIONS

1. Liens for taxes, charges and assessments which become due and payable subsequent to _____, 20__.

2. Application for Current Use Taxation by Mary Dodds, recorded with Cheshire County Registry of Deeds at Vol. 885, Page 223 and at Vol. 901, Page 70, as affected by Partial Release dated 5/12/00 and recorded at Book 1767, Page 757 and by Amendment dated 10/7/13 and recorded at Book 2843, Page 651 and further partial releases at Book 2842, Page 889; Book 2998, Page 1137; Book 2998, Page 1135; Book 3020, Page 96; Book 3020, Page 152; Book 3035, Page 407; Book 3035, Page 409; Book 3037, Page 444; and Book 3078 Page 417.

3. Drainage Rights acquired by City of Keene by virtue of Layout of Drainage of Ash Swamp, Tannery, White and Black Brooks Water Shed dated 3/16/61 and recorded 3/22/61 with Cheshire County Registry of Deeds at Vol. 679, Page 105.

4. Utility Easement dated 3/12/96 and recorded 3/14/96 with Cheshire County Registry of Deeds at Book 1552, Page 578.

5. All matters as shown on plans recorded at Cabinet 13, Drawer 1, #140, Cabinet 11 Drawer 10 #111, Cabinet 12, Drawer 3 #90 and 91, Cabinet 11, Drawer 3 #120 and Cabinet 11, Drawer 10, #103, Plan # 17069, 17070, 17071, 17072, 18046, and 18047 as well as on other plans depicting locus premises, as applicable.

6. Cross Easement Agreement described in Deed recorded with Cheshire County Registry of Deeds at Book 3001, Page 450 as amended at Book 3111, Page 127.

7. Easement recorded with Cheshire County Registry of Deeds at Book 3012, Page 169.

8. Rights of the City of Keene under a Return of Layout of drainage of Ash Swamp, Tannery, White, Black Books recorded with Cheshire County Registry of Deeds at Vol 679, Page 105. See also Vol 676, Page 563.

9. Rights of Keene Economic Development and Revitalization Corp recorded with Cheshire County Registry of Deeds at Book 1552, Page 578. See also Plan Cabinet 11, Drawer 10 #103.

10. All easements described in Deed recorded with Cheshire County Registry of Deeds at Book 1553, Page 532.

11. Drainage easement recorded with Cheshire County Registry of Deeds at Book 3001, Page 442.

12. Sewer line easement described in Deed recorded with Cheshire County Registry of Deeds Book 3001, Page 444.

61209016 v1