## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

## DECLARATION OF TOBY SHEA, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF THE DEBTOR'S FIRST DAY PLEADINGS

I, Toby Shea, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of The Prospect-Woodward Home d/b/a Hillside Village, a New Hampshire not-for-profit corporation and the above-captioned debtor and debtor in possession (the "Debtor"). I have served as CRO of the Debtor since December 1, 2020.

2.      I am also a Partner at OnePoint Partners ("OnePoint"). I have more than twenty-five years serving the senior living industry in a variety of roles, including lender, investment banker, Chief Financial Officer, and advisor. I specialize in providing operational, financial, and industry expertise to management, boards, and investors. I have provided long-term strategic planning, financial modeling, debt restructuring, asset disposition, and forecasting services to clients. Before joining OnePoint, I served as Chief Financial Officer of Masonic Health System of Massachusetts.

3.      In my capacity as CRO, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor, and I am authorized to submit this declaration (this "Declaration") on behalf of the Debtor. Except

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431.

as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees, agents, attorneys, and advisors while serving as CRO, the accuracy and completeness of which information I relied upon to provide this Declaration.

4.    I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case (the "Chapter 11 Case") and in support of: (a) the Debtor's voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the District of New Hampshire (the "Court"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and pleadings (collectively, the "First Day Pleadings").

5.    The Debtor remains in possession of its assets and continues to operate its business as debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.    No trustee, examiner, or committee has been appointed in this Chapter 11 Case.

7.    As described more fully in Section IV, the Debtor has contemporaneously filed the following First Day Pleadings:

    a.    Emergency Ex Parte Motion of Debtor for Entry of an Order Extending the Deadline to File Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules Extension Motion");

    b.    Emergency Ex Parte Motion of Debtor for Entry of an Order Authorizing Procedures to Maintain and Protect Confidential Resident Information (the "Resident Confidentiality Motion");

    c.    Emergency Ex Parte Motion of Debtor for Entry of an Order Authorizing Debtor to Maintain Escrow Arrangements in the Ordinary Course and Refund Certain Resident Deposits (the "Resident Escrow Motion");

    d.    Emergency Ex Parte Motion of Debtor for entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate

2

Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief (the "<u>Cash Collateral Motion</u>");

e.    Emergency Ex Parte Motion of Debtor for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) Maintenance of Existing Deposit Practices (the "<u>Cash Management Motion</u>");

f.    Emergency Ex Parte Motion of Debtor for Entry of Interim and Final Orders Authorizing (I) Payment of Certain Employee Compensation and Benefits and (II) Maintenance and Continuation of Such Benefits and Other Employee-Related Programs (the "<u>Wages Motion</u>");

g.    Emergency Ex Parte Motion of Debtor for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (II) Approving the Debtor's Proposed Adequate Assurance of Payment for Post-Petition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "<u>Utilities Motion</u>");

h.    Emergency Ex Parte Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (III) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy without Obtaining Relief from the Automatic Stay (the "<u>Insurance Motion</u>");

i.    Emergency Ex Parte Motion of Debtor for Entry of an Order Determining that Appointment of a Patient Care Ombudsman is Not Required in this Case (the "<u>Ombudsman Motion</u>"); and

j.    Debtor's Application for Entry of an Order Authorizing the Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtor (the "<u>Claims Agent Application</u>").

8.    The Debtor seeks the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Case on business operations and to maximize the value of its assets. I have reviewed the Debtor's petition and the First Day Pleadings, or have otherwise had their contents explained to me by the Debtor's advisors,

79496608.16

and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

9.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

10.     To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into three sections. Section I provides an overview of the Debtor and its operations. Section II describes the Debtor's prepetition capital structure. Section III describes the circumstances leading to the commencement of the Chapter 11 Case and Debtor's anticipated course of action in the Chapter 11 Case. Section IV sets forth the relevant facts in support of each of the First Day Pleadings.

11.     The purpose of this Chapter 11 Case is to effectuate a sale of the Community (as defined below) pursuant to Bankruptcy Code section 363. The Debtor anticipates that this sale process will be consensual and expeditious, with no disruptions to the Residents (as defined below) or daily operations.

## I.      Overview of the Debtor's Business

12.     The Debtor is a private New Hampshire not-for-profit corporation operating a state-of-the-art continuing care retirement community ("CCRC") located in Keene, New Hampshire and known as "Hillside Village Keene" (the "Community"). Generally, CCRCs offer seniors a full life cycle of retirement services on the same property. Unlike limited purpose senior living facilities which specialize in providing care for a particular set of healthcare needs, CCRCs, and in particular, the Community, do not require seniors to permanently relocate as their needs change. Rather, CCRCs, and the Community, enable seniors to remain in place as they age and their needs

4

change by providing various levels of support in one location. Moreover, CCRCs provide residents with multiple opportunities for social and intellectual engagement and other benefits for all stages of their retirement living.

13.     Entrance fee CCRCs are an attractive option to many seniors because the uncertain cost and burdens associated with senior living are leveled through an entrance fee model whereby prospective residents often will sell their home or otherwise liquidate a significant asset to fund an initial entrance fee. In addition, the resident pays monthly service fees separately or they are deducted from the entrance fee. Upon exiting the CCRC, depending upon the plan chosen, the former resident may be entitled to payment of some portion of the entrance fee as a refund once their unit is sold to another resident. CCRCs like the Community generate revenue from new resident entrance fees and monthly service fees. Many CCRCs also generate revenue through third party reimbursement, such as Medicare, Medicaid, and private insurance, for health care services. The Community, however, does not participate in any third-party reimbursement programs and is therefore 100% private pay.

**A.      The Property**

14.     The Debtor is the successor of a July 2016 merger between two not-for-profit corporations, Prospect Hill Home and The Woodward Home. Prospect Hill Home was formed in 1874 and, in 1884, moved to a property on Court Street in Keene, New Hampshire, where it operated continuously for over 130 years. The Woodward Home was founded in 1940 and was located at 194-202 Court Street in Keene, New Hampshire (the "Court Street Property"). The Board of Trustees of Prospect Hill Home determined that its mission would be better furthered by developing a CCRC located in Keene, New Hampshire, and, to that end, engaged in conversations with The Woodward Home, which led to the July 2016 merger. Following the merger, Prospect

5

Hill Home residents moved into the Court Street Property until the Community was built and opened.

15.     Construction of the Community began in 2017 and opened in phases beginning in January 2019. The Community offers its residents a continuum of care in a campus-style setting, providing living accommodations and related healthcare and support services to persons aged 62 or older. The Community is located on 66 acres and is comprised of 141 independent living apartments, 43 assisted living units, 20 long-term nursing care units, and 18 memory care units. The Community also contains a community center, heath center, multiple dining rooms and lounges, library, indoor pool, performing arts theater, and other common spaces. As detailed further below, portions of the Community are still under construction due to construction defects.

16.     As of the Petition Date, the Debtor had the following occupancy rates:

|  | Census | Capacity | Occupancy Rate |
|---|---|---|---|
| Independent Living Units | 103 | 141 | 73% |
| Assisted Living Units | 15 | 43 | 35% |
| Memory Care Units | 13 | 18 | 72% |
| Long-Term Care Units[2] | 0 | 20 | 0% |
| **Total** | **131** | **222** | **59%** |

**B.      Development of the Property**

**(1)      Financing of the Community**

17.      The development of the Community was financed through the issuance of bonds (the "Series 2017 Bonds") by the New Hampshire Health and Education Facilities Authority (the "Authority" or the "Issuer") in the principal amount of $93,015,000.00. On June 1, 2017, the Authority and U.S. Bank National Association as former trustee (the "Original Trustee"), entered into a Bond Indenture (the "Bond Indenture"), pursuant to which the Issuer issued revenue bonds in the initial principal amount of $93,015,000.00, consisting of: (i) $57,395,000.00 principal

---

[2]  The long-term nursing care units are licensed, but as of the Petition Date, have not yet opened.

79496608.16

amount direct note obligation in Series 2017A Bonds (the "2017A Bonds"), (ii) $17,210,000.00 principal amount direct note obligation in Series 2017B Bonds (the "2017B Bonds"), (iii) $16,520,000.000 principal amount direct note obligation in Series 2017C Bonds (the "2017C Bonds"), and (iv) $1,890,000.00 principal amount direct note obligation in Series 2017D Bonds (the "2017D Bonds"). The Debtor, the Authority, and the Original Trustee entered into that certain Loan Agreement and Mortgage (Security Agreement) dated as of June 1, 2017 (the "Loan Agreement") pursuant to which the Authority agreed to lend the proceeds of the 2017 Bonds to the Debtor (the "Loan"). At the request of the majority of holders of the Bonds and with the consent of the Authority, UMB Bank has replaced the Original Trustee as the Bond Trustee under the Bond Indenture (the "Bond Trustee").

**(2)      Construction Issues at the Community**

18.      Construction of the Community began in May 2017. The Debtor and MacMillin Company, LLC ("MacMillin") entered into a construction contract dated April 14, 2017 (the "Construction Contract"). Pursuant to the Construction Contract, MacMillin was the general contractor and construction manager for the construction of the Community.

19.      During construction, disputes arose between the Debtor and MacMillin regarding change order requests and MacMillin's performance. In February 2019, the Debtor and MacMillin entered into a settlement agreement which established the amount to be paid to MacMillin as $65,334,748. The parties then agreed to subsequent change order requests which increased the total to be paid to $65,624,122. As of the Petition Date, MacMillin had been paid approximately $60,730,884.

20.      In May 2019, Hillside Village began investigating MacMillin's work due to several areas of concern. These areas of concern included leaking in several areas which has caused water damage.  The Debtor hired an engineering firm, Simpson Gumpertz & Heger ("SGH") to perform

7

this investigation. SGH determined that MacMillin's work did not comply with the plans, specifications, or industry standards. The project architect refused to certify that any payment was due to MacMillin until those issues were resolved. MacMillin denied any wrongdoing or financial responsibility. SGH, at the Debtor's request, developed plans and specifications to address areas of concern (collectively, the "Repair Scope"). The Debtor then engaged a different construction management firm, Hutter Construction Corporation ("Hutter"), to provide a cost estimate for the Repair Scope. Hutter estimated that the cost of the Repair Scope was approximately $3,546,331.

21.     In August 2019, MacMillin filed a complaint in the Cheshire County Superior Court of New Hampshire seeking recovery for breach of contract, unjust enrichment, and other claims. The Superior Court entered an order granting MacMillin and certain subcontractors mechanics liens. Hillside Village and MacMillin stayed the Superior Court action in favor of contractually mandated arbitration which is currently scheduled for March 2022.

22.     In February 2020, Hillside Village and MacMillin engaged in mediation; however, these efforts were unsuccessful. Following mediation, the parties have continued to engage in settlement discussions, to no avail.

23.     Hillside Village hired Bergeron Construction ("Bergeron") in May 2021 to complete urgent repairs to certain balconies at the Community using the funds made available by the Bond Trustee pursuant to the terms and conditions of the Forbearance Agreement (as defined below). However, MacMillin has attempted to delay this work going forward as Bergeron's work continues to uncover further deficiencies in MacMillin's work.

## C.     Business Operations

### (1)     Residency Agreements

24.     Before a potential resident at the Community (a "Prospective Resident", or, following such individual becoming a resident at the Community, a "Resident") moves into the

8

Community, he or she must execute a Residency and Care Agreement (each a "Residency Agreement"). Among other things, the Residency Agreements sets forth the Resident's obligation to pay a fee to the Debtor to occupy the Prospective' Resident's unit (an "Entrance Fee"), which may be fully or partially refunded to the Resident, and the amount of monthly service fees (the "Monthly Service Fees") which the Resident must pay while living at the Community. Upon executing a Residency Plan, a Prospective Resident must make at deposit equal to at 10% of the Entrance Fee (the "Initial Deposit") to reserve the Prospective Resident's unit. After making the Initial Deposit, if the Prospective Resident elects to not move into the Community, the Initial Deposit will be refunded upon the resale of the unit.

25.     Currently, the Debtor offers Prospective Residents the choice of three residency and care plans, each evidenced by a different form of Residency Agreement. The differences primarily relate to the required Entrance Fee, the Monthly Service Fees, and the amount of the Entrance Fee to be refunded thereunder, if any.

26.     The terms of the three plans are as follows:

a.      The Traditional Plan. Under this plan, the Entrance Fee is reduced by 4% upon initial occupancy and then by 2% for each subsequent month of occupancy until the Entrance Fee to be refunded equals zero. This plan has no additional Monthly Service Fees. Under this plan, residents have a lower Entrance Fee. There are approximately 47 current residents under this plan currently at the Community.

b.      The 90% Refundable Shared Cost Plan. This plan is typically for Residents who own a long-term health care insurance policy. Under this plan, Residents are required to make an Entrance Fee payment, which is refundable up to 90%, and is reduced by the difference between the Monthly Service Fee paid by the Resident and the cost of the services utilized by the Resident, less any amounts reimbursed to the Debtor by the Resident's long-term health care insurance provider. If a Resident's Entrance Fee refund reaches zero, the Resident continues to pay only the Monthly Service Fee in accordance with the Residency Agreement. There are approximately 11 current residents under this plan currently at the Community.

79496608.16

  c.  <u>The Guaranteed 90% Refundable Plan</u>. This plan also requires that Residents make an Entrance Fee payment which is refundable up to 90%, however, the Entrance Fee is not subject to further reduction except for limited exceptions. Under this plan, the Resident is responsible for the entire monthly service fee. Residents experiencing financial difficulty may authorize the Debtor to deduct the Monthly Service Fee from the Resident's Entrance Fee. There are approximately 48 current residents under this plan currently at the Community.

27. Generally, Entrance Fees are refunded to a Resident by the Debtor no later than 30 days after a new Prospective Resident executes a Residency Agreement and makes an Entrance Fee payment to the Debtor for the same unit. If a Resident experiences financial hardship as defined in the Residency Agreement, then the Debtor may also refund the Entrance Fee if a new Entrance Fee payment is not made for the same unit (a) within 12 months from the date of termination of the Residency Agreement if the Community is at 80% or greater occupancy, or (b) within 24 months from the date of termination of the Residency Agreement if the Community is at 80% or lower occupancy.

28. Prior to executing a Residency Agreement, the Debtor provides each Prospective Resident with a disclosure document pursuant to New Hampshire laws and regulations. The disclosure document is reviewed and must be approved in advance by the New Hampshire Insurance Department ("<u>NHID</u>"), and contain certain disclosure regarding the nature of the Debtor and the Community, their financial situation, the services to be provided to Residents, and the material terms of each Residency Agreement.

29. As described in <u>Section III</u>, when the Debtor began suffering from financial distress, it was required by law to change the disclosure documentation to advise Prospective Residents of the additional financial risks and uncertain future.[3] In my experience, Prospective

---

[3] The Debtor was also required to made public disclosures to holders of the Series 2017 Bonds via postings to the EMMA system maintained by the Municipal Securities Rulemaking Board (www.emma.msrb.org).

Residents are reluctant to sign a Residency Agreement in similar situations without certain additional protections. The Community's advisors recommended, and the Board approved, an escrow structure which would allow the Community to continue with its marketing program while providing Prospective Residents comfort that their upfront payment would be protected during this period of uncertainty.

30.     To that end, in January 2021, Hillside Village did what several similarly situated CCRCs have done and began offering an option agreement (the "Option Agreement") to be executed simultaneously with a Residency Agreement. The form of Option Agreement and its use was approved by NHID on February 5, 2021. Under the terms of the Option Agreement, a Prospective Resident would make a deposit in escrow (the "Option Deposit") in the amount of the potential Entrance Fee required under a Residency Agreement. The Option Agreement permits the Prospective Resident to terminate the Residency Agreement at any time before certain milestones without cause. Instead of being available to the Debtor as an Entrance Fee, the Option Deposit is fully refundable to the Prospective Resident until his or her residency becomes permanent and the Option Deposit is released from escrow to the Debtor and converts to an Entrance Fee following a trigger event under the Deposit Agreement (described below).

31.     The Option Deposits are deposited by Prospective Residents directly into an escrow account with an independent third-party trust company, TMI Trust Company, as escrow agent (the "Escrow Agent") pursuant to that certain Option Deposit Escrow Agreement with the Debtor dated January 5, 2021 (the "Escrow Agreement").  Under the terms of the Escrow Agreement, the Escrow Agent must hold all Option Deposits in escrow and cannot release or disburse any Option Deposits unless a Resident makes a written termination of the Residency Agreement and request for refund (a "Refund Request") or unless the Option Agreement terminates as described below. Under the

79496608.16

Option Agreement, a Resident may make a Refund Request without cause at any time up until 28 days after the Debtor gives such Resident notice of completion of (a) a significant financial restructuring, (b) a transaction involving a merger, sponsor substitution, or change in control, or (c) a sale of substantially all of its assets (each a "Trigger Event"). If a Resident provides the Debtor with a timely Refund Request, then, pursuant to the terms of the Option Agreement, the Debtor shall terminate the Residency Agreement and shall refund the Option Deposit, minus any unpaid fees or charges that the Resident owes the Debtor, within 30 days after the Resident vacates his or her unit.

32.     The Option Agreement further provides that if the Resident does not provide the Debtor with a timely Refund Request within 28 days after receiving the notice, the Option Agreement shall (a) automatically terminate; (b) the escrow of the Option Deposit shall terminate; (c) the Escrow Agent shall deliver the applicable balance of the Option Deposit to the Debtor or its assigns; and (d) Debtor shall credit the Option Deposit toward satisfying the Entrance Fee requirement under the Resident's Residency Agreement, retroactive to the date of the Residency Agreement.

33.     As of the Petition Date, the Community reported total refund obligations of $23,473,020, of which (a) $20,313,000 represents contingent refunds related to Residents currently at the Community, which are not currently due and payable, (b) $2,952,320 represents amounts owed to former Residents or their estates who had previously resided at the Community but terminated their Residency Agreements and vacated their units, and (c) $207,700 represents Initial Deposits made by Prospective Residents who terminated their Residency Agreements and who are owed refunds upon the resale of the previously reserved unit. In addition, the Community reported 5 Option Deposits totaling $2,206,950 currently being held by the Escrow Agent.

### (2) Financial Performance

34.     In the fiscal year 2019, the Debtor recognized total operating revenue of $5,241,069 and net operating income of -$5,155,678. In the fiscal year 2020, the Debtor recognized total operating revenue of $10,150,387 and net operating income of -$6,942,736. For the period of January 1 through July 31, 2021, the Debtor recognized total operating revenue of $5,654,835 and net operating income of $635,213.[4]

### (3) Corporate Governance

35.     The Debtor is governed by its Board of Trustees (the "Board"). Hillside Village is managed by Life Care Services LLC ("LCS") pursuant to that certain Pre-Opening and Management Services Agreement dated December 7, 2015 (the "LCS Agreement") and that certain Amendment No. 1 to Pre-Opening Management Services Agreement dated May 2, 2017 (the "LCS Amendment", and together with the Services Agreement, the "LCS Documents"). The Board retained OnePoint Partners ("OnePoint") as CRO as of December 1, 2020.

### (4) Regulatory Authorities

36.     Certain aspects of the Debtor's operations, such as the Residency Agreements and Entrance Fees, are subject to regulation by the Commissioner of the New Hampshire Insurance Department under provisions of N.H. Rev. Stat. Ann. § 420-D ("RSA 420-D"). Violations of RSA 420-D may result in, among other things, a suspension of the Community's CCRC certificate of authority, the Commissioner's ability to obtain liens and impose other financial measures, and increased regulatory oversight. Also, as a non-profit, the Debtor is under the jurisdiction of the Director of Charitable Trusts, and as to its healthcare operations, the Debtor is under the jurisdiction of the New Hampshire Department of Health and Human Services.

---

[4] The change in net operating income is primarily due to (i) failure to make payments under the Bond Documents as described in ¶ 56 and (ii) forgiveness of certain debt as described in ¶ 49.

## II.    <u>Prepetition Capital Structure</u>

37.    As of the Petition Date, the Debtor owes a total of approximately $96,856,450.46 consisting of bond obligations, construction loan obligations, and unsecured obligations (collectively, the "<u>Debt Obligations</u>").[5]

### A.    Bond Obligations

38.    As referenced above, the Community was constructed using proceeds from the issuance of the Series 2017 Bonds which were loaned to the Debtor. The $93,015,000.00 in Series 2017 Bonds were structured as follows:

| | |
|---|---|
| Series 2017A Bonds | $57,395,000.00 in Series 2017A Bonds, which were comprised of:<br><br>(a) $5,325,000.00 in term bonds due July 1, 2027;<br><br>(b) $12,315,000.00 in term bonds due July 1, 2037;<br><br>(c) $9,540,000.00 in term bonds due July 1, 2042; and<br><br>(d) $30,215,000.00 in term bonds due July 1, 2052. |
| Series 2017B Bonds | $17,210,000.00 in entrance fee principal redemption bonds due July 1, 2024. |
| Series 2017C Bonds | $16,520,000.00 in entrance fee redemption bonds due July 1, 2022. |
| Series 2017D Bonds | $1,890,000.00 in federally taxable entrance fee principal redemption bonds due July 1, 2022. |

39.    As of the Petition Date, the amounts due and owing by the Debtor for the outstanding Series 2017 Bonds are as follows (collectively, the "<u>Bond Claims</u>"):

     a.      Unpaid principal on the Series 2017A Bonds and Series 2017B Bonds in the amount of $60,445,000;[6]

---

[5] This amount includes current Residents who are not presently owed refunds.
[6] Pursuant to the terms of the Bond Documents, Entrance Fee revenues were used to redeem the Series 2017C Bonds and Series 2017D Bonds.

14

      b.      Accrued but unpaid interest on the Series 2017A Bonds and Series 2017B Bonds in the amount of $4,197,667.12; and

      c.      Unliquidated, accrued, and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date.

40.     The Bond Documents (as defined below) established various funds to be held by the Bond Trustee (collectively, the "Trustee Held Funds") including[7] a Construction Fund, Debt Service Reserve Fund, Entrance Fee Fund, Working Capital Fund, Bond Fund, and Renewal and Replacement Fund. On March 26, 2021, the Bond Trustee setoff the funds in the Construction Fund, Entrance Fee Fund, Working Capital Fund, and the Renewal Replacement Fund, which collectively contained approximately $1.73 million on that date. On July 6, 2021, the Bond Trustee setoff additional funds from the Debt Service Reserve Fund, which had a balance of $2.58 million.

41.     Except as described below, pursuant to the Bond Documents, the Bond Trustee holds first priority liens and security interests in primarily all of Hillside Village's real and personal property as security for its obligations associated with the Series 2017 Bonds, including, but not limited to revenues generated from operations of the Community (the "Revenues", and together with the other collateral described in the Bond Documents, the "Prepetition Collateral").

**B.     SBW Obligations**

42.     With the consent of the Original Trustee, the Debtor and Saving Bank of Walpole ("SBW") are parties to that certain Construction Loan Agreement dated as of April 22, 2019 (the "Construction Loan Agreement") which provided a line of credit of up to $3,000,000 (the "SBW Loan"). The use of the SBW Loan proceeds were limited to the funding of completion of construction at the Community.  A portion of the SBW Loan balance was repaid with proceeds of the sale of the prior Prospect Home and Woodward Home properties (in which SBW was granted

---

[7] Each as defined in the Bond Documents.

a collateral assignment) in 2019. By its terms, the SBW Loan is not a revolving line of credit so any repaid amounts are not available for further lending and use by the Debtor. The expiration date for the SBW Loan has been extended to December 31, 2021.

43. As further security for the SBW Loan, the Debtor granted SBW a first priority security interest in Gross Receipts, as defined in that certain Construction Loan Security Agreement dated as of April 22, 2019 between the Debtor and SBW (the "Construction Loan Security Agreement" and, together with the Construction Loan Agreement and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents, the "SBW Documents"), subject only to the pari passu lien of the Bond Trustee as set forth in the Intercreditor Agreement (such security interest in Gross Receipts, the "Prepetition SBW Collateral" and together with the Prepetition Bond Collateral, the "Prepetition Collateral").[8]

44. As of the Petition Date, the amounts due and owing by the Debtor with respect to the SBW Loan and the obligations under the Construction Loan Agreement are as follows (collectively, the "SBW Claim"):

    a.    Unpaid principal on the SBW Loan in the amount of $1,727,760;

    b.    Accrued but unpaid interest on the SBW Loan in the amount of $139,647.56; and

    c.    Unliquidated, accrued and unpaid fees and expenses of SBW and its attorneys incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the SBW Claim.

45. As further security for the LOC, the Debtor granted SBW a security interest in Revenues, including Entrance Fees. Pursuant to that certain intercreditor agreement dated April

---

[8] "Prepetition Collateral" shall only include the Secured Parties' respective collateral as of the Petition Date.

22, 2019 (the "Intercreditor Agreement"), the Bond Trustee and SBW have *pari passu* first priority rights against any Revenues.

46.     As of the Petition Date, approximately $1.72 million is outstanding on the LOC.

**C.     Mechanics Liens**

47.     As discussed previously, MacMillin filed a complaint in the Cheshire County Superior Court of New Hampshire in August 2019. On October 25, 2019, the Superior Court issued an opinion for attachment purposes pursuant to N.H. Rev. Stat. Ann. § 447:12 for MacMillin and certain subcontractors (collectively, the "Mechanics Lienholders") for the following amounts:

| | |
|---|---|
| Wayne J. Griffin Electric, Inc. | $687,414.12 |
| Wallace Building Products Corporation | $325,579.64 |
| Denron Plumbing & HVAC, LLC | $693,535.44 |
| J.N.R. Gutters, Inc. | $139,308.00 |
| Pro Stock Kitchens LLC | $130,000.00 |
| American Builders and Contractors Supply Co. | $121,779.69 |
| MacMillin Company, LLC | $3,615,775.46 |
| **Total** | **$5,713,392.35** |

A financing statement on behalf the Mechanics Lienholders was filed on May 5, 2020.

48.     Upon information and belief, the Mechanics Lienholders are junior to the interests of the Bond Trustee and SBW and are substantially undersecured.

**D.     Unsecured Debt**

49.     To help alleviate the financial impact of COVID-19, the Debtor applied for funding to the Paycheck Protection Program ("PPP") through SBW. On April 15, 2020, Hillside Village received a loan for approximately $840,200 (the "PPP Loan"). By May 5, 2021, Hillside Village applied all proceeds of the PPP Loan towards payroll and operating expenses and the PPP Loan subsequently was forgiven in its entirety.

50.     As of the Petition Date, the Debtor estimates that general unsecured creditors are currently owed approximately $4,321,354.32.[9] This group includes trade creditors and Residents who have requested a refund of their Entrance Fees. The Debtor estimates that as of the Petition Date, approximately $3,160,020 is owed to Residents for pending refund requests and approximately $1,161,334.32 is owed to trade creditors.

## III.    Events Leading to Chapter 11 Filing

### A.    Causes of Financial Distress

51.     The Debtor's financial distress is due to several factors. The primary factors are COVID-19 stress on the senior housing industry and the construction defects and delays from MacMillan's work. These have contributed to the Debtor's inability to fill the Community in a timely fashion and service the outstanding debt obligations.

52.     In March 2020, the World Health Organization declared COVID-19 to be a pandemic. The extent to which COVID-19 has affected all aspects of life cannot be understated, but older adults are acutely susceptible to its effects.[10] The Centers for Disease Control and Prevention ("CDC") has found that:

> Older adults are more likely to get very sick from COVID-19. Getting very sick means that older adults with COVID-19 might need hospitalization, intensive care, or a ventilator to help them breathe, or they might even die. The risk increases for people in their 50s and increases in 60s, 70s, and 80s. People 85 and older are the most likely to get very sick.[11]

Of the more than 600,000 deaths attributed to COVID-19 in the United States, it is estimated that 92% of all deaths occurred among those aged 50 or older[12] and 31% are related to residents and

---

[9] This number is exclusive of Residents who are not currently owed a refund.

[10]        *See, e.g.,* CENTERS FOR DISEASE CONTROL AND PREVENTION, *Older Adults,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 23, 2021).

[11] *Id.*

[12]     CENTERS FOR DISEASE CONTROL AND PREVENTION, *Provision COVID-19 Deaths by Sex and Age,* https://data.cdc.gov/NCHS/Provisional-COVID-19-Deaths-by-Sex-and-Age/9bhg-hcku (last visited July 23, 2021).

employees associated with senior living.[13] In New Hampshire, approximately 66% of all deaths are related to residents and employees associated with senior living, the highest such percentage of any state in the United States.[14]

53.     The effects of COVID-19 were immediately felt by the Debtor and the Community. The Governor of New Hampshire declared a state of emergency in March 2020 and issued a series of emergency orders, including a state-wide shut down that directly impacted the Community and its operations. Census began to decline, and stress was put on residents and employees from dealing with the associated state and federal guidelines. Although CCRCs are somewhat better equipped to handle COVID-19 because of the independent nature of the units, including individual kitchens, the social distancing and isolation had a negative impact on the Residents. The Debtor incurred significant expenses in responding to the pandemic, including but not limited to those necessary to retain qualified staff. Despite the Debtor's best efforts, several Residents and staff members contracted COVID-19, which resulted in one death. As of the Petition Date, 100% of Residents and 70% of staff are vaccinated against COIVD-19.

54.     In addition to responding to the direct risks to current residents and staff, Prospective Residents were hesitant to move into the Community due to fears of COVID-19. Moreover, the State of New Hampshire did not allow any new residents to be admitted to assisted living, memory care, or nursing home units for a period of time. The marketing efforts, which typically include site visits or onsite events, were significantly limited by New Hampshire and federal regulations. Despite the best efforts of the marketing teams, the number of new move ins dropped precipitously and has yet to fully recover.

---

[13]  THE NEW YORK TIMES, *Nearly One-Third of U.S. Coronavirus Deaths Are Linked to Nursing Homes*, https://www.nytimes.com/interactive/2020/us/coronavirus-nursing-homes.html (last visited July 23, 2021).
[14]  *Id.*

55.   During this time, MacMillin continued litigation against the Debtor. As discussed herein, the estimate to repair the construction defects were over $3.5 million. Certain of these repairs were urgent, but the Debtor was delayed by MacMillin and unable to make repairs which were critical to maintaining the Community. In fact, the Debtor is currently making critical repairs to the balconies on one building, which efforts are being funded by the Bond Trustee using certain cash from the Trustee-Held Funds. Several other repairs were made from the Debtor's own cash reserves. The construction defects of MacMillan made it difficult for the Debtor to market the Community and the construction repair standstill because of the litigation complicated the Debtor's plan to move forward.

56.   When coupled with COVID-19's effect on census and the resulting effect on revenue, the Debtor began to face liquidity constraints. In July 2020, the Debtor was unable to make fully a debt service payment of approximately $2 million due under the Bond Documents, which payment was ultimately made in part from the Debt Service Reserve Fund. In January 2021 and July 2021, the Debtor again determined not to make payments under the Bond Documents in order to conserve funds necessary for operations. Despite marketing efforts and the widespread distributions of COVID-19 vaccines, after the Debtor publicly reported the missed payment as required by securities laws, Prospective Residents were even more hesitant to move into the Community.

57.   When taken together, the difficulties caused by the repairs and COVID-19 led to depressed occupancy, which in turn led to an amount of debt in excess of what the Community could reasonably sustain.

**B.   Restructuring Efforts**

58.   As the Debtor began to experience financial distress in 2020, it moved to hire OnePoint Partners to serve as a CRO and evaluate the Debtor's strategic options. After evaluating

20

certain operational improvements, the Debtor ultimately determined that a potential transaction with another financially sound operator would best further the Debtor's charitable mission and serve the interests of the residents, creditors and the greater Keene, New Hampshire community.

59.     As the Debtor began to experience distress in 2020, and in 2021, it defaulted under the Loan Agreement. The Debtor and the Bond Trustee began to negotiate, and ultimately entered into a forbearance agreement on June 28, 2021 (the "Forbearance Agreement"). The Forbearance Agreement provided, among other things, that the Debtor would operate under an agreed upon budget, retain an investment banker to market the Community for sale with agreed deadlines and milestones, and provide the Bond Trustee with monthly unaudited financial statements. Additionally, the Debtor granted the Bond Trustee a mortgage (the "Mortgage" and together with the Indenture, Loan Agreement, Forbearance Agreement, and other documents evidencing or securing the Bonds, the "Bond Documents") in parcels of abutting land which were previously unencumbered. In exchange, the Bond Trustee agreed to advance up to $570,000 from the Trustee Held to complete repairs at the Community and the Bond Trustee agreed to forbear on certain rights under the Bond Documents through August 31, 2021.

60.     As required by the Forbearance Agreement, prepetition, the Debtor retained a broker with significant experience in the marketing and sale of distressed and healthy CCRCs, Grandbridge Real Estate Capital, LLC ("Grandbridge"). Grandbridge conducted a broad marketing process for potential regional and national operators or investors, ultimately obtaining eight letters of intent. Contemporaneously herewith, the Debtor has filed the *Motion of the Debtor for Entry of (I) An Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and*

21

*Assignment of Contracts, and (E) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtor and the Successful Bidder, and (B) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "Bidding Procedures Motion"). Among other things, the Bidding Procedures Motion contemplates a sale process with Covenant Living Communities serving as stalking horse (the "Stalking Horse").

## IV.    **First Day Pleadings**

61.    Contemporaneously with the filing of its chapter 11 petition, the Debtor has filed the First Day Pleadings. The Debtor requests that each of the First Day Pleadings described below be granted, as they are critical to maintaining business operations with minimal disruption, protecting the Debtor's residents, and maximizing the value of the Debtor's estate.

### A.    **Schedules Extension Motion**

62.    Pursuant to the Schedules Extension Motion, the Debtor seeks entry of an order extending the deadline to file the (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statement of financial affairs (collectively, the "Schedules and Statements") by an additional thirty (30) days, from the date such Schedules and Statements are otherwise required to be filed, to the earlier of (a) forty-four (44) total days from the Petition Date or (b) the date which is five calendar days before the date first set for the 341 meeting.

63.    Accordingly, cause exists for the following reasons: (a) the size and complexity of the Debtor's business; (b) the number of creditors; (c) the number of interested parties; and (d) the burden that would be imposed on the Debtor to file schedules and statements within the next fourteen days. To completely and accurately file Schedules and Statements, the Debtor must collect, review, and analyze a substantial amount of information.

79496608.16

64.     Prior to the Petition Date, the Debtor, its advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. The Debtor is working expeditiously to prepare and file the Schedules and Statements, however, given the size of the Debtor's business and the amount of information required to adequately prepare such Schedules and Statements, the Debtor respectfully requests an extension of thirty (30) days, without prejudice to the Debtor's right to request further extensions, for cause shown.

### B.     Resident Confidentiality Motion

65.     Pursuant to the Resident Confidentiality Motion, the Debtor seeks entry of an order authorizing the implementation of procedures to protect confidential information of the Debtor's current and former Residents. The Debtor is in the business of operating an independent living, assisted living, and memory care facility that provides, among other things, health care services to individuals. In the ordinary course of business, the Debtor has access to and receives "protected health information" and data relating to Residents. Because the Debtor does not participate in Medicare or Medicaid, HIPAA arguably does not apply; however, out of an abundance of caution and because the Debtor is subject to the NH Privacy Law, the Debtor files the Resident Confidentiality Motion because some Residents could potentially hold actual or contingent claims against the Debtor's estates, and as such, under Bankruptcy Code section 521(a), the Debtor has a duty to list all such creditors on the Debtor's mailing matrices and bankruptcy schedules.

66.     In an effort to comply with both federal and state patient privacy statutes and regulations, the Debtor proposes certain procedures to maintain confidentiality during the pendency of this Chapter 11 Case (the "Privacy Procedures").  I believe that the relief requested in the Patient Confidentiality Motion appropriately balances the need to maintain confidential information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.

### C.      Resident Escrow Motion

67.      Pursuant to the Resident Escrow Motion, the Debtor requests authority to (i) cause the Escrow Agent to honor in the ordinary course in accordance with the terms of the Option Agreement and the Escrow Agreement any Option Deposit refund claims made by New Residents postpetition, without further application to the Court, and (ii) continue to escrow any and all Option Deposits  delivered by New Residents postpetition in accordance with the terms of the Option Agreement.

68.      The Debtor requests authority to cause the Escrow Agent to honor undisputed postpetition Option Deposit refund claims in the ordinary course of business under the terms of the Option Agreement and Escrow Agreement, and submits that there are compelling legal and economic reasons for permitting such relief as set forth in the Resident Escrow Motion.

69.      First, honoring the Option Deposit claims of New Residents in the ordinary course is a contractual obligation of the Debtor with respect to escrowed funds held by an independent Escrow Agent under the Option Agreement and the Escrow Agreement (and are not part of the Debtor's estate). Honoring Option Deposit claims is the best way to preserve the Debtor's relationship with its most important constituency– its clients and prospective clients, *i.e.,* the residents who provide a significant portion of its revenues.

70.      Second, if the Debtor did not honor the Option Deposit claims of New Residents, the resulting negative publicly could significantly hinder the Debtor's operations, including the Debtor's ability to attract new residents. Moreover, the long-term care and retirement housing services industry is highly competitive, and any tarnish to the Debtor's reputation resulting from the repudiation of its future refund claims will undoubtedly be used to the advantage of its competitors. Negative publicity could also eliminate the Debtor's ability to attract future charitable donors.

71.     Third, the Debtor primarily generates revenue from residents' monthly services fees and the conversion of Option Deposits to Entrance Fees. Such fees account for a significant portion of the Debtor's annual operating budget and the collection of such amounts is critical to the Debtor's ability to continue to care for its residents. A resident's willingness to pay the substantial Entrance Fees and other sums required by the Residency Agreements is necessarily dependent upon such resident's conviction that the Debtor is willing and able to honor its obligations to the resident, including the payment of any refund claim when it arises.

72.     In short, maintaining the status quo by allowing the Debtor to continue its New Resident refund practices in the ordinary course after the Petition Date is warranted. The placement of Option Deposits in the escrow during the pendency of this Chapter 11 Case is necessary to protect Prospective Residents' interest in the Option Deposits.

### D.     Cash Collateral Motion

73.     As set forth herein, there is approximately $64,642,667.12 in outstanding principal, interest, and fees for the amount outstanding under the Series 2017 Bonds. Additionally, there is approximately $1,866,036.67 outstanding to SBW under the SBW Documents.  Pursuant to the Bond Documents and SBW Documents, the Secured Parties have a first priority security interest in and liens on all of the Prepetition Collateral.

74.     The Debtor has determined that absent the use of Cash Collateral, it will be unable to operate its business during the Chapter 11 Case, irreparably harming the Debtor's estate and creditors.

75.     Without the use of Cash Collateral, the Debtor is unable to continue normal operation of its business during the Chapter 11 Case. If the Debtor is unable, on a consistent basis, to maintain its business and demonstrate financial stability to existing and future residents, the Debtor will lose existing residents, key employees, and vendors, will be unable to attract new

residents and will ultimately be forced to cease operations. This will cause harm to the Debtor, but also to its residents who expect a continuum of quality care, potentially leaving residents without food, medical supplies, proper medical care, and other services they require. Therefore, the Debtor's immediate access to Cash Collateral is necessary to preserve and maximize the value for the benefit of all parties in interest. Thus, the use of Cash Collateral is essential to Debtor's continued ability to operate, maintain the value of its assets and properly care for its residents until sale or consummation of a plan.

76.     The Debtor has an immediate and critical need to use Cash Collateral to pay, in accordance with the 13-week budget, which will be attached to the proposed Interim Order as Exhibit 1 (the "Budget"). The Debtor requires the use of Cash Collateral for various items in the ordinary course of business and as authorized by the Court, including payments to employees, employee benefits, utilities, and other items which, in the judgment of the Debtor's management, provide the essential services needed to operate, maintain and insure the Debtor's assets. In addition, the Debtor requires the use of Cash Collateral to retain and pay costs of professionals, consultants and advisors who will enable the Debtor to conduct a sale of its assets in a manner that maximizes value for the Debtor's estate and its creditors, as may be approved by the Court. Taken together, the services provided by all of the foregoing parties and other entities are critical to the preservation of the Debtor's business and asset value.

77.     The Debtor reasonably believes that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. Without use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and the entire bankruptcy proceeding will be jeopardized to the significant detriment of the Debtor's estate and its creditors.

78.     After considering its alternatives, the Debtor has concluded that the use of Cash Collateral pursuant to the terms of the Interim Order represents the best option available to interested parties, which funds will be used to maintain the Debtor's assets and maintain its high standards for the benefit of its residents during an orderly sale process.

79.     The Debtor believes that the terms of the use of Cash Collateral which will be contained in the Interim Order protects the Secured Parties against any diminution in the value of their interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, the subordination of the Secured Parties' liens to a carve-out, and the imposition of the automatic stay, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by fair consideration.

80.     At a minimum, the Debtor's inability to use Cash Collateral would disrupt Debtor's operations as a going concern, would severely hamper Debtor's efforts to market the CCRC, which would eliminate or significantly decrease the possibility of confirmation of a plan of reorganization, if necessary, and would otherwise not be in the best interests of the Debtor, its estate, or creditors, including the residents and the bondholders.

81.     At this time, the Debtor is not contemplating the need for postpetition financing. Instead, the Debtor intends to operate its business solely on the use of the existing Cash Collateral. Access to existing Cash Collateral on an interim basis will provide the Debtor with the liquidity necessary to ensure that the Debtor has sufficient working capital and liquidity to operate its business, maintain its high standard of resident care, and thus preserve and maintain the value of the Debtor's estates. Without access to such liquidity, the Debtor and its estate will face irreparable harm.

79496608.16

82.     Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

### E.     Cash Management Motion

83.     Pursuant to the Cash Management Motion, the Debtor seeks entry of interim and final orders (a) authorizing, but not directing, the Debtor to continue to maintain and use the existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (b) granting the Debtor a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtor's practices under the existing cash management system or other actions described herein; and (c) authorizing, but not directing, the Debtor to continue to maintain and use the existing deposit practices notwithstanding the provisions of Bankruptcy Code section 345(b). The Debtor also requests that the Court authorize and direct all banks with which the Debtor maintains accounts to continue to maintain, service, and administer such accounts and authorize third-party administrators and providers to prepare and issue payments on behalf of the Debtor.

84.     The Debtor maintains an integrated cash management system (the "Cash Management System") to collect, transfer, and disburse funds generated by its operations. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, and reporting functions and enables the Debtor maintain its 12 Debtor-held bank accounts (together with any other bank accounts that the Debtor may open in the ordinary course of its business or in connection with the Chapter 11 Case, the "Bank Accounts") and 6 accounts (the "Trustee-Held Accounts") held by the Bond Trustee under the Bond Indenture. All of the Trustee-Held Accounts are maintained at UMB Bank, N.A. (in its capacity as a depository institution, "UMB").

85.     The Debtor maintains the Bank Accounts at the following institutions: Cambridge Trust, People's Bank, and Savings Bank of Walpole (each a "Bank" and collectively, the "Banks"). Generally, the Bank Accounts fall into the following categories:

      a.     Unrestricted Funds (Cambridge Trust);

      b.     Endowment Funds (Cambridge Trust);[15]

      c.     Operating and Payroll Accounts (People's Bank);

      d.     Landscape Account (People's Bank);

      e.     Operating and Payroll Accounts (Savings Bank of Walpole);

      f.     Landscape Account (Savings Bank of Walpole);[16]

      g.     Bond Interest Account (Savings Bank of Walpole);

      h.     Entrance Fee Escrow (Savings Bank of Walpole); and

      i.     Real Estate Tax Escrow (Savings Bank of Walpole).

86.     The Debtor's Cash Management System involves routine deposits into, withdrawals from, and transfers of funds between Bank Accounts by various means, including checks, wire transfers, and ACH transfers. On a daily basis, the Debtor processes large numbers of transactions through its Cash Management System. At all times, the Debtor keeps current and accurate records of all transactions processed through its Cash Management System and of its Bank Accounts.

87.     Certain employees are able to utilize a purchase card (the "P-Card") which has a pre-set limit to pay for expenses. The P-Card was issued by US Bank and the approximate monthly spend on account of the P-Card is between $1,000 to $7,000.

---

[15]  These funds are non-estate property and may only be utilized for donor-restricted purposes.
[16]  This account is restricted by the City of Keene and is to be released to the Debtor upon approval from the City of the Debtor's landscaping.

88.     Before the Petition Date, the Debtor also used in the ordinary course of its business numerous business forms, including checks, deposit slips, letterhead, contracts, purchase orders, and invoices. Because the Debtor has the ability to print checks on an as-needed basis, the Debtor will be able to utilize existing check stock and will include the language "Debtor-in-Possession" and Bankruptcy Case number on all postpetition checks.

89.     The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtor's business operations during the Chapter 11 Case and the goal of maximizing value for the benefit of all parties in interest. To require the Debtor to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtor's ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtor to address cash management requirements. Historically, the Debtor has maintained the Bank Accounts at Cambridge Trust and Savings Bank of Walpole. However, Savings Bank of Walpole is not on the United States Trustee's List of Authorized Depositories for Bankruptcy Cases filed in Region 1 (the "Authorized Depository List"). In anticipation of the Petition Date, the Debtor opened accounts as People's United Bank. The Debtor was not able to fully remove Savings Bank Walpole from its Cash Management System prior to the Petition Date but anticipates that the Bank Accounts at People's United Bank will replace all Bank Accounts at Savings Bank of Walpole within 45 days of the Petition Date. Although Savings Bank of Walpole is not on the Authorized Depository List, the Debtor submits that it is well-capitalized and financially stable institution insured by the FDIC.  Thus, with this proposed modification and for the aforementioned

30

reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtor, the estate, and all interested parties. Accordingly, the Debtor requests that it be allowed to maintain and continue to use the Cash Management System, including maintenance of the existing Bank Accounts.

90.     Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

### F.      Wages Motion

91.     Pursuant to the Wages Motion, the Debtor requests entry of interim and final orders authorizing, but not directing, the Debtor to (i) pay certain prepetition wages, salaries, and other compensation; (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtor's paid time off policies, severance practices, and employee benefit plans and programs, as described below; (iii) reimburse Employees (as defined below) for prepetition expenses that Employees incurred on behalf of the Debtor in the ordinary course of business on a prepetition basis; (iv) pay all related prepetition payroll taxes and other deductions; (iv) honor worker's compensation obligations and related obligations; and (v) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider.

92.     In connection with the operation of its business, the Debtor currently employs approximately: 72 full-time employees and 61 part-time employees (together, the "Employees"). All Employees are employed at the Debtor's campus located in Keene, New Hampshire (the "Property" or the "Hillside Village Campus").

93.     The Employees are critical to the operation of the Debtor's business. The loss of Employees would impede the Debtor's business and seriously inhibit its ability to conduct a

postpetition sales process. The Hillside Village Campus is made up of independent living units, assisted living units, memory care units, and skilled nursing units. Thus, many of the Employees have specialized healthcare related skills to care for residents. Replacing Employees would be difficult for the Debtor given the limited number of individuals with the requisite skills and experience to provide care in the senior care space.

94.     If the Debtor cannot assure its Employees that prepetition Employee Obligations will be promptly paid, certain Employees may seek employment elsewhere. The loss of Employees at this juncture would have a material adverse impact on the Debtor's business and ability to conduct a sales process during this Chapter 11 Case.

95.     As noted above, the Debtor has approximately 133 Employees. In the ordinary course of business, the Debtor incurs payroll obligations to its Employees, comprised generally of salaries and wages. Approximately 11 Employees are paid a fixed salary and approximately 122 are paid on an hourly basis.

96.     The Debtor utilizes a biweekly payroll cycle. Employees are paid every other Friday, with the next pay date of September 3, 2021. Payroll is funded by ACH on the Thursday before payroll is disbursed. The Debtor uses a combination of Kronos (timekeeping), Oracle HCM (processing) and ADP (payment and tax processing) (collectively, the "Payroll Processing Service Providers") for payroll processing services. The Debtor's average biweekly payroll is approximately $110,000. The last payroll date before the Petition Date was August 20, 2021.

97.     The Debtor estimates that approximately $115,000 in salaries and wages has accrued and remains unpaid as of the Petition Date (the "Employee Compensation Obligations"). To the best of the Debtor's understanding, no Employee is owed more than the $13,650 statutory cap of Bankruptcy Code section 507(a)(4). Given the critical role of the Employees in the Debtor's

business operations, the Debtor seeks authority to honor its salary, wage, and bonus obligations by paying, in the ordinary course, any prepetition amounts owed to the Employees.

98.     The Debtor also utilizes the services of three independent contractors (the "Independent Contractors") to provide marketing consulting (the "Marketing Consultant"), hair styling, and manicure services. The Marketing Consultant is paid $200 per hour and works between 8-10 hours a week, depending on the needs of the Debtor. The Independent Contractors providing hair styling and manicure services charge fees for their services, which Debtor collects and distributes to the Independent Contractors, keeping 10% of the fees charged. The Independent Contractors are paid on a monthly basis and have been paid through the month of July. The only hours outstanding as of the Petition Date would be due for the month of August.

99.     Together, the Debtor request authority that it be authorized, but not directed to pay prepetition claims and honor obligations incurred or related to the Employee Compensation Obligations, the Withholding Obligations, the Employee Benefit Programs, the ET, Workers' Compensation, Unemployment Insurance, and Miscellaneous Employee Obligations (collectively, the Employee Obligations").

### G.      Utilities Motion

100.     Pursuant to the Utilities Motion, the Debtor seeks the entry of interim and final orders (i) prohibiting Utility Providers from altering, refusing, or discontinuing service, (ii) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers, and (iii) establishing procedures for resolving future requests for additional adequate assurance.

101.     In connection with its day-to-day operations, the Debtor receives traditional utility services from approximately 10 utility providers (each a "Utility Provider" and collectively, the "Utility Providers"). The Utility Providers are identified on the "Utility Service List" attached to

the proposed interim order. The Debtor paid an average of approximately $64,000 per month on account of utility services during the trailing twelve months ("TTM") ended July 31, 2021. As detailed in the First Day Declaration, the Debtor anticipates needing the services of the Utility Providers going forward to maintain operations of the continuing care retirement facility known as Hillside Village.

102.    Debtor proposes to segregate on its books and records, within twenty (20) days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.,* approximately $30,000.00), calculated based on the historical data for TTM 7/31/2021 (the "Adequate Assurance Deposit") into one segregated bank account designated for the Adequate Assurance Deposit (the "Adequate Assurance Deposit Account") for the benefit of all Utility Providers. Thus, to maintain uninterrupted Utility Services, the Debtor proposes to deposit $30,000.00 into the Adequate Assurance Deposit Account within 20 days of the Petition Date. Thereafter, the Debtor proposes to adjust the amount in the Adequate Assurance Deposit Account to reflect several factors: (a) the termination of Utility Services by the Debtor regardless of any Additional Assurance Requests (as defined below), and (b) agreements reached with Utility Providers. These adjustments will permit the Debtor to maintain the Adequate Assurance Deposit Account with an amount that consistently provides the Utility Providers with a half-month deposit on account of such services.

103.    I believe that the Adequate Assurance Deposit and maintenance of the Adequate Assurance Deposit Account as described above, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business (together, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance of future payment to the Utility Providers to satisfy the requirements of Bankruptcy Code section 366. However, if any Utility Provider

believes additional assurance is required, they may request such assurance pursuant to the procedures described in the Utilities Motion. The Debtor's receipt of uninterrupted Utility Services is vital to the Debtor's continued business operations and, consequently, to the success of this Chapter 11 Case. Accordingly, the relief requested herein is necessary and in the best interests of the Debtor, the estate, and creditors. Such relief ensures that the Debtor's business operations will not be disrupted and provides Utility Companies and the Debtor with an orderly and fair procedure for determining "adequate assurance." Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estates, creditors, and all other parties in interest.

### H.      Insurance Motion

104.     Pursuant to the Insurance Motion, the Debtor seeks interim of interim and final orders (i) authorizing, but not directing, the Debtor to continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business and pay prepetition obligations in respect thereof, (ii) authorizing banks and other financial institutions at which the Debtor holds accounts to honor and process check and electronic transfer requests related to the foregoing, and (iii) preventing insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies without first obtaining relief from the automatic stay imposed by Bankruptcy Code section 362.

105.     In the ordinary course of business, the Debtor maintains approximately 8 insurance policies with various insurance providers (collectively, the "Insurers") that provide coverage for, among other things, the Debtor's general liability, director and officer liability, fiduciary liability, employment practices liability, workers compensation liability, automobile liability, professional

liability, cyber liability, and property liability (each, an "Insurance Policy" and collectively, the "Insurance Policies"), as summarized on **Exhibit C** attached to the Insurance Motion.

106.    The Debtor incurs a total of approximately $238,015.50 in the aggregate premiums on an annual basis under the terms of the existing Insurance Policies that are the subject of this Motion as well as other obligations, including other related fees and costs (collectively, the "Insurance Obligations"). In addition, the Debtor may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

107.    The Debtor seeks authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are primarily prepaid in full at a policy's inception or renewal.

108.    Generally, these Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. In the ordinary course of business, the Debtor renews annual coverage under many of the policies, including those related to D&O and cyber liability, and the Debtor pays the full amount of the premiums owed for such policies due at renewal. Accordingly, as of the Petition Date, the Debtor does not owe unpaid premium amounts on account of policies that require payment in full at the inception of the applicable policy period.

109.    The coverage provided under the Insurance Policies is essential for preserving the value of the Debtor's assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtor fails to perform its obligations under the Insurance Policies, its coverage thereunder could be voided. Such a disruption of the Debtor's insurance coverage could expose the Debtors to serious risks, including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the

Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtor to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe that any or all of these consequences could cause serious harm to the Debtor's business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

## I. Ombudsman Motion

110.    Pursuant to the Ombudsman Motion, the Debtor requests entry of an order finding that the appointment of a patient care ombudsman is unnecessary in the Chapter 11 Case.

111.    On behalf of the Debtor, I submit that the requirements of Bankruptcy Code section 333 requiring the appointment of a patient care ombudsman are not necessary given the facts of this case, including: the Debtor's record of patient care; the internal safeguards for providing patient care; the oversight of federal and state regulatory bodies; and that the appointment of an ombudsman would be duplicative and costly. Further, the Debtor is willing to self-report to the Court, the U.S. Trustee, applicable regulators, and any other party seeking such a report. Thus, patients will continue to receive exemplary care and will be adequately protected during the pendency of these cases.

112.    The Debtor works closely with Cheshire Medical Center, which is located in Keene and is an affiliate of the Dartmouth-Hitchcock Health System, and with Dartmouth-Hitchcock Clinic, Keene Division ("D-HC"). Cheshire Medical Center and D-HC provide on-site and/or off-site medical services to the residents of Hillside Village (the "Residents") on an as-needed basis, pursuant to a Medical Director Services Agreement between D-HC and the Debtor. The Debtor also works closely with skilled nursing facilities in the greater Keene area that specialize in

providing short-term rehabilitative services funded through Medicare, as the Debtor does not provide such services in its onsite health center.

113.     The Debtor is subject to comprehensive oversight by the New Hampshire Department of Health and Human Services ("DHHS"). The DHHS is responsible for the oversight and enforcement of basic standards designed to promote safe and appropriate care of persons receiving care and treatment in residential care facilities such as Hillside Village. The DHHS's Health Facility Licensing Unit licenses and inspects assisted living residences, nursing facilities, and other residential care facilities, and investigates and attempts to resolve complaints filed against such facilities. The DHHS's Health Facility Certification Unit certifies and inspects health facilities. Since the Hillside Village Campus has been open, the Debtor has never been subject to a complaint or a disciplinary action related to Resident care. Moreover, the Debtor is current on all inspections, including annual state surveys. No state survey has ever identified a deficiency related to patient care.

114.     Additionally, the Debtor employs numerous individuals responsible for overseeing Resident care and wellbeing and responsible for Resident complaints and for seeking redress when appropriate. All of the Debtor's employees (collectively, the "Employees") are trained regularly using Relias for all aspects of patient care. The Debtor continually meets all guidelines required by the state to safely serve assisted living residents. All Employees are trained to address the following: personal protective equipment ("PPE") and infection control; and fire, safety, and disaster scenarios. Employees who work in the Debtor's kitchen receive Safe Serve training.

115.     The Debtor is licensed through DHHS to provide nursing and assist living services. The Debtor's independent living is regulated by NHID.

116.     The Debtor has also adopted protocols to address COVID-19 including: requiring that all Employees and Residents wear masks, keep socially distant, use hand sanitizer and wash hands frequently. Although the mask requirement was lifted in the independent living portions of the Hillside Village Campus for a period of time, due to the nationwide surge in COVID-19 cases, the mask requirement has once again been implemented. All visitations to the Hillside Village Campus may only be done upon appointment and all visitors must be vaccinated against COVID-19. If cases at the Hillside Village Campus begin to increase, no visitors will be permitted. Finally, the Board of Trustees is considering requiring COVID-19 vaccinations all Employees.

117.     On behalf of the Debtor, I respectfully submit that the Ombudsman Motion be granted for the reasons set forth in therein, including: the Debtor's history of exemplary Resident care; the internal safeguards for providing Resident care; the oversight of federal and state regulatory bodies; and that the appointment of an ombudsman would be duplicative and costly. The Debtor is willing to self-report to the Court, the U.S. Trustee, applicable regulators, and any other appropriate party seeking such a report. Thus, the Residents will continue to receive exemplary care and will be adequately protected during the pendency of this Chapter 11 Case.

### J.      Claims Agent Application

118.     Pursuant to the Claims Agent Application, the Debtor requests entry of an order authorizing the appointment of Donlin, Recano & Company ("DRC") as claims and noticing agent for the Debtor in the Chapter 11 Case.

119.     The Debtor's selection of DRC to act as the claims and noticing is appropriate under the circumstances and in the best interests of their estates. Moreover, the Debtor submits that, based on the four engagement proposals obtained and reviewed DRC's rates are competitive and reasonable given DRC's quality of services and expertise. By appointing DRC as the claims and

noticing agent in this Chapter 11 Case, the distribution of notices will be expedited, and the Clerk will be relieved of the administrative burden of noticing.

120.    Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

I declare under penalty of perjury that the foregoing is true and correct:

Executed this 30th day of August, 2021       _/s/ Toby Shea_
Topsfield, Massachusetts                             Toby Shea
                                                                  Chief Restructuring Officer
                                                                  The Prospect-Woodward Home