**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Prospect-Woodward Home, | ) | Case No. 21-10523 (BAH) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

### *AMENDED* EMERGENCY *EX PARTE* MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) SETTING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above-captioned debtor ("Hillside Village" or the "Debtor") hereby moves (this "Motion") pursuant to sections 105, 361, 362, and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the District of New Hampshire (the "Local Rules"), for entry of an interim order (the "Proposed Interim Order" and, as entered by the Court, the "Interim Order"), substantially in the form attached hereto as **Exhibit A**, and a final order, to be submitted in substantially the same form as the Proposed Interim Order (the "Proposed Final Order" and together with the Proposed Interim Order, the "Proposed Orders") (i) authorizing the Debtor use the cash collateral, as such term is defined in Bankruptcy Code section 363(a) (the "Cash Collateral"), UMB Bank, N.A., in its capacity as successor trustee for the bonds described more fully below (the "Bond Trustee") and the Savings Bank of Walpole ("SBW", and together with the Bond Trustee, the "Secured Parties"); granting adequate protection to the Secured Parties upon the terms set forth in the Interim Order and in any final orders; (iii) modifying the automatic stay; (iv) scheduling a final hearing on the Motion; and (v) granting such other and

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431

further relief as the Court deems just and appropriate. In support of the Motion, the Debtor relies upon the *Declaration of Toby Shea, Chief Restructuring Officer, in Support of the Debtor's First Day Pleadings* (the "First Day Declaration") filed with the Court contemporaneously herewith. In further support of the Motion, the Debtor respectfully represents as follows:

**PROVISIONS HIGHLIGHTED PURSUANT
TO BANKRUPTCY RULE 4001 AND LBR 4001-2**

1. The following is a concise statement of the relief requested in this Motion pursuant to Bankruptcy Rule 4001(1)(B) and LBR-2.[2]

2. As described in more detail in the Interim Order, the Bond Trustee has a first priority security interest in substantially all of the Debtor's assets, subject only to the pari passu lien of SBW in Gross Receipts. The Debtor requires either the consent of the Secured Parties or the approval of the Court to use the Secured Parties' Cash Collateral. The Bond Trustee would not consent to the Debtor's use of Cash Collateral except for on the terms provided in the Interim Order. SBW has not yet consented to the relief requested herein, however, the Debtor anticipates either obtaining the consent of SBW or seeking the Court's authorization to use Cash Collateral on a contested basis with the consent of Bond Trustee. If the Debtor is unable to obtain SBW's consent, the Debtor submits that cause exists for the court to authorize the use of Cash Collateral pursuant to Bankruptcy Code section 363(c)(2)(B) after notice and a hearing.

3. The Debtor requests authority to use cash collateral until a final hearing to avoid immediate and irreparable harm pursuant to Bankruptcy Rule 4001(b)(2). The Debtor further requests that the Court schedule a final hearing on this Motion in not less than 14 days and not

---

[2] Capitalized terms used but not otherwise defined in the chart have the meanings ascribed to them in the Interim Order. This summary and any other description of the Interim Order provided for in this Motion is qualified in its entirety by the actual terms of the Interim Order. The actual terms of the Interim Order will control in the event of any inconsistency between this Motion and the Interim Order.

2

more than 30 days, pursuant to Bankruptcy Rule 4001(b)(2) and LBR 4001-2(e), and that the Court authorize the use of Cash Collateral on a final basis following that hearing.

4.      Attached to the Interim Order as **Schedule A** is the Cash Collateral Budget, which reflects the Debtor's anticipated revenues and expenses for the period covered therein. The use of Cash Collateral on an interim basis is necessary to, among other things, continue patient care and protect residents, fund operations, pay U.S. Trustee fees, and pay professionals. The Debtor believes that the Cash Collateral Budget will be adequate to pay all administrative expenses due or accruing during the interim period.

5.      The Debtor seeks authorization to use Cash Collateral on the following terms:

| Term | Summary | Interim Order Reference |
|---|---|---|
| Identity of Each Entity with an Interest in the Cash Collateral<br><br>Bankruptcy Rule 4001(b)(1)(B)(i); LBR 4001-2(a) | Bond Trustee; SBW | ¶¶ E-J |
| Purpose for the Use of Cash Collateral<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii); LBR 4001-2(a) | Cash Collateral to be used in the ordinary course of business for categories of expenses listed in the Cash Collateral Budget. | ¶ 5; **Schedule A** |
| Maximum Amount Available on an Interim and Final Basis<br><br>LBR 4001-2(d) | The amounts set forth in the Cash Collateral Budget. | ¶ 5; **Schedule A** |
| Material Terms and Duration of Use<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii); LBR 4001-2(a); LBR 4001-2(d) | The Debtor's authorization to use Cash Collateral shall last until the earlier of (i) the occurrence of a Termination Event (as set forth in Interim Order ¶ 16) or (ii) the last day included in the Cash Collateral Budget, but only on the terms of the Interim Order. | ¶ 5; **Schedule A** |
| Adequate Protection<br><br>LBR 4001-2(d) | <u>Postpetition Advances.</u> Pursuant to the Forbearance Agreement, the Bond Trustee has agreed to make certain advances on behalf of the Debtor in connection with urgent construction needs up to $570,000 (less previously advanced amounts of approximately $276,000, such remaining amounts to be advanced, the | ¶¶ 9-10; 12-13; 15-16; **Schedule B** |

| Term | Summary | Interim Order Reference |
|------|---------|------------------------|
| | "Postpetition Advances"). The Postpetition Advances shall be made and otherwise used in a manner consistent with the terms of the Forbearance Agreement.  Pursuant to Bankruptcy Code section 364(c)(2), (c)(3) and (d) and as security for the repayment of the Postpetition Advances, the Bond Trustee is hereby granted valid, binding, enforceable and perfected first priority mortgages, pledges, liens and security interests (the "Postpetition Liens") in all currently owned or hereafter acquired property and assets of the Debtor of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, causes of action, tax refund claims, commercial tort claims, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "Postpetition Collateral"); provided, however, that the Postpetition Collateral does not include Avoidance Actions (as defined below) or the proceeds thereof and the Postpetition Liens shall be subject to the Carve Out (as defined below) and all Prior Liens (as defined below) on such Postpetition Collateral, if any. The Postpetition Liens shall be valid, binding, continuing, enforceable and fully perfected upon entry of the Interim Order. Such Postpetition Advances shall be due and payable upon a Termination Event (as defined below).<br><br>Replacement Liens. As adequate protection for any diminution in the value of Cash Collateral and other Prepetition Collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), and solely to the extent of such Diminution, each Secured Party shall have a pari passu, valid, perfected, and enforceable replacement lien and security interest (the "Replacement Liens") in (i) all Postpetition Collateral of the same type as such Secured Party's Prepetition Collateral to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of each Secured Party as of the Petition Date; and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral" and, collectively with the Postpetition Collateral, the "Collateral"); provided, however, that actions for preferences, fraudulent conveyances or other avoidance power claims and any recoveries under Bankruptcy Code sections 542, 544, 545, 547, 548 (exclusive of transferees under Section 549), 550 and 553 (collectively, the "Avoidance Actions") shall not be Supplemental Collateral under the Interim Order. Notwithstanding the foregoing, the Secured Parties reserve the right to request that the Supplemental Collateral include Avoidance Actions in any Final Order on the Motion. Further, the Replacement Liens shall be subject and | |

| Term | Summary | Interim Order Reference |
|---|---|---|
| | subordinate to the Carve Out (as defined below) and all valid and perfected liens existing on the Petition Date that are otherwise allowed secured claims existing as of the Petition Date, including any liens of the Secured Parties ("Prior Liens").<br><br>Superpriority Claims. As additional adequate protection for any Diminution, and solely to the extent of such Diminution, each Secured Party shall have superpriority administrative expense claims pursuant to Bankruptcy Code section 507(b) with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual (together, the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject only to Prior Liens and the Carve Out and shall have priority, pursuant to Bankruptcy Code section 507(b), over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code section 503(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.<br><br>Adequate Protection Payments. In consideration of the use of Cash Collateral, on and after the date hereof, the Debtor shall make adequate protection payments consistent with the Cash Collateral Budget in an amount of $50,000 per month to the Bond Trustee and $5,000 per month to the SBW (the "Adequate Protection Payments"). Any and all such Adequate Protection Payments shall be irrevocable and shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b). For the avoidance of doubt, all Adequate Protection Payments shall be without prejudice to the rights of the Bond Trustee and SBW to assert a claim for payment of additional amounts in accordance with the Bond Documents or the SBW Documents, respectively. Financial Information. As additional adequate protection of the Secured Parties' security interests in the Cash Collateral, the Debtor shall allow the Secured Parties and their professionals and designees reasonable access, during normal business hours and on reasonable notice, subject to all applicable health safety and welfare related federal, state and local mandates, rules, regulations, or recommendations and the Debtor's policies, procedures, and restrictions implementing same, to the premises of the Debtor in order to | |

| Term | Summary | Interim Order Reference |
|---|---|---|
| | conduct appraisals, analyses, and/or audits of the Prepetition Collateral and the Collateral, and shall otherwise reasonably cooperate in providing any other financial information reasonably requested by the Secured Parties for this purpose. From and after the entry of the Interim Order, the Debtor shall provide to the Secured Parties once each week (commencing with the second week after the Petition Date), a weekly report certified by the Debtor's authorized representative, and in the same form as the Cash Collateral Budget, indicating all receipts received and disbursements made by the Debtor in the week ending the prior Friday compared to the Cash Collateral Budget and detailing any variances of more than 10% and at least $10,000 from the expenditures and receipts in the Cash Collateral Budget. The Debtor and its professionals shall be available once each week (subject to reasonable scheduling conflicts) for a telephonic conference call with the Secured Parties to discuss matters pertaining to the Facility and the Chapter 11 Case. The Debtor shall provide to the Secured Parties such other reports and information as the Secured Parties may reasonably request from time to time.<br><br>Compliance With Bond Documents. As further adequate protection against Diminution, the Debtor shall comply with those terms and provisions of the Bond Documents set forth on **Schedule B** attached hereto and incorporated herein. The requirements of the Interim Order shall be in addition to, and not in substitution for, the terms and provisions of the Bond Documents set forth on **Schedule B**; provided, however, that in the event of any inconsistency between the Bond Documents and the Interim Order, the terms of the Interim Order shall control. | |
| Use of Fund Limitations<br><br>LBR 4001-2(d) | Prohibited Use of Cash Collateral. Except as expressly provided in the Order, no Cash Collateral, proceeds thereof, or other proceeds of the Prepetition Collateral shall be used for the purpose of: (i) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds or the SBW Loan, the Prepetition Collateral, the Bond Claim, the SBW Claim or any liens or security interests with respect thereto; (ii) asserting any claims or defenses or causes of action against the Bond Trustee, the holders of the Bonds in their capacity as such, SBW, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, causes of action arising out of, based upon, or related to, in whole or in part, the Bonds, the SBW Loan, the Bond Documents or the SBW Documents or any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents or the SBW Documents; (iii) paying any amounts on account of claims arising before the Petition Date, except to the extent provided for in the Cash Collateral Budget and approved by the Court; (iv) seeking to modify any of the rights granted to the Bond Trustee or SBW hereunder, or (y) seeking to bifurcate any claims of the Bond Trustee or SBW. Notwithstanding the foregoing, not more than $15,000 of the Cash Collateral may be made available to | ¶ 7. |

| Term | Summary | Interim Order Reference |
|---|---|---|
| | reimburse the Committee, if appointed, upon appropriate application therefor, for the Committee's fees and expenses in investigating the validity, priority, perfection and enforceability of the Secured Parties' liens in their respective Prepetition Collateral. | |
| Findings of Fact<br><br>LBR 4001-2(c)(2) | The Interim Order contains typical findings of fact which bind the estate. The justification for this provision is that the Bond Trustee would not consent to the use of Cash Collateral without these provisions. | ¶¶ A-M; 7; 18. |
| Provisions Waiving 506(c) Rights<br><br>LBR 4001-2(c)(3) | The interim order contains a typical waiver under Bankruptcy Code section 506(c). The justification for this provision is that the Bond Trustee would not consent to the use of Cash Collateral without these provisions. | ¶ 21. |
| Provisions Modifying the Automatic Stay<br><br>LBR 4001-2(c)(9) | The interim order contains a typical waiver under Bankruptcy Code section 506(c). The justification for this provision is that the Bond Trustee would not consent to the use of Cash Collateral without these provisions. | ¶¶ 20; 22. |

6.     Additionally, pursuant to LBR 4001-2, the Debtor represents that the Interim Order does not contain the following provisions:

a.     cross-collateralization protections (LBR 4001-2(c)(1));

b.     provisions granting immediate liens on causes of action (LBR 4001-2(c)(4));

c.     provisions deeming prepetition secured debt to be postpetition debt (LBR 4001-2(c)(5));

d.     provisions which provide for the different treatment of committee (LBR 4001-2(c)(6));

e.     nonconsensual priming (LBR 4001-2(c)(7)); and

f.     declaration that the order does not impose lender liability on any secured creditor (LBR 4001-2(c)(8)).

## <u>JURISDICTION AND VENUE</u>

7.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).

8.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, and 363; Bankruptcy Rules 4001, 6003, and 6004; and Local Rule 4001-2.

## BACKGROUND

10.     On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

11.     The factual background regarding the Debtor, including business operations, capital and debt structure, and the events leading to the filing of the Chapter 11 Case is set forth in the First Day Declaration and incorporated herein by reference.

12.     The Debtor continues to operate and manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

13.     No trustee, examiner, or creditors' committee has been appointed in the Chapter 11 Case.

## THE DEBTOR'S SECURED DEBT OBLIGATIONS

### I.      Bond Obligations

14.     As set forth in more detail in the First Day Declaration, the Debtor is a private New Hampshire not-for-profit corporation operating a state-of-the-art continuing care retirement community ("CCRC") located in Keene, New Hampshire (the "Community" or the "Facility"). The development of the Facility was financed through the issuance of $93,015,000 in New Hampshire Health and Education Facilities Authority Revenue Bonds, Hillside Village Issue, Series 2017 (the "Bonds") by the New Hampshire Health and Education Facilities Authority (the "Issuer") pursuant to that certain Bond Indenture, dated as of June 1, 2017 between the Issuer and the Bond Trustee (the "Indenture"). The Bonds were structured as follows:

8

| Series 2017A Bonds | $57,395,000.00 in Series 2017A Bonds, which were comprised of: <br><br> (a) $5,325,000.00 in term bonds due July 1, 2027; <br><br> (b) $12,315,000.00 in term bonds due July 1, 2037; <br><br> (c) $9,540,000.00 in term bonds due July 1, 2042; and <br><br> (d) $30,215,000.00 in term bonds due July 1, 2052. |
|---|---|
| Series 2017B Bonds | $17,210,000.00 in entrance fee principal redemption bonds due July 1, 2024. |
| Series 2017C Bonds | $16,520,000.00 in entrance fee redemption bonds due July 1, 2022. |
| Series 2017D Bonds | $1,890,000.00 in federally taxable entrance fee principal redemption bonds due July 1, 2022. |

15.    Proceeds from the sale of the Bonds were loaned to the Debtor pursuant to that certain Loan Agreement and Mortgage (Security Agreement) dated as of June 1, 2017 between the Debtor and the Issuer (the "Loan and Security Agreement"). Proceeds of the Bonds were used by the Debtor to, among other things, finance and refinance the acquisition, construction, equipping and furnishing of the Facility. The rights of the Issuer under the Loan and Security Agreement were assigned to the Bond Trustee under the terms of the Indenture.

16.    In connection with the issuance of the Bonds, the Debtor granted the Bond Trustee (i) a first priority security interest in Gross Receipts, as defined in and pursuant to the Indenture, subject only to the pari passu lien of SBW as set forth in that certain Intercreditor Agreement dated as of April 22, 2019 between the Debtor the Issuer, the Bond Trustee and SBW (the "Intercreditor Agreement"), (ii) a first priority security interest in substantially all of the personal property of the Debtor, including all of the Debtor's equipment, machinery, furnishings, fixtures and other similar items of tangible personal property necessary or convenient for the operation of the Facility,

79628401.5

pursuant to the Loan and Security Agreement, and (iii) a first priority mortgage and other liens on the real and personal property owned by the Debtor pursuant to the Loan and Security Agreement and that certain Forbearance Agreement dated as of June 14, 2021 between the Debtor and the Bond Trustee (the "Forbearance Agreement" and, together with the Indenture, the Loan and Security Agreement and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents, the "Bond Documents"). Pursuant to these grants, the Bond Trustee holds valid and perfected first priority liens and security interests in substantially all of the Debtor's real and personal property as security for its obligations associated with the Bonds (the collateral above and as further described in the Bond Documents, the "Prepetition Bond Collateral").

17. As of the Petition Date, the amounts due and owing by the Debtor with respect to the Bonds and the obligations under the Bond Documents are as follows (collectively, the "Bond Claim"):

   a. Unpaid principal on the Bonds in the amount of $60,445,000;

   b. Accrued but unpaid interest on the Bonds in the amount of $4,197,667.12; and

   c. unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claim.

18. Pursuant to the Bond Documents, the Bond Trustee controls various reserves including: a construction fund (the "Construction Fund"), a debt service reserve fund (the "DSRF"), an entrance fee fund (the "Entrance Fee Fund"), a working capital fund (the "Working Capital Fund"), a bond fund (the "Bond Fund", together with the Construction Fund, the DSRF, the Entrance Fee Fund, and the Working Capital Fund, the "Trustee-Held Funds").

19.     As detailed in the First Day Declaration, due to the effects of COVID-19 and certain construction defects on the Community's census, the Debtor was unable to fully make a debt service payment in June 2020 and the Bond Trustee drew upon the DSRF in the amount of $1,801,555.01. The Debtor was also unable to make the payment due under the Bond Documents in January and July 2021. On March 6, 2021, the Bond Trustee swept the funds from the Trustee Held Funds, except for the DSRF, which collectively contained approximately $1.73 million on that date. On July 6, 2021, the Bond Trustee swept additional funds from the DSRF, which had a balance of $2.58 million on that date.

## II.     The SBW Obligations

20.     With the consent of the Bond Trustee, the Debtor and SBW are parties to that certain Construction Loan Agreement dated as of April 22, 2019 (the "Construction Loan Agreement") which provided a line of credit of up to $3,000,000 (the "SBW Loan"). The use of the SBW Loan proceeds were limited to the funding of completion of construction at the Community.  A portion of the SBW Loan balance was repaid with proceeds of the sale of the prior Prospect Home and Woodward Home properties (in which SBW was granted a collateral assignment) in 2019.  By its terms, the SBW Loan is not a revolving line of credit so any repaid amounts are not available for further lending and use by the Debtor.  The expiration date for the SBW Loan has been extended to December 31, 2021.

21.     As further security for the SBW Loan, the Debtor granted SBW a first priority security interest in Gross Receipts, as defined in that certain Construction Loan Security Agreement dated as of April 22, 2019 between the Debtor and SBW (the "Construction Loan Security Agreement" and, together with the Construction Loan Agreement and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents, the "SBW Documents"), subject only to the pari passu lien of the Bond

Trustee as set forth in the Intercreditor Agreement (such security interest in Gross Receipts, the "Prepetition SBW Collateral" and together with the Prepetition Bond Collateral, the "Prepetition Collateral").[3]

22.    As of the Petition Date, the amounts due and owing by the Debtor with respect to the SBW Loan and the obligations under the Construction Loan Agreement are as follows (collectively, the "SBW Claim"):

    a.    Unpaid principal on the SBW Loan in the amount of $1,727,760;

    b.    Accrued but unpaid interest on the SBW Loan in the amount of $139,647.56; and

    c.    unliquidated, accrued and unpaid fees and expenses of SBW and its attorneys incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the SBW Claim.

## III.    Mechanics Liens

23.    As set forth in the First Day Declaration, following the Debtor's discovery of certain construction defects, the Debtor has been engaged in litigation with MacMillin Company, LLC ("MacMillin") and certain subcontracts (collectively, with MacMillin, the "Mechanics Lienholders").[4] On October 25, 2019, the Superior Court issued an opinion for attachment purposes pursuant to N.H. Rev. Stat. Ann. § 447:12 for the Mechanics Lienholders for the following amounts:

---

[3] "Prepetition Collateral" shall only include the Secured Parties' respective collateral as of the Petition Date.
[4] Two additional parties, Installed Building Products, LLC and Builders Installed Products of VT, LLC have filed complaints for mechanics liens, put as of the Petition Date, the Superior Court has not adjudicated these matters.

| | |
|---|---|
| Wayne J. Griffin Electric, Inc. | $687,414.12 |
| Wallace Building Products Corporation | $325,579.64 |
| Denron Plumbing & HVAC, LLC | $693,535.44 |
| J.N.R. Gutters, Inc. | $139,308.00 |
| Pro Stock Kitchens LLC | $130,000.00 |
| American Builders and Contractors Supply Co. | $121,779.69 |
| MacMillin Company, LLC | $3,615,775.46 |
| **Total** | **$5,713,392.35** |

24.     Upon information and belief, the liens of the Secured Parties as to Gross Receipts are significantly undersecured and are superior to the liens of the Mechanics Lienholders. Moreover, even if the liens of the Mechanics Lienholders are superior to the Secured Parties, such liens would only be superior as to certain property, not Cash Collateral.

### THE DEBTOR'S NEED FOR THE USE OF CASH COLLATERAL

25.     As described in the First Day Declaration, the Debtor explored various strategic alternatives, including a forbearance agreement with the Bond Trustee. The Debtor has determined that absent the use of Cash Collateral, it will be unable to operate its business during the Chapter 11 Case, irreparably harming the Debtor's estate and creditors.

26.     Without the use of Cash Collateral, the Debtor is unable to continue normal operation of its business during the Chapter 11 Case. If the Debtor is unable, on a consistent basis, to maintain its business and demonstrate financial stability to existing and future residents, the Debtor will lose existing residents, key employees, and vendors, will be unable to attract new residents and will ultimately be forced to cease operations. This will cause harm to the Debtor, but also to its residents who expect a continuum of quality care, potentially leaving residents without food, medical supplies, proper medical care, and other services they require. Therefore, the Debtor's immediate access to Cash Collateral is necessary to preserve and maximize the value for the benefit of all parties in interest. Thus, the use of Cash Collateral is essential to Debtor's

continued ability to operate, maintain the value of its assets and properly care for its residents until sale or consummation of a plan.

27. The Debtor has an immediate and critical need to use Cash Collateral to pay, in accordance with the 13-week budget, which will be attached to the proposed Interim Order as Exhibit 1 (the "Budget"). The Debtor requires the use of Cash Collateral for various items in the ordinary course of business and as authorized by the Court, including payments to employees, employee benefits, utilities, and other items which, in the judgment of the Debtor's management, provide the essential services needed to operate, maintain and insure the Debtor's assets. In addition, the Debtor requires the use of Cash Collateral to retain and pay costs of professionals, consultants and advisors who will enable the Debtor to conduct a sale of its assets in a manner that maximizes value for the Debtor's estate and its creditors, as may be approved by the Court. Taken together, the services provided by all of the foregoing parties and other entities are critical to the preservation of the Debtor's business and asset value.

28. The Debtor reasonably believes that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. Without use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and the entire bankruptcy proceeding will be jeopardized to the significant detriment of the Debtor's estate and its creditors.

29. After considering its alternatives, the Debtor has concluded that the use of Cash Collateral pursuant to the terms of the Interim Order represents the best option available to interested parties, which funds will be used to maintain the Debtor's assets and maintain its high standards for the benefit of its residents during an orderly sale process.

30.     The Debtor believes that the terms of the use of Cash Collateral which will be contained in the Interim Order protects the Secured Parties against any diminution in the value of their interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, the subordination of the Secured Parties' liens to a carve-out, and the imposition of the automatic stay, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by fair consideration.

31.     At a minimum, the Debtor's inability to use Cash Collateral would disrupt Debtor's operations as a going concern, would severely hamper Debtor's efforts to market the CCRC, which would eliminate or significantly decrease the possibility of confirmation of a plan of reorganization, if necessary, and would otherwise not be in the best interests of the Debtor, its estate, or creditors, including the residents and the bondholders.

32.     At this time, the Debtor is not contemplating the need for postpetition financing. Instead, the Debtor intends to operate its business solely on the use of the existing Cash Collateral. Access to existing Cash Collateral on an interim basis will provide the Debtor with the liquidity necessary to ensure that the Debtor has sufficient working capital and liquidity to operate its business, maintain its high standard of resident care, and thus preserve and maintain the value of the Debtor's estates. Without access to such liquidity, the Debtor and its estate will face irreparable harm.

33.     At this time, the Bond Trustee has consented to the form of Interim Order attached hereto as Exhibit A. The attached form of Interim Order reflects the terms of the parties' agreement on the use of Cash Collateral, without which the Bond Trustee would not have consented to the Debtor's use of Cash Collateral. The Debtor has not yet been able to obtain the consent of the SBW.

15

## RELIEF REQUESTED

34.     The Debtor respectfully requests entry of the Interim and Final Orders, Bankruptcy Code sections 105, 361, 362, 363, 506, 507, and 552(b) and Bankruptcy Rules 2002, 4001, 6004(h), 7062 and 9014 (i) authorizing the Debtors to use Cash Collateral, (ii) granting the Secured Parties adequate protection upon the terms set forth in the Interim Order and any final orders, (iii) modifying the automatic stay, and (iv) scheduling a final hearing on the Motion.

## BASIS FOR RELIEF REQUESTED

### I.     Cash Collateral and Adequate Protection

35.     Bankruptcy Code section 363(c) provides that a debtor in possession may use cash collateral if all interested entities consent or the Court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c). Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). *See also In re DeSardi*, 350 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("Adequate protection . . . is grounded in the belief that secured creditors should not be deprived of the benefit of their bargain"). The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 is limited to use-based decline in value).

36.     Bankruptcy Code section 361 delineates non-exhaustive forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other

79628401.5

forms of relief. Adequate protection is determined on a case-by-case basis and may take various forms. *See, e.g.*, *United Sav. Ass'n of Tex. V. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1388 (5th Cir. 1986). *See also In re Self*, 239 B.R. 877, 881 (E.D. Tex. 1999) (noting that the adequate protection determination is not an "exact science"); *In re Continental Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993); *MBank Dallas., N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of this requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."). "[T]he debtor-in-possession has the burden of proof on the issue of adequate protection." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

37.     The proposed adequate protection included in the Interim Order provides adequate protection in the form of, among other things, replacement liens and reporting requirements. The Debtor submits that the proposed adequate protection is appropriate and sufficient to protect the Trustee from any diminution in value of the Cash Collateral.

38.     The Cash Collateral will be used for funding business operations and allowing the Debtor to transition into the Chapter 11 Case. Immediate access to this liquidity will permit the Debtor to fund payroll, pay vendors, provide patient care, and otherwise continue business in the ordinary course. As detailed in the First Day Declaration, one reason underlying the filing of the Chapter 11 Case is to sell its assets pursuant to Bankruptcy Code section 363. If Cash Collateral is not available, the Debtors will dissipate value to the detriment of the Trustee and other

stakeholders, including employees and patients. Thus, the use of Cash Collateral will protect the Trustee's security interests by preserving the value of the Cash Collateral. *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor). *See also Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992).

39.     In light of the foregoing, the Debtor submits that the proposed adequate protection to be provided is appropriate and necessary to protect such party against any diminution in value and is also fair and appropriate on an interim basis under the circumstances of this case and to ensure that the Debtor is able to continue using Cash Collateral in the near term, for the benefit of all parties in interest and its estate.

40.     Based on the foregoing, the Debtor respectfully submits that entry of the Interim Order authorizing the interim use of Cash Collateral and scheduling a Final Hearing to approve the use of Cash Collateral on a final basis is necessary and appropriate.

## II.     <u>Modification of the Automatic Stay is Warranted</u>

41.     The relief requested by this Motion contemplates a modification of the automatic stay. 11 U.S.C. § 362. The automatic stay should be modified on a limited basis (to the extent applicable) as necessary to effectuate all terms and provisions of the Interim Order, including, without limitation to: (a) permit the Debtor to grant replacement liens, and (b) permit the Secured Parties to exercise, upon the occurrence and during the continuation of any Termination Event (as defined in the Interim Order).

42.     Stay modification provisions of this sort are ordinary features of cash collateral arrangements and, in Debtor's business judgment, are reasonable under the circumstances. *See,*

*e.g.*, *In re Gen. Growth Prop. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009). Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

43.     Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

## III.     Interim Approval and Scheduling of a Final Hearing

44.     Interim relief may be granted on a motion to use cash collateral pursuant to Bankruptcy Code sections 363(c) or 364 where relief "is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

45.     The Debtor believes that all or substantially all of their available cash constitutes Cash Collateral and is therefore unable to proceed to continue its business operations without the ability to use Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. The Debtor's ability to finance its operations is vital to the preservation and maintenance of the value of the Debtor's assets.

46.     The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing Debtor to use the Cash Collateral is not granted promptly after the Petition Date. The commencement of this Chapter 11 Case and the anticipated sale process will significantly and immediately increase the demands on its free cash as a result of, among other things, the costs of administering this Chapter 11 Case, expenditures related to the care of the residents and conducting a sale of the Debtor's assets in a manner that maximizes value for the Debtor's estate and its creditors. Accordingly, the Debtor has an immediate need for access to liquidity to, among other things, continue the operation of its business, maintain its relationships

with its residents and vendors, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy its working capital and operational needs, all of which is required to preserve and maintain the value of the Debtor's asserts for the benefit of all parties in interest. Therefore, the Debtor respectfully requests that the Court schedule a final hearing, no sooner than 14 days after the Petition Date and no later than 30 days after the Petition Date, to consider entry of the Final Order.

47.     Moreover, Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtor submits that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor.

48.     Further, the Debtor respectfully requests that the Court schedule the Final Hearing. Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 4001-2.

## **WAIVER OF BANKRUPTCY RULES**

49.     To the extent that any aspect of the relief sought herein constitutes a use of property under Bankruptcy Code section 363(b), the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay under Bankruptcy Rule 6004(h), to the extent applicable. *See* Fed. R. Bankr. P. 6004(a), (h). As described above, the relief that the Debtor seeks in this Motion is immediately necessary for the Debtor to be able to continue to operate its business and preserve the value of the estate. The Debtor respectfully requests that the Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## WAIVER OF MEMORANDUM OF LAW

50.     The Debtor requests that the Court waive and dispense with the requirement set forth in LBR 7102(b)(2) that any motion filed shall have an accompanying memorandum of law. The legal authorities upon which the Debtor relies are set forth in the Motion. Accordingly, the Debtor submits that a waiver of the requirements set forth in LBR 7102(b)(2) is appropriate under the circumstances.

## NOTICE

51.     Notice of the Motion has been provided to: (a) the Office of the United States Trustee for the District of New Hampshire; (b) counsel to the New Hampshire Insurance Department; (c) the United States Attorney's Office for the District of New Hampshire; (d) counsel to UMB Bank, as indenture trustee; (e) the Debtor's twenty (20) largest unsecured creditors; and (f) any party filing a notice of appearance in this Chapter 11 Case.

52.     The Debtor submits that, in light of the nature of the relief requested, no further notice of this Motion is required.

## NO PRIOR REQUEST

53.     No prior request for the relief sought herein has been made to this Court or any other court.

79628401.5

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: August 31, 2021

/s/    *Owen R. Graham*

**HINCKLEY, ALLEN & SNYDER LLP**
Daniel M. Deschenes (Bar No. 14889)
Owen R. Graham (Bar No. 266701)
650 Elm Street
Manchester, New Hampshire 03101
Telephone: (603) 225-4334
Facsimile: (603) 224-8350
ddeschenes@hinckleyallen.com

-and-

Jennifer V. Doran (*Pro Hac Vice* Pending)
28 State Street
Boston, Massachusetts 02109
Telephone: (617) 345-9000
Facsimile: (617) 345-9020
jdoran@hinckleyallen.com

-and-

**POLSINELLI PC**
Jeremy R. Johnson (*Pro Hac Vice* Pending)
Stephen J. Astringer (*Pro Hac Vice* Pending)
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

*Proposed Counsel to the Debtor and Debtor in Possession*

79628401.5

**Exhibit A**

Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| The Prospect-Woodward Home, | ) Case No. 21-10523 (BAH) |
| | ) |
| Debtor.[1] | ) **Re: Docket No. _____** |
| | ) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO
USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION;
(III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

This Interim Order (this "Interim Order") is entered upon the *Emergency Ex Parte Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final hearing, and (V) Granting Related Relief* (the "Motion"),[2] and upon terms agreed to by and between the above-captioned debtor (the "Debtor"), UMB Bank, N.A., in its capacity as successor trustee for the bonds described more fully below (the "Bond Trustee") and the Savings Bank of Walpole ("SBW" and together with the Bond Trustee, the "Secured Parties").

In connection with the negotiation and filing of the Chapter 11 Case and the Motion, the Debtor and the Secured Parties have stipulated and agreed as follows:

**The Debtor's Chapter 11 Case; Procedural Background; Jurisdiction; Notice**

A.     August 30, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") with this Court under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtor has operated its business and managed its property as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. No

---

[1] The last four digits of the Debtor's federal taxpayer identification are 2146. The address of the Debtor's headquarters is 95 Wyman Road, Keene, New Hampshire 03431
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

request has been made for the appointment of a trustee or examiner in the Chapter 11 Case and no committee of unsecured creditors has been appointed in this Chapter 11 Case under section 1102 of the Bankruptcy Code as of the date hereof (a "Committee").

B.     The Debtor is the owner and operator of a continuing care retirement community known as Hillside Village (the "Facility").

C.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

D.     The Debtor has properly served notice of the Motion and the interim hearing thereon pursuant to Sections 102, 361, 362, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules, which notice was sent to, among others: (i) the Office of the United States Trustee for the District of New Hampshire; (ii) counsel to the Bond Trustee; (iii) the Debtor's twenty (20) largest unsecured creditors; (iv) counsel to SBW; and (v) any party filing a notice of appearance in this Chapter 11 Case. This notice is appropriate under the circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules in respect to the relief requested.

## The Secured Bond Obligations

E.     The Debtor is obligated to the Bond Trustee for the benefit of the beneficial holders of the tax-exempt Bonds described below, authorized and issued by the New Hampshire Health and Education Facilities Authority (the "Issuer"). The Issuer issued its $93,015,000 New Hampshire Health and Education Facilities Authority Revenue Bonds, Hillside Village Issue, Series 2017 (the "Bonds") pursuant to that certain Bond Indenture, dated as of June 1, 2017 between the Issuer and the Bond Trustee (the "Indenture").

2

F.     Proceeds from the sale of the Bonds were loaned to the Debtor pursuant to that certain Loan Agreement and Mortgage (Security Agreement) dated as of June 1, 2017 between the Debtor and the Issuer (the "Loan and Security Agreement"). Proceeds of the Bonds were used by the Debtor to, among other things, finance and refinance the acquisition, construction, equipping and furnishing of the Facility. The rights of the Issuer under the Loan and Security Agreement were assigned to the Bond Trustee under the terms of the Indenture.

G.     As of the Petition Date, the amounts due and owing by the Debtor with respect to the Bonds and the obligations under the Bond Documents are as follows (collectively, the "Bond Claim"):

     (i)     Unpaid principal on the Bonds in the amount of $60,445,000;

     (ii)     Accrued but unpaid interest on the Bonds in the amount of $4,197,667.12; and

     (iii)     unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claim.

### Security for the Bond Obligations

H.     The Debtor granted the Bond Trustee (i) a first priority security interest in Gross Receipts, as defined in and pursuant to the Indenture, subject only to the pari passu lien of SBW as set forth in that certain Intercreditor Agreement dated as of April 22, 2019 between the Debtor the Issuer, the Bond Trustee and SBW (the "Intercreditor Agreement"), (ii) a first priority security interest in substantially all of the personal property of the Debtor, including all of the Debtor's equipment, machinery, furnishings, fixtures and other similar items of tangible personal property necessary or convenient for the operation of the Facility, pursuant to the Loan and Security Agreement, and (iii) a first priority mortgage and other liens on the real and personal property owned by the Debtor pursuant to the Loan and Security Agreement and that

3

certain Forbearance Agreement dated as of June 14, 2021 between the Debtor and the Bond Trustee (the "Forbearance Agreement" and, together with the Indenture, the Loan and Security Agreement and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents, the "Bond Documents"). Pursuant to these grants, the Bond Trustee holds valid and perfected first priority liens and security interests in substantially all of the Debtor's real and personal property as security for its obligations associated with the Bonds (the collateral above and as further described in the Bond Documents, the "Prepetition Bond Collateral").

## The Secured SBW Obligations

I.     The Debtor is obligated to SBW (the "SBW Loan") pursuant to that certain Construction Loan Agreement dated as of April 22, 2019 between the Debtor and SBW (the "Construction Loan Agreement"). Proceeds of the SBW Loan were used to finance certain construction needs at the Facility. As of the Petition Date, the amounts due and owing by the Debtor with respect to the SBW Loan and the obligations under the Construction Loan Agreement are as follows (collectively, the "SBW Claim"):

(i)     Unpaid principal on the SBW Loan in the amount of $1,727,760 as of the Petition Date;

(ii)    Accrued but unpaid interest on the SBW Loan in the amount of $138,277 as of the Petition Date; and

(iii)   unliquidated, accrued and unpaid fees and expenses of SBW and its attorneys incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the SBW Claim.

**Security for the SBW Obligations**

J.     The Debtor granted SBW a first priority security interest in Gross Receipts, as defined in that certain Construction Loan Security Agreement dated as of April 22, 2019 between the Debtor and SBW (the "Construction Loan Security Agreement" and, together with the Construction Loan Agreement and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents, the "SBW Documents"), subject only to the pari passu lien of the Bond Trustee as set forth in the Intercreditor Agreement (such security interest in Gross Receipts, the "Prepetition SBW Collateral" and together with the Prepetition Bond Collateral, the "Prepetition Collateral").[3]

**Use of Cash Collateral and Need for Adequate Protection**

K.     The Debtor has requested the use of Cash Collateral (as defined below) in connection with the Chapter 11 Case to preserve the value of its business. Pursuant to the Bankruptcy Code, the Debtor is required, upon the Secured Parties' request, to provide adequate protection to the Secured Parties in respect of the Debtor's use of Cash Collateral. The Secured Parties have informed the Debtor and this Court that they do not consent to the use of Cash Collateral except upon the terms and conditions of this Interim Order.

L.     Without the use of Cash Collateral on an interim basis, the Debtor would suffer immediate and irreparable harm pending a final hearing on the Motion and would likely be required to cease operations immediately. At a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor's operations as a going concern and would otherwise not be in the best interests of the Debtor, its estate, or creditors, including residents of the Facility. In lieu of giving the Secured Parties relief from stay or attempting to obtain this Court's approval

---

[3] "Prepetition Collateral" shall only include the Secured Parties' respective collateral as of the Petition Date.

for use of Cash Collateral on a non-consensual basis, the Debtor wishes to provide adequate protection of the liens and security interests of the Secured Parties in Cash Collateral and the Bond Trustee with respect to the other Prepetition Bond Collateral on the terms set forth in this Interim Order, reflecting the agreement of the Debtor and the Secured Parties.

M.    The Debtor agrees that it shall not take any action to assert that: (i) the Bond Claim or the SBW Claim is not a valid, binding, and allowed claim against the Debtor's estate; (ii) the Bond Claim or the SBW Claim is not secured by valid, enforceable, duly perfected first priority liens on and security interests in the Secured Parties' respective Prepetition Collateral; and (iii) the Bond Claim, the SBW Claim or the liens or security interests securing such claims are subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

N.    Good cause has been shown for the entry of this Interim Order.

**NOW, THEREFORE, THE COURT HEREBY CONCLUDES AND ORDERS AS FOLLOWS:**

1.    <u>Jurisdiction</u>. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. The Debtor has operated its business and managed its property as debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. No request has been made for the appointment of a trustee or examiner in the Chapter 11 Case and no committee of unsecured creditors has been appointed in the Chapter 11 Case under Section 1102 of the Bankruptcy Code as of the date hereof.

2.    <u>Notice</u>. The Debtor has properly served notice of the Motion and the interim hearing thereon pursuant to Sections 102, 361, 362, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Bankruptcy Rules of this Court (the "<u>Local</u>

6

<u>Rules</u>"), which notice was sent to, among others: (i) the U.S. Trustee for the State of New Hampshire; (ii) the United States Attorney for the State of New Hampshire; (iii) the Commissioner of Insurance of the New Hampshire Insurance Department ("<u>NHID</u>"); (iv) the New Hampshire Department of Health and Human Services; (v) the New Hampshire Director of Charitable Trusts; (vi) the New Hampshire Attorney General's Office; (vii) counsel for the Bond Trustee; (viii) Parties who have filed UCC-1 financing statements against Debtor; (ix) the Internal Revenue Service; (x) the banks and other financial institutions where Debtor maintains accounts; (xi) the holders of the twenty largest unsecured claims against the Debtor; and (xii) those who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>"). This notice is appropriate under these circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules in respect to the relief requested.

3.      <u>Good Cause</u>. Good cause has been shown for entry of this Interim Order.

4.      <u>Disposition</u>. The Motion is GRANTED on an interim basis on the terms set forth in this Interim Order. The requirements of Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2 are satisfied with respect to the use of Cash Collateral on an interim and preliminary basis pending a final hearing on the Motion. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled on the merits, without prejudice, however, to any such objection or reservation of rights being reasserted in connection with the hearing on entry of the Final Order.

5.      <u>Authorization to Use Cash Collateral</u>. The Debtor is authorized to use, as cash collateral (as defined in Section 363 of the Bankruptcy Code), any Gross Receipts derived by the Debtor in the ordinary course of their business, all accounts receivable held by the Debtor,

7

and all amounts currently held in the Debtor's operating accounts (the "Cash Collateral") until the earlier of (i) the Debtor's ability to use Cash Collateral terminates as the result of the occurrence of a Termination Event (as set forth below) or (ii) the last day included in the Cash Collateral Budget (as defined below), but only on the terms of this Interim Order. Subject to the preceding sentence, such use of Cash Collateral shall be limited solely to the categories of expenses listed in the budget attached hereto as **Schedule A** (the "Cash Collateral Budget"). Further, such use of Cash Collateral shall be limited solely to pay expenses in the amounts and at the times listed in the Cash Collateral Budget; provided, however, that the Debtor shall have authority to use Cash Collateral in excess of, and at times different from, the amounts set forth in the Cash Collateral Budget to the extent such a variance does not constitute a Termination Event described in paragraph 17(i) of this Interim Order or the Secured Parties consent in writing to such proposed use.

6. Exclusion from Cash Collateral. The Debtor is not authorized to use and shall not use any Gross Receipts (or other cash proceeds) not derived in the ordinary course of the Debtor's operations.

7. Prohibited Use of Cash Collateral. Except as expressly provided in this Order, no Cash Collateral, proceeds thereof, or other proceeds of the Prepetition Collateral shall be used for the purpose of: (i) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds or the SBW Loan, the Prepetition Collateral, the Bond Claim, the SBW Claim or any liens or security interests with respect thereto; (ii) asserting any claims or defenses or causes of action against the Bond Trustee, the holders of the Bonds in their capacity as such, SBW, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without

8

limitation, causes of action arising out of, based upon, or related to, in whole or in part, the Bonds, the SBW Loan, the Bond Documents or the SBW Documents or any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents or the SBW Documents; (iii) paying any amounts on account of claims arising before the Petition Date, except to the extent provided for in the Cash Collateral Budget and approved by the Court; (iv) seeking to modify any of the rights granted to the Bond Trustee or SBW hereunder, or (y) seeking to bifurcate any claims of the Bond Trustee or SBW. Notwithstanding the foregoing, not more than $15,000 of the Cash Collateral may be made available to reimburse the Committee, if appointed, upon appropriate application therefor, for the Committee's fees and expenses in investigating the validity, priority, perfection and enforceability of the Secured Parties' liens in their respective Prepetition Collateral.

8.     <u>Amendment or Extension of Use of Cash Collateral</u>. The Debtor may, at any time, propose to the Secured Parties in writing (including by email) an amended Cash Collateral Budget, either for the period covered by the Cash Collateral Budget or for any period thereafter, and the Bond Trustee may approve or not approve any such amendment in its sole and absolute discretion, which consent shall not be unreasonably withheld. Upon the written consent of the Bond Trustee, the amended Cash Collateral Budget shall become the Cash Collateral Budget for purposes of this Interim Order. At such time as the amended Cash Collateral Budget becomes the Cash Collateral Budget, the Debtor shall file a copy thereof with this Court and shall provide a copy thereof to any party in interest upon request to the Debtor's counsel. In the event the Bond Trustee does not approve a requested amendment to a Cash Collateral Budget, the Debtor reserves the right to seek an order authorizing the use of the Cash Collateral by filing

79516956.9

a motion with the Bankruptcy Court, and the Secured Parties reserve all rights to object to such motion.

9. <u>Postpetition Advances</u>. Pursuant to the Forbearance Agreement, the Bond Trustee has agreed to make certain advances on behalf of the Debtor in connection with urgent construction needs up to $570,000 (less previously advanced amounts of approximately $276,000) (such remaining amounts to be advanced, the "<u>Postpetition Advances</u>"). The Postpetition Advances shall be made and otherwise used in a manner consistent with the terms of the Forbearance Agreement. Pursuant to section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and as security for the repayment of the Postpetition Advances, the Bond Trustee is hereby granted valid, binding, enforceable and perfected first priority mortgages, pledges, liens and security interests (the "<u>Postpetition Liens</u>") in all currently owned or hereafter acquired property and assets of the Debtor of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, causes of action, tax refund claims, commercial tort claims, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "<u>Postpetition Collateral</u>"); <u>provided</u>, <u>however</u>, that the Postpetition Collateral does not include Avoidance Actions (as defined below) or the proceeds thereof and the Postpetition Liens shall be subject to the Carve Out (as defined below) and all Prior Liens (as defined below) on such Postpetition Collateral, if any. The Postpetition Liens shall be valid, binding, continuing, enforceable and fully-

10

perfected upon entry of this Interim Order. Such Postpetition Advances shall be due and payable upon a Termination Event (as defined below).

10.     <u>Replacement Liens</u>. As adequate protection for any diminution in the value of Cash Collateral and other Prepetition Collateral resulting from the Debtor's use thereof after the Petition Date ("<u>Diminution</u>"), and solely to the extent of such Diminution, each Secured Party shall have a pari passu, valid, perfected, and enforceable replacement lien and security interest (the "<u>Replacement Liens</u>") in (i) all Postpetition Collateral of the same type as such Secured Party's Prepetition Collateral to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of each Secured Party as of the Petition Date; and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "<u>Supplemental Collateral</u>" and, collectively with the Postpetition Collateral, the "<u>Collateral</u>"); <u>provided</u>, <u>however</u>, that actions for preferences, fraudulent conveyances or other avoidance power claims and any recoveries under Sections 542, 544, 545, 547, 548 (exclusive of transferees under Section 549), 550 and 553 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>") shall not be Supplemental Collateral under this Interim Order. Notwithstanding the foregoing, the Secured Parties reserve the right to request that the Supplemental Collateral include Avoidance Actions in any Final Order on the Motion. Further, the Replacement Liens shall be subject and subordinate to the Carve Out (as defined below) and all valid and perfected liens existing on the Petition Date that are otherwise allowed secured claims existing as of the Petition Date, including any liens of the Secured Parties ("<u>Prior Liens</u>").

11

11.     <u>No Further Action Required</u>. The approval of this Interim Order by the Court shall be sufficient and conclusive evidence of the validity, extent, enforceability, and perfection of the Replacement Liens granted to the Secured Parties, whether or not the Secured Parties elect to file or record financing statements or any other documents that may otherwise be required under federal or state law in any jurisdiction, or to take such other steps as may otherwise be required to obtain, evidence, or perfect such liens under applicable law; <u>provided</u>, <u>however,</u> that upon the request of either Secured Party, the Debtor shall execute such other documents as may be reasonably requested to evidence and perfect such liens; that the Secured Parties may, in their sole discretion, but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any jurisdiction in which the Debtor has real or personal property; that the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon the Secured Parties' reasonable request; and that such filing or recording shall be accepted and shall constitute further evidence of perfection of the Secured Parties' liens and security interests. No obligation, payment, transfer, or grant of security under this Interim Order shall be stayed (other than by court order in an appeal from this Interim Order), restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any otherwise applicable state law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

12.     <u>Superpriority Claims</u>. As additional adequate protection for any Diminution, and solely to the extent of such Diminution, each Secured Party shall have superpriority administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or

12

residual (together, the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject only to Prior Liens and the Carve Out and shall have priority, pursuant to Section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

13. <u>Adequate Protection Payments</u>. In consideration of the use of Cash Collateral, on and after the date hereof, the Debtor shall make adequate protection payments consistent with the Cash Collateral Budget in an amount of $75,000 per month to the Bond Trustee and $5,000 per month to the SBW (the "Adequate Protection Payments"). Any and all such Adequate Protection Payments shall be irrevocable and shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b). For the avoidance of doubt, all Adequate Protection Payments shall be without prejudice to the rights of the Bond Trustee and SBW to assert a claim for payment of additional amounts in accordance with the Bond Documents or the SBW Documents, respectively.

14.     <u>Allowance of Claim</u>. Except as set forth in paragraph 25 below, the entry of this Interim Order by the Court shall be a conclusive and binding determination on all parties (x) as to the amount of the Bond Claim and SBW Claim set forth herein, and (y) as to the scope, extent, perfection, validity, and enforceability, in all respects, of each Secured Party's security interests and liens in its respective Prepetition Collateral, including, without limitation, the Cash Collateral as set forth in the Debtor's acknowledgements herein.

15.     <u>Financial Information</u>. As additional adequate protection of the Secured Parties' security interests in the Cash Collateral, the Debtor shall allow the Secured Parties and their professionals and designees reasonable access, during normal business hours and on reasonable notice, subject to all applicable health safety and welfare related federal, state and local mandates, rules, regulations, or recommendations and the Debtor's policies, procedures, and restrictions implementing same, to the premises of the Debtor in order to conduct appraisals, analyses, and/or audits of the Prepetition Collateral and the Collateral, and shall otherwise reasonably cooperate in providing any other financial information reasonably requested by the Secured Parties for this purpose. From and after the entry of this Interim Order, the Debtor shall provide to the Secured Parties once each week (commencing with the second week after the Petition Date), a weekly report certified by the Debtor's authorized representative, and in the same form as the Cash Collateral Budget, indicating all receipts received and disbursements made by the Debtor in the week ending the prior Friday compared to the Cash Collateral Budget and detailing any variances of more than 10% and at least $10,000 from the expenditures and receipts in the Cash Collateral Budget. The Debtor and its professionals shall be available once each week (subject to reasonable scheduling conflicts) for a telephonic conference call with the Secured Parties to discuss matters pertaining to the Facility and the Chapter 11 Case. The Debtor shall provide to the Secured Parties

14

such other reports and information as the Secured Parties may reasonably request from time to time.

16.  <u>Compliance With Bond Documents</u>. As further adequate protection against Diminution, the Debtor shall comply with those terms and provisions of the Bond Documents set forth on **<u>Schedule B</u>** attached hereto and incorporated herein. The requirements of this Interim Order shall be in addition to, and not in substitution for, the terms and provisions of the Bond Documents set forth on **<u>Schedule B</u>**; <u>provided</u>, <u>however,</u> that in the event of any inconsistency between the Bond Documents and this Interim Order, the terms of this Interim Order shall control.

17.  <u>Termination of Use of Cash Collateral With Notice</u>. A Termination Event shall be deemed to have occurred five (5) business days after written notice sent by the Bond Trustee to the Debtor, its counsel, and the U.S. Trustee of the occurrence of any of the following (each a "<u>Termination Event</u>"):

(i)  the payment of any expenses that would cause: (x) aggregate expenditures under the Cash Collateral Budget to exceed one hundred and ten percent (110%) of the total budgeted expenses for that same Measuring Period (as defined below) or (y) expenditures under a single line item of the Cash Collateral Budget to exceed one hundred and fifteen percent (115%) of the amount budgeted for that same line item for that same Measuring Period; <u>provided</u>, <u>however</u>, professional fees shall not exceed one hundred percent (100%) of such budgeted line item; <u>provided further</u> that professionals may carry forward or carry backward any unused professional fee and expense budget line item amounts to pay unpaid professional fees and expenses that have been allowed pursuant to any orders of this Court; <u>provided</u>, <u>however</u>, that Professionals cannot borrow in advance from future budgeted amounts. This variance shall be measured, on a rolling four week period (the "<u>Measuring Period</u>"); <u>provided</u>, <u>however</u>, that for purposes of calculating such variances, (i) the first Measuring Period shall be the one week after the Petition Date and the first week of the Cash Collateral Budget, (ii) the second Measuring Period shall be the two weeks after the Petition Date and the first two weeks of the Cash Collateral Budget, (iii) the third Measuring Period shall be the three weeks after the Petition Date and the first three weeks

15

of the Cash Collateral Budget, and (iv) the fourth Measuring Period shall be the first four weeks after the Petition Date and the first four weeks of the Cash Collateral Budget. Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period and, for the purpose of calculating rolling four week variances set forth above, the Cash Collateral Budget will be revised to move such expenditures to the later period, it being understood that such later period can be outside the four-week period. Expenditures (except for professional fees) may be paid in an earlier period in the reasonable discretion of the Debtor in the aggregate up to $25,000 in any month, in which event, the Cash Collateral Budget shall be deemed amended to move the expenditure into the week of the actual expenditure for the purpose of calculating rolling four week variances set forth above. The Debtor will provide to the Secured Parties a written explanation in reasonable detail explaining the amount of and the reason for the prepayment or delay in payment;

(ii)     the failure of the Debtor to pay, within ten (10) days of the applicable due date, all undisputed administrative expenses in full in accordance with their terms to the extent provided for in the Cash Collateral Budget and as permitted by applicable law;

(iii)    the failure of the Debtor to meet the milestones set forth in the Bidding Procedures established pursuant to that certain *Order (A) Approving Bidding Procedures In Connection With The Sale Of Substantially All Of The Debtor's Assets, (B) Approving The Form And Manner Of Notice Thereof, (C) Authorizing The Debtor To Enter Into The Stalking Horse Agreement, (D) Authorizing Payment Of The Stalking Horse Payment As An Administrative Expense, (E) Scheduling An Auction And A Sale Hearing, (F) Approving Procedures For The Assumption And Assignment Of Contracts, And (G) Granting Related Relief*;

(iv)    the failure of the Debtor to timely pay all fees due under 28 U.S.C. § 1930; and

(v)     the failure of the Debtor to comply with, keep, observe, or perform any of its agreements or undertakings under this Interim Order.

Unless the Debtor has cured the Termination Event(s) specified in the Bond Trustee's notice prior to the expiration of the five (5) business day period (the "Default Notice Period") described in this paragraph or obtained an order of this Court, on notice to and with the opportunity to be heard by the Secured Parties, that no such Termination Event has occurred, the Debtor's authority to use Cash Collateral hereunder shall terminate immediately at the expiration of the Default Notice

Period, without prejudice to the Debtor seeking an order of this Court to use Cash Collateral on a non-consensual basis. During the Default Notice Period, the Debtor shall (x) have the right to use Cash Collateral to contest the alleged occurrence or continuation of a Termination Event, and (y) be entitled to an emergency hearing before the Court, with proper notice to the Secured Parties, to contest the alleged occurrence or continuation of a Termination Event. The Bond Trustee shall have the power to waive any Termination Event set forth in this paragraph in their sole discretion without further order of the Court.

18.     Termination of Use of Cash Collateral Without Prior Notice. The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court, and a Termination Event shall occur without prior notice, upon the occurrence of any of the following (each also a "Termination Event"):

(i)     the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(ii)    the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in Sections 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application, or other pleading consenting to or acquiescing in any such appointment;

(iii)   this Court suspends the Chapter 11 Case under Section 305 of the Bankruptcy Code;

(iv)    this Interim Order becomes stayed, reversed, vacated, amended, or otherwise modified in any respect without the prior written consent of the Secured Parties;

(v)     an order is entered in the Chapter 11 Case over the objection of the Secured Parties approving financing pursuant to Section 364 of the Bankruptcy Code that would grant an additional security interest or a lien on any Prepetition Collateral or Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to the Secured Parties under this Interim Order; or

17

(vi)     the filing of any Challenge (as defined below) by the Debtor, or the Bankruptcy Court grants standing to the Committee or another third party to pursue such Challenge.

Upon the occurrence of a Termination Event described in this paragraph, the Debtor's authority to use Cash Collateral hereunder shall immediately and automatically terminate, without prejudice to the Debtor seeking an order of this Court to use Cash Collateral on a non-consensual basis. The Bond Trustee shall have the power to waive any Termination Event set forth in this paragraph in its sole discretion without further order of the Court.

19.     <u>Claims and Causes of Action</u>. Subject to paragraph 25 of this Interim Order, the Debtor hereby waives, releases, and discharges the Bond Trustee, all Bondholders in their capacity as such, SBW and their respective affiliates, agents, attorneys, professionals, officers, directors, and employees (collectively, the "<u>Released Parties</u>"), from any and all claims and causes of action arising out of, based upon, or related to, in whole or in part, the Bonds, the SBW Loan, the SBW Documents and the Bond Documents; any aspect of the prepetition relationship between the Bond Trustee, SBW and/or the Bondholders, and the Debtor; and any other acts or omissions by the Bond Trustee, SBW and/or the Bondholders in connection with either the Bond Documents or the SBW Documents or the Bond Trustee's, SBW's and/or Bondholders' prepetition relationship with the Debtor. Further, subject to paragraph 25 of this Interim Order, the Debtor waives any and all rights to object to or contest the amount of the Bond Claims, the SBW Claims or the Bond Trustee's security interest in the Prepetition Collateral and agrees not to challenge that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens.

20.     <u>Failure of Adequate Protection</u>. Nothing herein shall constitute a waiver, release or modification of the rights of the Secured Parties to assert a claim under Bankruptcy Code sections 364(c) and 507(b).

79516956.9

21.     <u>Deemed Request for Stay Relief</u>. This Interim Order shall be deemed to constitute a request by the Secured Parties for relief from the automatic stay with respect to the Prepetition Collateral for purposes of any request for adequate protection granted hereunder.

22.     <u>No Charge on Collateral; Carve Out</u>. In partial consideration of the Debtor's acknowledgement of the debt due and owing and the Debtor's waiver of any claims under Sections 506(c) and 552(b) of the Bankruptcy Code (upon entry of the Final Order), the Secured Parties consent to certain expenses and professional fees incurred during the pendency of this Chapter 11 Case that shall be superior in all instances to the liens and claims of the Secured Parties and all other parties (the "<u>Carve Out</u>"). For purposes hereof, the "Carve Out" means the sum of (a) an aggregate amount not to exceed the sum of: (i) the unpaid dollar amount of the fees and expenses of professionals retained by the Debtor or a Committee, if any, to the extent (A) incurred or accrued prior to the occurrence of a Termination Event and remaining unpaid and (B) provided for under the Cash Collateral Budget, <u>plus</u> (ii) the dollar amount of the fees and expenses of the professionals retained by the Debtor's estate to the extent incurred or accrued after the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 (the "<u>Post-Termination Event Professional Fee Cap</u>"), in each of (i) and (ii) to the extent allowed by the Court at any time, whether by interim order, procedural order, or otherwise, <u>plus</u> (b) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court plus any interest at the statutory rate. Prior to the payment of such fees and expenses from the amount available under the Carve Out, such professionals shall first apply any retainers held by such professional to their allowed fees and expenses. Nothing herein shall constitute a waiver of any right of the Secured Parties to object to fees and expenses of any professionals or to challenge any assertion that any amount of the fees and

expenses remain unpaid. Except to the extent of and in consideration of the Carve Out, subject to entry of the Final Order, (i) no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Secured Parties, the Prepetition Collateral, or the Collateral pursuant to Section 506(c) of the Bankruptcy Code or similar principal of law; and (ii) the "equities of the case" exception under Section 552(b) of the Bankruptcy Code is waived as to the Secured Parties, the Prepetition Collateral, and the Collateral.

23. <u>Modification of Stay</u>. The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Secured Parties to: (i) receive payments to be made by the Debtor to SBW and/or the Bond Trustee for and on behalf of the Bondholders, (ii) apply, allocate, or make payments from any of the funds or accounts maintained by the Secured Parties in accordance with the terms of the Bond Documents or the SBW Documents, as applicable, and (iii) take any action expressly authorized or contemplated by this Interim Order.

24. <u>Preservation of Rights</u>. If any or all of the provisions of this Interim Order are at any time, modified, vacated or stayed, such stay, modification, or vacation shall not affect the validity, extent, priority, and enforceability of any lien, priority, or other benefit conferred under this Interim Order prior to such stay, modification, or vacation.

25. <u>Binding Effect</u>. This Interim Order shall be binding on all creditors and parties in interest in this Chapter 11 Case, including, but not limited to, the Debtor and any successors thereto, any Chapter 11 or Chapter 7 trustee that is appointed or elected in this case; <u>provided</u>, <u>however,</u> that this Interim Order is without prejudice to the rights of any party in interest including

20

a Chapter 11 trustee or Chapter 7 trustee (other than the Debtor) to challenge the validity, amount, perfection, priority, extent, or enforceability of the Bond Claim or the SBW Claim or the prepetition security interests of the Secured Parties or to commence any other cause of action or claim against the Secured Parties (any and all claims and causes of action against the Secured Parties, including, but not limited to, any challenge to the validity, amount, perfection, priority, extent, or enforceability of the Bond Claim, the SBW Claim or the prepetition security interests of the Bond Trustee or SBW, a "Challenge"), so long as any Challenge is made on or before the date that is sixty (60) days from the entry of the Interim Order (the "Challenge Period"), after which Challenge Period all Challenges shall be deemed finally and conclusively barred; provided further that if one or more Challenges are timely made under this paragraph and properly filed, then except for such Challenges timely made, all potential Challenges are hereby deemed forever waived and relinquished. Nothing in this Interim Order shall be deemed to confer standing on any Committee or any other non-Debtor party-in-interest to commence a Challenge, and such Committee or other non-Debtor party in interest shall be required to move for standing and satisfy the applicable standard for obtaining standing to pursue estate causes of action.

26.    No Competing Liens. Except as set forth herein, the Debtor shall not grant liens on, or security interests in, the Prepetition Collateral or the Collateral to any other party, pursuant to Section 364 of the Bankruptcy Code or otherwise, without the consent of the Secured Parties.

27.    Reservation of Rights. Except as provided in this Interim Order, neither the Debtor nor the Secured Parties waive any of its rights under the Bankruptcy Code, any applicable law, the Bond Documents or the SBW Documents, including, without limitation, the right of the Debtor or the Secured Parties at any time to seek any relief (or to oppose any such relief) under

21

the Bankruptcy Code, or the right of the Debtor or the Secured Parties to exercise any of its rights and remedies under the Bankruptcy Code at any time.

28.     _Further Relief_. Nothing herein shall (i) preclude the Secured Parties from seeking any other relief that it may deem appropriate, including relief from the automatic stay; or (ii) prevent the Secured Parties from asserting at some later time that its liens and security interests in the Prepetition Collateral are not being adequately protected.

29.     _No Control_. Nothing in this Interim Order shall cause the Secured Parties to be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person," "managing agent," or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtor, notwithstanding its consent to this Interim Order or its extension of financial accommodations of any type, kind, or nature under this Interim Order.

30.     _No Third Party Beneficiaries_. Except as expressly provided herein, no rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary except for the Bondholders, as set forth herein.

31.     _Effectiveness_. The rights and obligations of the parties under this Interim Order shall be effective and enforceable as of the Petition Date. This Interim Order shall be deemed effective immediately and, for the avoidance of doubt, Bankruptcy Rule 6004(h) shall not apply hereto. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, extent, priority, or enforceability of any obligations incurred prior to the actual receipt of written

22

notice by the Secured Parties of the effective date of such reversal, modification, vacatur, or stay, or (ii) the validity, extent, or enforceability of the liens and claims granted hereunder.

32.    <u>Notices</u>. All notices, requests, demands, waivers, and other communications required or permitted to be given under this Interim Order shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by email with a next-day or overnight mail or delivery, or (c) sent by facsimile, with a confirming phone message or call to the addressee:

      (a)    If to the Debtor to:

            The Prospect-Woodward home d/b/a Hillside Village Keene
            Attn: Toby Shea
            95 Wyman Road
            Keene, NH 03431
            tshea@onepoint-partners.com

with a copy sent contemporaneously by email to:

            Polsinelli PC
            Attn: Jeremy Johnson
            600 Third Avenue, 42nd Floor
            New York, NY 10016
            Jeremy.johnson@polsinelli.com

      (b)    If to the Bond Trustee to:

            UMB Bank, N.A.
            Attn: Virginia A. Housum
            120 Sixth Street South, Suite 1400
            Minneapolis, MN 55403
            Virginia.housum@umb.com

with a copy sent contemporaneously by email to:

            Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
            Attn: Daniel S. Bleck, Esq.
            One Financial Center
            Boston, MA 02111
            Dsbleck@mintz.com

79516956.9

(c)    If to SBW:

       Savings Bank of Walpole
       Attn: Amy L. Lehr
       84 Marlboro Street, P.O. Box 744
       Keene, NH 03431

with a copy sent contemporaneously by email to:

       Devine Millimet
       11 Amherst Street
       Manchester, NH 03101
       Cpowell@devinemillimet.com

33.    <u>Notice of Final Hearing</u>. The Debtor shall, within two (2) business days after entry of this Interim Order, mail a notice of the entry of this Interim Order, together with a copy of the Motion and notice of the Final Hearing, to the Notice Parties.

34.    <u>Final Hearing; Objections</u>. A final telephonic hearing to consider the Motion will be held on **September [●], 2021 at [●] (prevailing Eastern Time)** before the Honorable United States Bankruptcy **[●]**, in the United States Bankruptcy Court for the District of New Hampshire. Any party desiring to object to the relief sought in the Motion on a final basis shall file a written objection with the Court on or before **September [●], 2021 at [●] (prevailing Eastern Time)** and shall contemporaneously serve that objection on the Notice Parties.

Dated: _____, 2021
Concord, New Hampshire

                               _____
                               UNITED STATES BANKRUPTCY JUDGE

79516956.9

## Schedule A

**Cash Collateral Budget**

8/30/2021

**Hillside Village Keene**
13 Week Cash Flow (8/30/2021 - 11/26/2021)                                                                                                                                            **13 WEEKS**

| Budget (B) / Actual (A) Friday Week Ending Week Number | B 9/3/2021 1 | B 9/10/2021 2 | B 9/17/2021 3 | B 9/24/2021 4 | B 10/1/2021 5 | B 10/8/2021 6 | B 10/15/2021 7 | B 10/22/2021 8 | B 10/29/2021 9 | B 11/5/2021 10 | B 11/12/2021 11 | B 11/19/2021 12 | B 11/26/2021 13 | Budget 8/30 - 11/26 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Activity** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Independent Living | $197,551 | $244,339 | $57,186 | $20,795 | $197,551 | $244,339 | $57,186 | $10,398 | $10,398 | $197,551 | $244,339 | $57,186 | $20,795 | **$1,559,613** |
| Assisted Living | $22,420 | $27,730 | $6,490 | $2,360 | $22,420 | $27,730 | $6,490 | $1,180 | $1,180 | $22,420 | $27,730 | $6,490 | $2,360 | **$177,000** |
| Memory Care | $26,710 | $33,036 | $7,732 | $2,812 | $26,710 | $33,036 | $7,732 | $1,406 | $1,406 | $26,710 | $33,036 | $7,732 | $2,812 | **$210,870** |
| Other | $2,755 | $3,408 | $798 | $290 | $2,755 | $3,408 | $798 | $145 | $145 | $2,755 | $3,408 | $798 | $290 | **$21,753** |
| **Subtotal: Operating Receipts** | **$249,436** | **$308,513** | **$72,206** | **$26,257** | **$249,436** | **$308,513** | **$72,206** | **$13,129** | **$13,129** | **$249,436** | **$308,513** | **$72,206** | **$26,257** | **$1,969,236** |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll | $136,123 | $0 | $136,123 | $0 | $136,123 | $0 | $136,123 | $0 | $136,123 | $0 | $136,123 | $0 | $136,123 | **$952,861** |
| Payroll Taxes & Employee Benefits | $62,965 | $0 | $62,965 | $0 | $62,965 | $0 | $62,965 | $0 | $62,965 | $0 | $62,965 | $0 | $62,965 | **$440,758** |
| General & Administrative | $28,613 | $9,538 | $9,538 | $9,538 | $28,613 | $9,538 | $9,538 | $9,538 | $0 | $28,613 | $9,538 | $9,538 | $9,538 | **$171,678** |
| Plant Operations/Maintenance | $9,058 | $9,058 | $9,058 | $9,058 | $9,058 | $9,058 | $9,058 | $9,058 | $0 | $9,058 | $9,058 | $9,058 | $9,058 | **$108,697** |
| Utilities | $11,798 | $11,798 | $11,798 | $11,798 | $9,756 | $9,756 | $9,756 | $9,756 | $0 | $12,168 | $12,168 | $12,168 | $12,168 | **$134,886** |
| Environmental Services | $653 | $653 | $653 | $653 | $653 | $653 | $653 | $653 | $0 | $653 | $653 | $653 | $653 | **$7,833** |
| Food & Beverage | $14,401 | $14,401 | $14,401 | $14,401 | $14,401 | $14,401 | $14,401 | $14,401 | $0 | $14,401 | $14,401 | $14,401 | $14,401 | **$172,815** |
| Resident Services | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $0 | $750 | $750 | $750 | $750 | **$9,000** |
| Health Care | $365 | $365 | $365 | $365 | $365 | $365 | $365 | $365 | $0 | $365 | $365 | $365 | $365 | **$4,382** |
| Assisted Living | $1,110 | $1,110 | $1,110 | $1,110 | $1,110 | $1,110 | $1,110 | $1,110 | $0 | $1,110 | $1,110 | $1,110 | $1,110 | **$13,324** |
| Assisted Living Memory Care | $146 | $146 | $146 | $146 | $146 | $146 | $146 | $146 | $0 | $146 | $146 | $146 | $146 | **$1,757** |
| Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| PILOT | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Management Fee | $0 | $0 | $32,891 | $0 | $0 | $0 | $0 | $32,891 | $0 | $0 | $0 | $32,891 | $0 | **$98,673** |
| Reimbursed Wages | $0 | $9,279 | $0 | $9,279 | $0 | $9,279 | $0 | $9,279 | $0 | $9,279 | $0 | $9,279 | $0 | **$55,676** |
| **Subtotal: Operating Disbursements** | **$265,983** | **$57,099** | **$279,799** | **$57,099** | **$263,941** | **$55,057** | **$244,866** | **$87,948** | **$199,088** | **$76,545** | **$247,278** | **$90,360** | **$247,278** | **$2,172,341** |
| 5% Contingency | $13,299 | $2,855 | $13,990 | $2,855 | $13,197 | $2,753 | $12,243 | $4,397 | $9,954 | $3,827 | $12,364 | $4,518 | $12,364 | **$108,617** |
| **Net Cash from Operations** | **($29,846)** | **$248,559** | **($221,583)** | **($33,697)** | **($27,702)** | **$250,703** | **($184,903)** | **($79,217)** | **($195,914)** | **$169,064** | **$48,871** | **($22,672)** | **($233,385)** | **($311,722)** |
| **Non-Operating Activity** | | | | | | | | | | | | | | |
| Scheduled Capex | $0 | $0 | $0 | $6,000 | $0 | $0 | $0 | $6,000 | $0 | $0 | $0 | $0 | $1,000 | **$13,000** |
| Capex | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | **$13,000** |
| Neil Ackley | $0 | $0 | $0 | $0 | $0 | $5,000 | $0 | $0 | $0 | $0 | $5,000 | $0 | $0 | **$10,000** |
| Simpson, Gumpertz & Heger | $0 | $0 | $0 | $0 | $0 | $5,000 | $0 | $0 | $0 | $0 | $5,000 | $0 | $0 | **$10,000** |
| Entrance Fee Refunds | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Subtotal: Non-Operating Activity** | **$1,000** | **$1,000** | **$1,000** | **$7,000** | **$1,000** | **$11,000** | **$1,000** | **$7,000** | **$1,000** | **$1,000** | **$11,000** | **$1,000** | **$2,000** | **$46,000** |
| **Net Cash from Operations and Non-Operating Activity** | **($30,846)** | **$247,559** | **($222,583)** | **($40,697)** | **($28,702)** | **$239,703** | **($185,903)** | **($86,217)** | **($196,914)** | **$168,064** | **$37,871** | **($23,672)** | **($235,385)** | **($357,722)** |

8/30/2021

**Hillside Village Keene**
**13 Week Cash Flow (8/30/2021 - 11/26/2021)**                                                                                                                                    **13 WEEKS**

| Budget (B) / Actual (A) | B | B | B | B | B | B | B | B | B | B | B | B | B | Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Friday Week Ending | 9/3/2021 | 9/10/2021 | 9/17/2021 | 9/24/2021 | 10/1/2021 | 10/8/2021 | 10/15/2021 | 10/22/2021 | 10/29/2021 | 11/5/2021 | 11/12/2021 | 11/19/2021 | 11/26/2021 | 8/30 - 11/26 |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Weeks |
| **Adequate Protection Payments** | | | | | | | | | | | | | | |
| Bondholders | $0 | $75,000 | $0 | $0 | $0 | $75,000 | $0 | $0 | $0 | $0 | $75,000 | $0 | $0 | **$225,000** |
| Savings Bank of Walpole | $0 | $5,000 | $0 | $0 | $0 | $5,000 | $0 | $0 | $0 | $0 | $5,000 | $0 | $0 | **$15,000** |
| Administrative Fees | $0 | $10,000 | $0 | $0 | $0 | $10,000 | $0 | $0 | $0 | $0 | $10,000 | $0 | $0 | **$30,000** |
| **Subtotal: Adequate Protection Pmts** | $0 | $90,000 | $0 | $0 | $0 | $90,000 | $0 | $0 | $0 | $0 | $90,000 | $0 | $0 | **$270,000** |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| Polsinelli | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $145,000 | $0 | $0 | $0 | $0 | $145,000 | **$290,000** |
| OnePoint | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $70,000 | **$70,000** |
| Hinckley Allen | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $60,000 | $0 | $0 | $0 | $0 | $60,000 | **$120,000** |
| SilverBloom Consulting | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $30,000 | $0 | $0 | $0 | $0 | $30,000 | **$60,000** |
| AC Communications | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $15,000 | $0 | $0 | $0 | $0 | $10,000 | **$25,000** |
| Donlin Recano (Claims Administration) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $50,000 | $0 | $0 | $0 | $0 | $10,000 | **$60,000** |
| United States Trustee | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $7,849 | $0 | $0 | $0 | $0 | $0 | **$7,849** |
| Atkins Callahan | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,500 | $0 | $0 | $0 | $0 | $4,500 | **$9,000** |
| **Subtotal: Restructuring Costs** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $312,349 | $0 | $0 | $0 | $0 | $329,500 | **$641,849** |
| **Beginning Unrestricted Cash Balance** | $2,950,000 | $2,919,154 | $3,076,713 | $2,854,130 | $2,813,433 | $2,784,731 | $2,934,435 | $2,748,531 | $2,349,966 | $2,153,052 | $2,321,116 | $2,268,986 | $2,245,314 | **$2,950,000** |
| **Ending Unrestricted Cash Balance** | $2,919,154 | $3,076,713 | $2,854,130 | $2,813,433 | $2,784,731 | $2,934,435 | $2,748,531 | $2,349,966 | $2,153,052 | $2,321,116 | $2,268,986 | $2,245,314 | $1,680,429 | **$1,680,429** |
| *Net Cash Increase (Decrease)* | *($30,846)* | *$157,559* | *($222,583)* | *($40,697)* | *($28,702)* | *$149,703* | *($185,903)* | *($398,566)* | *($196,914)* | *$168,064* | *($52,129)* | *($23,672)* | *($564,885)* | *($1,269,571)* |

## **Schedule B**

The Debtor shall be in compliance with the following sections of the Bond Documents:

1. Section 4.11 of the Loan and Security Agreement relating to compliance with regulatory requirements.
2. Section 5.1 of the Loan and Security Agreement relating to corporate existence, maintenance of property, etc.
3. Sections 5.2 and 5.5 of the Loan and Security Agreement relating to preservation of exempt status and securities law status.
4. Section 5.22 of the Loan and Security Agreement relating to insurance.
5. Section 5.34 of the Loan and Security Agreement relating to environmental laws.

79516956.9