UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|   |   |   |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| The Prospect-Woodward Home, | ) ) | Case No. 21-10523-BAH |
|  | ) Hearing Date: TBD |  |
| Debtor. | ) Hearing Time: TBD ) |  |

**SAVINGS BANK OF WALPOLE'S
MOTION TO ESTABLISH SECURED AND PRIORITY CLAIM**

The creditor, Savings Bank of Walpole ("SBW"), files this Motion to Establish Secured and Priority Claim pursuant to, *inter alia*, 11 U.S.C. §§ 503(b), 506(a) and 507(b) and Federal Rules of Bankruptcy Procedure Rule 3012 and in support thereof states as follows:

**INTRODUCTION**

1. This matter comes before the Court via a Chapter 11 Petition filed on August 30, 2021 (the "Petition Date"), by The Prospect-Woodward Home (the "Debtor"). Pursuant to the previously entered Final Cash Collateral Order (defined below), SBW has an allowed secured claim and a superpriority claim in an amount to be determined. SBW now moves for such a determination to enforce its rights under the Final Cash Collateral Order, 11 U.S.C. §§ 503(b) and 507(b) and pursuant to the pending Third Amended Chapter 11 Plan, Doc. No. 426 (the "Plan") now set for hearing on May 5, 2022 (subject to its confirmation).

**JURISDICTION AND VENUE**

2. The Court has jurisdiction over this matter under 28 U.S.C. §§157 and 1334.

3. Venue of this case and proceeding is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

4. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B), (K), and (O).

5. SBW assents to the entry of final orders by this Court.

6. The statutory precedent for the relief requested herein is found at, *inter alia*, 11 U.S.C. §§506. The Court's authority to make the determinations requested hereby is also found under the Federal Rules of Bankruptcy Procedure, Rule 3012(a)(1) and (2).[1]

## FACTUAL BACKGROUND AND CASE SUMMARY

7. SBW offers the following factual background and procedural status. Other facts may be introduced herein below as necessary.

SBW's Claims:

8. SBW has a secured claim in the amount of $1,876,289.39. Proof of Claim, ECN-18 (the "SBW Proof"); *see also* Final Order (I) Authorizing the Debtor to Use Cash Collateral; (II) Granting Adequate Protection; and (III) Granting Related Relief, Doc. No. 236, ¶¶(G)(v) (p. 4/27), 10, 11, 12 (the "Final Cash Collateral Order") (allowing SBW's claim including certain prepetition costs/expenses as well as replacement liens and a superpriority claim).

9. SBW timely filed the SBW Proof on December 20, 2021. As stated in the SBW Proof, the Debtor is indebted to Claimant in connection with a loan transaction in which SBW loaned funds pursuant to various loan documents. The loan documents include the Intercreditor Agreement dated April 22, 2019 (SBW Proof, Exhibit A) by, between and among, inter alia, The Prospect-Woodward Home, the Bond Trustee, and SBW on or about April 22, 2019 as well as that certain Promissory Note (SBW Proof, Exhibit B); Construction Loan Agreement (SBW Proof, Exhibit C); Security Agreement (SBW Proof, Exhibit D); Commitment Letter (SBW Proof, Exhibit E); Assignment of Purchase and Sale Agreement (SBW Proof, Exhibit F); Disbursement Request

---

[1] Federal Rule of Bankruptcy Procedure Rule 3012 provides as follows:
(a) Determination of Amount of Claim. On request by a party in interest and after notice – to the holder of the claim and any other entity the court designates – and a hearing, the court may determine:

(1) the amount of a secured claim under § 506(a) of the Code; or

(2) the amount of a claim entitled to priority under § 507 of the Code

2

and Authorization (SBW Proof, Exhibit G); Statement of Finance Charges (SBW Proof, Exhibit H); and Errors and Omissions Agreement (SBW Proof, Exhibit I), all of which are dated April 22, 2019 (collectively referred to hereinafter as the "Loan Documents").

        10.     The SBW Proof is secured via the above-referenced Loan Documents including, without limitation, the Security Agreement (SBW Proof, Exhibit D), and certain filings at the New Hampshire Secretary of State's office including, as shown in Exhibit K to the SBW Proof, certain "UCC Form 1" filings memorializing the Claimant's secured position as against "gross receipts." "Gross receipts" is defined as:

> All receipts, revenues, income and other moneys received by or on behalf of Debtor, including, but without limiting the generality of the foregoing, revenues derived from the ownership or operation of its facilities, including insurance and condemnation proceeds with respect to such facilities or any portion thereto, and all rights to receive the same, whether in the form of accounts, accounts receivable, entrance fees for residents and future residents, including those entrance fees held in Debtor's Entrance Fee Redemption Account of the Bond Fund established under the Loan Agreement and Mortgage (Security Agreement) dated as of June 1, 2017, between the Debtor and the New Hampshire Health and Education Facilities Authority, contract rights or other rights, and the proceeds of such rights, and whether now owned or held or hereafter coming into existence; excluding, however, gifts, grants, bequests, donations and contributions heretofore or hereafter made and designated or specified by the granting authority, donor or maker thereof as being for specific purposes inconsistent with the payment of debt service or expenses and the income derived therefrom to the extent required by such designation; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacement, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

*See also* Security Agreement (Exhibit D to SBW Proof); UCC Financing Statements (Exhibit K to SBW Proof).

        11.     In that the above-referenced Intercreditor Agreement (SBW Proof, Exhibit A) also memorializes the Claimant's secured claim including as to "Shared Collateral" and "Control

3

Collateral" in accordance with, *inter alia*, §2.1(d)(iii) thereof, reference is also made to all public filings of record at the Secretary of State's office and/or the Registry of Deeds which further memorialize and support the Claimant's secured claim. *See generally* Intercreditor Agreement, Exhibit A to the SBW Proof.

12. On September 24, 2021, the Court issued the Final Cash Collateral Order allowing the Debtor to use cash collateral and requiring that the Debtor provide adequate protection to SBW's interests in the collateral. *See* Final Cash Collateral Order, ¶12; *see also* Interim Order (I) Authorizing Use of Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief dated September 3, 2021 (Doc. No. 108)(the "Interim Cash Collateral Order"). The Final Cash Collateral Order is discussed in more detail herein below.

The Intercreditor Agreement and Related Agreements:

13. The above-mentioned Intercreditor Agreement figures significantly in this bankruptcy proceeding. It is discussed in the Interim Cash Collateral Order and the Final Cash Collateral Order as well as in the Plan. It describes the relationship between the various parties thereto, including the "Institution," i.e., the Debtor, the Bond Trustee (as successor to the Authority) and SBW. It also describes SBW's role as the "Construction Completion Lender," in which capacity it provided financing to fund the completion of the construction of the Debtor's facility.

14. The Intercreditor Agreement provided that:

> The Institution now desires to incur Alternate Debt to finance the completion of the construction of the Project, in the form of a line of credit from the Construction Completion Lender in an amount up to $3,000,000, in accordance with the terms of the Construction Loan Agreement. The Alternate Debt will be secured by a security interest in Gross Receipts (including but not limited to the Entrance Fees), which will be entitled to a parity position with the Authority's existing security interest in Gross Receipts, in accordance with Section 5.21 of the Loan Agreement. . . . The Parties hereto agree that, with respect to the Shared Collateral (as hereinafter defined), the

4

>sharing of proceeds and the Shared Collateral by the Intercreditor Secured Parties shall be in the terms set forth herein.

Intercreditor Agreement, p. 1.

15. Section 2.1 of the Intercreditor Agreement describes the "Pari Passu Rights Against Shared Collateral." Under §2.1(a) of the Intercreditor Agreement, "[a]ll amounts owing with respect to the Secured Obligations shall be secured by the Shared Collateral with pari passu priority without distinction as to whether some Secured Obligations are then due and payable and other Secured Obligations are not then due and payable, all in accordance with the priorities established in this §2."

16. The duties and obligations of the parties with regard to Shared Collateral and the pari passu priority without distinction referenced in §2.1 of the Intercreditor Agreement likewise applies to all amounts received as a result of a right of setoff pursuant to 2.1(b). Intercreditor Agreement, §2.1(b).

17. Sections 2.1(d)(iii) of the Intercreditor Agreement provide as follows:

>iii. Each Intercreditor Secured Party may act as a collateral agent for each of the other Intercreditor Secured Parties for the limited purpose of acting on behalf of each other Intercreditor Secured Party with respect to any Shared Collateral consisting of any Certificated Security, Instrument, Investment Property, Deposit Accounts (each as defined in the UCC), cash and any other Shared Collateral as to which a first priority security interest shall or may be perfected through possession or control by a secured party or any agent therefor (the "Control Collateral") for the limited purpose of perfecting (or increasing the rights of each Intercreditor Secured Party with respect to) the security interests of each Intercreditor Secured Party on the Control Collateral. Each Intercreditor Secured Party hereby (i) accepts such appointment, and (ii) agrees to hold any Control Collateral in its possession or control (or in the possession or control of its agents or bailees) as control agent for the benefit of each other Intercreditor Secured Party and any successor or permitted assignee of any Intercreditor Secured Party solely for the purpose of perfecting the security interest granted to such parties in such Control Collateral, in accordance with and subject to the terms and conditions of this

Agreement….

18. Sections 2.1(f) of the Intercreditor Agreement provides as follows:

> (f) Exercise of Setoff Rights. Notwithstanding anything to the contrary contained herein, the exercise of setoff rights (without regard to the source or basis of any such setoff rights) by any Intercreditor Secured Party in respect of any Shared Collateral, including any Proceeds or Net Proceeds therefrom, shall be subject to the terms of this Agreement, specifically including the provisions of Section 2.1(b) hereof, and shall be for the shared benefit of the Intercreditor Secured Parties.

19. Pursuant to Section §7.4, the Intercreditor Agreement "SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW HAMPSHIRE (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF)." *Id*. (capitalization in the original).

The Bond Trustee's Setoff of the Debtor's Assets:

20. At the meeting of creditors pursuant to 11 U.S.C §341 on or about October 5, 2021, the Debtor disclosed that the Bond Trustee setoff certain funds referenced by the Debtor as current assets as of the Petition Date as disclosed in its "Schedule A/B Assets," Doc. No. 243, on file with the Court, including the accounts referenced at page 13/142 thereof at entries 3.12 (totaling $993,066.28) and 3.12 (totaling $2,580,588.50).

21. Upon inquiry by the undersigned counsel, the Bond Trustee later disclosed two setoffs. However, according to the Bond Trustee, the first occurred on March 17, 2021 in the amount of $1,731,672.90 and the second on July 6, 2021 in the amount of $2,580,610.51.

22. The Debtor has represented that it is not in possession of the "control" or other agreements relative to the setoff accounts and that, upon information and belief, only the Bond Trustee possesses those operative documents.

23. Other than the Bond Trustee's disclosure upon inquiry of the undersigned counsel,

6

the Bond Trustee had not previously disclosed the foregoing setoffs to SBW.

The Final Cash Collateral Order:

24. In the Final Cash Collateral Order (as in the Interim Cash Collateral Order), the above-referenced Intercreditor Agreement was a central topic. For example, at page 3, Section G of the Final Cash Collateral Order, it provides that "[t]he Debtor granted the Bond Trustee … a first priority security interest in Gross Receipts, as defined in and pursuant to the Indenture, subject only to the pari passu lien of SBW as set forth in that certain Intercreditor Agreement …." *See* Final Cash Collateral Order, p. 3. The Final Cash Collateral Order also provides that "[t]he Debtor granted SBW a valid and perfected first priority security interest in Gross Receipts … subject only to the pari passu lien of the Bond Trustee as set forth in the Intercreditor Agreement…"

25. As referenced above, the Court entered the Final Cash Collateral Order on September 24, 2021. Pursuant to the Final Cash Collateral Order, SBW has a superpriority administrative expense claim pursuant to 11 U.S.C. § 507(b) to the extent of any diminution in value of collateral. In this regard, the Final Cash Collateral Order provided as follows:

> Superpriority Claims. Pursuant to the Interim Order, as reaffirmed by this Final Order, as adequate protection for any Diminution, and solely to the extent of such Diminution, each Secured Party has superpriority administrative expense claims pursuant to Bankruptcy Code section 507(b) with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual (together, the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims are subject only to Prior Liens and the Carve Out and have priority, pursuant to Section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and are at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-

consensual lien, levy, or attachment.

Final Cash Collateral Order, ¶ 12.

26. On or about the Petition Date, the Debtor held "unrestricted cash" of no less than $2,893,091.00 as stated in connection with the Final Cash Collateral Order. Final Cash Collateral Order, (p. 27/27) (Exhibit A-Cash Collateral Budget).

27. The Debtor has used the collateral, however, the value of the collateral has not been adequately preserved. As of the end of this case, the Debtor has represented that the unrestricted cash will be completely depleted to $0.00.

28. Assuming that the Debtor's budgeted estimates are correct, as a result of the Debtor's use of cash collateral, the value of the collateral will have decreased from approximately $3 million to zero.

The *Proposed* Third Amended Plan (Doc No 426):

29. The currently pending Amended Chapter 11 Plan, Doc. No. 426, on file with the Court, is scheduled for hearing on May 5, 2022. It contemplates a resolution of SBW's claims through a negotiated settlement or litigation as proves necessary.[2] It establishes a reserve of $1,226,543.17 for the payment of SBW's claim including its claims for (i) recovery of amounts due as a result of diminution of SBW's cash collateral (ii) payment from the proceeds of the sale of the Debtor's assets to Covenant Living as a result of its security interest in the underlying assets and (iii) recovery of amounts due as a result of the Bond Trustee's setoff as referenced above. *See, e.g.*, Plan, Section II (A) (stating that "an administrative expense claim asserted by SBW shall be paid from the SBW Reserve if Allowed."); *Id.*, Section III (B)(3)(SBW Treatment, quoted *infra*); *Id.*, Section V (B)(4)(Contested Claim Reserve, quoted *infra*).

---

2 Irrespective of the results of the upcoming confirmation hearing as to the Plan, SBW's claims must nonetheless be determined.

8

30. The Plan as proposed provides for SBW's Class 3 claim as follows:

*Classification*. Class 3 consists of the SBW Secured Claim.

*Treatment*. Except to the extent that the Holder of the Allowed SBW Claim, the Bond Trustee, and the Debtor agree in writing to a different treatment of its Allowed SBW Claim, the Holder of the Allowed SBW Claim shall receive, in full and complete satisfaction, settlement, discharge, and release of, and in exchange for its Allowed SBW Claim :

    a. Payment, in Cash from the SBW Reserve of the amount the Bankruptcy Court determines that SBW is entitled to on account of its pari passu interest in the Purchase Price and/or the Excluded Assets to which its Lien applies; and/or

    b. Payment, in Cash, from the SBW Reserve of any other amount a court of competent jurisdiction determines that SBW may be entitled to, including any potential claim related to prepetition setoffs by the Bond Trustee; and/or

    c. Treatment as a General Unsecured Claim for the SBW Deficiency Claim.

*Id*., Section III(B)(3).

31. The Plan provides for a "Contested Claim Reserve" as follows:

On the Effective Date, the Debtor will establish the Contested Claim Reserve in the original amount of $10,118,514.15, which includes the SBW Reserve of $1,226,543.17 and Mechanics Lien Reserve of $8,891,970.98.

The SBW Reserve will be established because, at this time, it is unclear (a) to what extent the SBW Liens attach to the Excluded Assets and/or Purchase Price, (b) whether, and to what extent, SBW may have an Administrative Expense Claim pursuant to Bankruptcy Code section 507(b) and/or replacement liens as provided in the Final Cash Collateral Order, (c) whether, and to what extent, SBW may have a claim against the Bond Trustee related to prepetition setoffs and (d) whether the Bond Trustee has defenses to the foregoing or any counterclaims against SBW. To the extent that SBW's Liens do attach to the Excluded Assets and/or the Purchase Price (or a portion thereof),

9

> SBW would be entitled to the Pro Rata/pari passu amount of the
> Excluded Assets and/or the Purchase Price on which its Liens attach.
> The Debtor will continue to hold the SBW Reserve until the earlier of
> (a) resolution between the Bond Trustee and SBW as to the amount of
> SBW's claims, including the Allowed SBW Secured Claim, any
> Administrative Expense Claim asserted by SBW, and/or any claim
> asserted by SBW against the Bond Trustee for prepetition setoffs, or (b)
> a Final Order is entered by a court of competent jurisdiction as to a
> determination of the amount of SBW's claims; provided that any claim
> by SBW against the Bond Trustee for prepetition setoffs and any claim
> by the Bond Trustee must be brought within six (6) months of the
> Effective Date or shall be waived; provided further that upon the
> initiation and during the continuance of any action by either party, all
> defenses and counterclaims by such parties are preserved for assertion
> consistent with applicable rules and not otherwise waived. The Bond
> Trustee and SBW each reserve all rights under the Intercreditor
> Agreement, and the Final Cash Collateral Order, and nothing in the
> Plan shall be deemed to modify or otherwise affect such rights.

*Id.*, Section V (B)(4).

<u>The Sale of the Debtor's Assets:</u>

32.     The Debtor sold the majority of its assets to Covenant Living for $33 million dollar (the "Sale Proceeds"). Disclosure Statement, Doc. No. 427, Section III (G) (pp. 13-14/53).  The sale resulted in the transfer of numerous categories of assets to the successful bidder, Covenant Living, including "Assumed Contracts, including Residency Agreements and any rights of the Debtor in Entrance Fee and Option Deposits" as well as the Debtor's rights in certain endowments.  *Id*.

## DISCUSSION

<u>The Superpriority Claim:</u>

33.     As ordered by the Court. SBW possesses a superpriority claim to the extent of any diminution of its cash collateral.  SBW now seeks a determination of that claim pursuant to the Final Cash Collateral Order and the proposed Plan according to the applicable sections of the Code (including 11 U.S.C. §507(b)) and the Federal Rules of Bankruptcy Procedure as more fully stated above.  Although the extent of diminution appears in the record, SBW reserves the right to seek

further discovery on this issue, including as to the use and diminution of any post-petition assets falling within its security interest.

The Secured Claim:

34. SBW and the Bond Trustee dispute whether SBW's security interest attaches to the sale proceeds, even though, as explained above, the assets sold include contract rights. As stated above, SBW now seeks to have this Court address that issue and determine the amount of the claim as provided for in 11 U.S.C. §506 and Federal Rules of Bankruptcy Procedure Rule 3012.

35. SBW has sought more specific information with regard to the assets involved in the sale to Covenant in order to more precisely determine the amount of its secured claim. *See* Final Cash Collateral Order, ¶15 (requiring access to information). In this regard, prior submissions to the Court effectively provided no concrete information as to the allocation of sale proceeds among the assets purchased by Covenant, even though such an allocation was in fact contemplated by the APA, and no other meaningful information as to the value of those assets has been readily available. *See, e.g.*, Sale Motion [Doc. No. 10] (including the Asset Purchase Agreement which requires allocation of the purchase price to assets pursuant to section 2.7); Combined Plan, Doc. No. 336 (27-8/62) (reciting various categories of assets purchased by Covenant that fall within SBW's security interest including contracts and entrance fees); *Id*. (30/62) (providing no information as to cash on hand or accounts receivable both of which fall within SBW's security interest) Disclosure Statement, Doc. No, 427 (same). Although the Debtor very recently provided additional information subject to an NDA which is currently being evaluated, there has been insufficient time to arrange for a review of this new information. In any event, SBW anticipates that it will require discovery as to the type and value of assets sold in order to supplement the information recently provided by the Debtor.

36. The amount due from the Bond Trustee for its previously undisclosed setoff of funds that it apparently controlled is likewise part and parcel of this Court's determination of SBW's secured claim amount. Indeed, the Plan expressly reserves funds for payment of SBW's claims, including its setoff claim against the Bond Trustee. Thus, this controversy between SBW and the Bond Trustee will plainly affect the distribution of money in the Debtor's hands and should therefore be decided by this Court as a matter integral to the administration of the Estate.

37. SBW submits that the Bond Trustee's setoff represents a breach of the Bond Trustee's duty to SBW as well as a breach of the Intercreditor Agreement.

38. In this regard, "[u]nder New Hampshire law, '[a] breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract.'" *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343 (D.N.H. 2018) (quoting *Audette v. Cummings*, 165 N.H. 763, 767 (2013)); *Ellis v. Candia Trailers & Snow Equip., Inc.*, 164 N.H. 457, 467 (2012) (quoting 23 Williston on Contracts § 63:3, at 438-39 (4th ed.) and stating that "[a] breach is 'material' if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract."); *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 311 (D.N.H. 2012) (party alleging breach of contract must show "(1) that a valid, binding contract existed between the parties, and (2) that [the defendant] breached the terms of the contract"). In the instant matter, pursuant to the express terms of the Intercreditor Agreement, the Bond Trustee failed to notify SBW of the referenced setoffs or to provide SBW its appropriate share of the funds setoff.

39. The Bond Trustee's conduct likewise represents a breach of the Bond Trustee's duty to SBW as a collateral agent of SBW to the extent that it held assets subject to SBW's pari passu

interest as stated in the Intercreditor Agreement.

40. "A fiduciary relationship is a 'comprehensive term and exists wherever influence has been acquired and abused or confidence has been reposed and betrayed.'" *Peterboro Tool Co. v. People's United Bank*, 848 F. Supp. 2d 164, 170 (D.N.H. 2012) (quoting *Lash v. Cheshire Cnty. Sav. Bank*, 124 N.H. 435, 438 (1984)).  Put differently, "a fiduciary relationship exists when 'there has been a special confidence reposed in one who, in equity and in good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.'" *Rice v. Wal-Mart Stores, Inc.*, No. 02-390-B, 2003 U.S. Dist. LEXIS 17288, at *11 (D.N.H. Sept. 30, 2003) (quoting *Lash*, 124 N.H. at 439).  "A fiduciary relationship does not depend upon some technical relation created by, or defined in, law." *Schneider v. Plymouth State Coll.*, 144 N.H. 458, 462 (1999) (quoting *Lash*, 124 N.H. at 439).

41. In the instant matter, the Bond Trustee was bound to act in good faith in its treatment assets in which both the Bond Trustee and SBW possessed an interest—here, that interest being in "gross receipts."  Notwithstanding that obligation, the Bond Trustee setoff in excess of $4 million of funds but never informed SBW until approached by the undersigned counsel.  SBW submits that this conduct represents breach of contract and breach of fiduciary duty in connection with the Intercreditor Agreement as well as a breach of the implied duty of good faith and fair dealing.

**Request for Waiver of Memorandum of Law**:

42. In that relevant authority is cited herein and the movant requests discovery and further briefing of the matters raised by this motion, the Movant requests that the Court waive any requirement of a memorandum of law.

**WHEREFORE**, Savings Bank of Walpole hereby requests that this Honorable Court enter an order:

A. Scheduling a preliminary conference on this motion and the relief requested herein;

B. Setting a discovery and briefing schedule including a deadline by which Savings Bank of Walpole may amend this motion as may prove necessary;

C. Scheduling such other and further hearings as prove necessary;

D. Allowing Savings Bank of Walpole a superpriority claim to the full extent of the diminution of value of the collateral of Savings Bank of Walpole to be determined and paid from the SBW Reserve or the sale proceeds as appropriate;

E. Determining the amount of SBW's secured claim including as a result of the Bond Trustee's setoff of funds held involving the Debtor and ordering payment to Savings Bank of Walpole from the SBW Reserve or the sale proceeds as appropriate; and

F. Ordering such other and further relief to Savings Bank of Walpole as is just, equitable, and proper.

Respectfully submitted,

**SAVINGS BANK OF WALPOLE**

By its attorneys,

**DEVINE, MILLIMET & BRANCH PROFESSIONAL ASSOCIATION**

Dated:  May 4, 2022         By:   */s/ Charles R. Powell*
                                   Charles R. Powell, Esquire, #05507
                                   Devine, Millimet & Branch, P.A.
                                   111 Amherst Street
                                   Manchester, NH  03101
                                   603-669-1000
                                   cpowell@devinemillimet.com

## **CERTIFICATE OF SERVICE**

      I, Charles R. Powell III, Esq., do hereby certify that on the date referenced below, I served a copy of the foregoing and accompanying Certificate of Service *via* CM/ECF and/or United States First Class mail, postage pre-paid to all attorneys of record.

Dated:  May 4, 2022              By:   /s/ Charles R. Powell_____
                                               Charles R. Powell, Esquire, #05507
                                               Devine, Millimet & Branch, P.A.
                                               111 Amherst Street
                                               Manchester, NH 03101
                                               603-669-1000
                                               cpowell@devinemillimet.com